**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

RONALD S. HINES, D.V.M.,

     *Plaintiff*,

v.

JESSICA QUILLIVAN, D.V.M., in her
official capacity as President of the Texas
State Board of Veterinary Medical Examiners;
KEITH PARDUE, in his official capacity as
Vice President of the Texas State Board of
Veterinary Medical Examiners; SANDRA
"LYNN" CRINER, D.V.M., in her official
capacity as Secretary of the Texas State Board
of Veterinary Medical Examiners; MICHAEL
WHITE, D.V.M., in his official capacity as a
Member of the Texas State Board of Veterinary
Medical Examiners; SAMANTHA MIXON,
D.V.M., in her official capacity as a Member of
the Texas State Board of Veterinary Medical
Examiners; RANDALL SKAGGS, D.V.M., in
his official capacity as a Member of the Texas
State Board of Veterinary Medical Examiners;
CARLOS CHACON, in his official capacity as
a Member of the Texas State Board of
Veterinary Medical Examiners; SUE ALLEN,
L.V.T., in her official capacity as a Member of
the Texas State Board of Veterinary Medical
Examiners; and GEORGE ANTUNA, in his
official capacity as a Member of the Texas
State Board of Veterinary Medical Examiners,

     *Defendants*.

Civil Action No. 1:18-cv-155

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      It should not be illegal for veterinarians to give veterinary advice. This First Amendment challenge seeks to vindicate the free-speech rights of Plaintiff, Dr. Ronald Hines, and reverse a grave injustice done to him. Dr. Hines is a 75-year-old, Texas-licensed veterinarian. Between 2002 and 2012, Dr. Hines used the Internet to provide—often for free and sometimes for a small flat fee—veterinary advice to pet owners across the country and around the world. For many of these pet owners, Dr. Hines was the only available veterinarian.

2.      On March 25, 2013, the Texas State Board of Veterinary Medical Examiners (the "State Board") punished Dr. Hines for corresponding with pet owners, despite the absence of any allegation of harm. The State Board suspended his license, fined him, and forced him to retake the jurisprudence portion of the veterinary-licensing exam because Texas law forbids a veterinarian from giving individualized advice unless he or she has first physically examined the animal.

3.      Dr. Hines sued in this Court on April 18, 2013, challenging the State Board's actions under the First Amendment. *See Hines v. Alldredge*, No. 1:13-cv-56, 2014 U.S. Dist. LEXIS 194733 (S.D. Tex. 2014). This Court denied the State Board's Rule 12(b)(6) motion to dismiss the First Amendment claim, ruling that Dr. Hines's advice is a form of protected speech and hence that the State Board was required to carry its affirmative burden under heightened scrutiny of justifying its restrictions on his speech. On March 27, 2015, however, the U.S. Court of Appeals for the Fifth Circuit reversed on interlocutory review, holding that Dr. Hines's individualized veterinary advice was a form of occupational conduct, not speech, and hence the First Amendment did not apply. Dr. Hines's free-speech claims were thus dismissed, and final

judgment was entered against him and in favor of the State Board. *Hines v. Alldredge*, 783 F.3d 197, 201 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 534 (2015).

4.     On June 26, 2018, the Supreme Court issued its decision in *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"), holding that the First Amendment fully protects the speech of professionals, including professionals subject to occupational licensure. The *NIFLA* decision adopted the precise occupational-speech argument and case law that Dr. Hines proffered to the Fifth Circuit, but which that court rejected.

5.     Had the *NIFLA* decision existed when Dr. Hines appeared before the Fifth Circuit, the outcome of his appeal would have been different. The Court of Appeals would not have reversed the lower court's denial of the motion to dismiss. It would have affirmed. Dr. Hines's free-speech claims would have then been remanded, and the State Board would have had to carry its affirmative First Amendment burden, as described in *NIFLA*.

6.     Ordinarily, once a case is finished and the judgment is final, the plaintiff cannot refile the same lawsuit. There is an exception, however, when there has been an outcome-determinative change in constitutional law after a constitutional case is over. When that happens, the losing plaintiff in the original lawsuit may file the suit again to be able to exercise the rights that everyone else possesses.

7.     Based on the outcome-determinative change in free-speech law established by *NIFLA*, Dr. Hines now brings this second free-speech lawsuit challenging the State Board's continuing suppression of his individualized veterinary advice—a fully protected form of speech.

## JURISDICTION AND VENUE

8.      Dr. Hines brings this civil-rights lawsuit under the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

9.      Dr. Hines seeks declaratory and injunctive relief against the enforcement of the Texas Veterinary Licensing Act, Tex. Occ. Code §§ 801.001 *et seq.*; regulations promulgated under that Act, Tex. Admin. Code §§ 571.1 *et seq.*; and the practices and policies of the State Board, which deny his First Amendment right to communicate his opinions and advice on veterinary medicine to pet owners across the country and around the world without first having to perform physical examinations of those pet owners' animals.

10.      This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.      Venue lies in this Court under 28 U.S.C. § 1391(b).

## PARTIES

12.      Dr. Ronald S. Hines is a United States citizen and resides in Brownsville, Cameron County, Texas. In 2001, he created a Florida nonprofit corporation called 2nd Chance. This 501(c)(3) charity provided free treatment to animals. No one involved drew a salary. Dr. Hines created a website called www.2ndchance.info, which he still uses as a portal for providing veterinary information and advice. 2nd Chance no longer provides treatment to animals, and its primary project is now the website, for which Dr. Hines is the sole writer.

13.      Defendants, Jessica Quillivan, D.V.M., Keith Pardue, Sandra "Lynn" Criner, D.V.M., Michael White, D.V.M., Samantha Mixon, D.V.M., Randall Skaggs, D.V.M., Carlos Chacon, Sue Allen, L.V.T., and George Antuna, are members of the Texas State Board of Veterinary Medical Examiners. They are sued in their official capacities.

## FACTUAL ALLEGATIONS

### Dr. Hines's Veterinary Background

14.    Dr. Hines is a Texas-licensed veterinarian.

15.    Dr. Hines graduated from Texas A&M School of Veterinary Medicine in 1966. He also has a Ph.D. in microbiology from the Hebrew University in Jerusalem, Israel.

16.    In 1966, Dr. Hines enlisted in the United States Public Health Service. He was assigned to the Division of Research Resources at the National Institutes of Health ("NIH") in Bethesda, Maryland, where he maintained primate, dog, and rodent colonies for research.

17.    In 1977, Dr. Hines fell from a catwalk onto machinery at an NIH facility and sustained a serious spinal-cord injury. Although not fully paralyzed, Dr. Hines suffered permanent nerve damage, which has left him with lower-body numbness, caused problems with walking and his excretory functions, and rendered him highly susceptible to fatigue.

18.    In 1978, the Surgeon General of the United States awarded Dr. Hines the Public Health Service Commendation Medal.

19.    Dr. Hines retired from the Public Health Service in 1979 with a 100-percent disability rating. The Public Health Service and Veterans Administration regard him as unemployable due to disability.

20.    In 1980, Dr. Hines opened an animal hospital in San Antonio, which he equipped to accommodate his disabilities. He continued to operate this hospital until 1990, when he sold it because he could no longer physically tolerate the rigors of a busy practice.

21.    In 1989, Dr. Hines became a contract veterinarian at SeaWorld San Antonio, where he remained until 1992.

22.    In 1992, Dr. Hines moved to Sarasota, Florida, and practiced veterinary medicine there until returning to Texas in 2002.

### Dr. Hines Offers Veterinary Information and Advice Online

23.    In February 2002, Dr. Hines was effectively retired from veterinary medicine. His disabilities and advancing age made it too difficult to continue working in a conventional brick-and-mortar practice. From February 2006 until October 2007, he worked once a week at a Petco pet store administering vaccinations.

24.    In February 2002, Dr. Hines began to use his website, www.2ndchance.info, to post general articles that he had written about pet health and pet care. Since launching his website, he has posted over four hundred articles, all of which he makes available to the world for free. His only restriction is that others may not re-post his articles on other websites without his consent because he does not want to be construed as endorsing any website or any approach to veterinary medicine.

25.    Dr. Hines's articles cover typical household pets, such as cats and dogs, as well as more exotic animals and wildlife, which he has experience working with as a veterinarian for the NIH and SeaWorld.

26.    After launching his website in 2002, Dr. Hines was inundated with emails from across the country and around the world seeking his advice about specific animals. Dr. Hines quickly decided to use his website not only to disseminate his articles to the public, but also to provide veterinary advice to specific pet owners about their pets. This advice usually began with email and sometimes included telephone calls or real-time video chats using Skype.

27.    This veterinary advice not only provided advice to specific animal owners, but also gave Dr. Hines useful feedback on his general articles, enabling him to improve them, which

he does on a regular basis. This communication also allowed Dr. Hines to write new articles based on the interests of his readers.

28.     Because the animal owners to whom Dr. Hines provided advice are scattered across the country and around the world, and because Dr. Hines does not maintain a brick-and-mortar veterinary facility, he never physically examined the animals that were the subject of his advice.

29.     Dr. Hines always requested the complete medical records from the owner's local veterinarian. If none existed, he attempted when practicable to find the most qualified veterinarian in the client's area and urged that he or she have the pet examined physically. He has trusted veterinary colleagues around the world and throughout the United States to whom he referred these pets, and he asked that he receive a copy of the results of those examinations.

30.     There are many situations in which it is possible for a veterinarian to give useful advice to a pet owner via only electronic means and in which it would be needlessly expensive and time-consuming for the pet owner to bring the pet in for a physical examination.

31.     Veterinarians and pet owners routinely make cost-benefit decisions about whether treatment options make financial sense for the pet owner given the species at issue, the pet's age, its relationship to its owner, etc. For example, a pet owner and veterinarian could legally and ethically euthanize a hamster rather than opt for expensive treatment even though that decision would be illegal and unethical for a medical doctor and parent to make about a sick child.

32.     Dr. Hines received five basic types of correspondence from readers of his website: (1) email from people in parts of the world where there is no ready access to trustworthy veterinary care and for whom Dr. Hines, or someone like him, was their only realistic option; (2) email from people in the United States and overseas who had received conflicting diagnoses

from local veterinarians and who wanted Dr. Hines to offer his insights; (3) email from people in the United States and overseas who simply could not afford conventional veterinary care and whose pets would not get care without someone like Dr. Hines, who in such instances tried to find local veterinarians or a local Society for the Prevention of Cruelty to Animals to treat the animal for free; (4) email from distressed people, frequently the elderly, who had dying pets and simply wanted a sympathetic ear; and (5) email from veterinarians who wanted to consult Dr. Hines.

33.    For example, Dr. Hines corresponded with Scottish AIDS-relief workers living in rural Nigeria about the cat they brought with them from Scotland. This married couple did not have access to a qualified veterinarian, so they turned to Dr. Hines for help. Without Dr. Hines, or someone like him who could provide qualified veterinary advice online, this couple's family pet would not have had veterinary care.

34.    In another example, a respected veterinary facility in New York City diagnosed a cat as having leg weakness due to a blood clot. Upon reviewing the cat's records, Dr. Hines found inconsistencies and suggested the cat be examined by a specific veterinarian at the Animal Medical Center in Manhattan. That veterinarian discovered that the problem was a leg fracture, which was successfully treated.

35.    In another example, Dr. Hines helped a severely disabled New Hampshire resident. This man had lost both legs in an industrial accident and lived alone with his beloved dog. When the dog became ill, the man could not afford conventional veterinary care. Dr. Hines provided as much advice as he could and, when it became apparent that the dog required more care than Dr. Hines could responsibly provide online, he used his personal contacts in the veterinary community to find a vet willing to help the man in person for free.

36.    Additionally, pet owners often experience profound grief when their pets are incurably ill or die. Dr. Hines answered every email from grieving pet owners with empathy nurtured over a lifetime of service to people and their animals.

37.    In November 2003, Dr. Hines added a PayPal button to his website that allowed him to charge a flat fee of $8.95 for veterinary advice. He did this to screen out the minor requests and identify the more serious ones, which he believed would enable him to do the most good. This fee also helped cover the cost of maintaining his website.

38.    In September 2011, Dr. Hines raised the flat fee to $58, which he determined through trial and error produced the most interesting questions and gave him the opportunity to do the most good. Dr. Hines could have charged much more than a flat $58, but he did not want to.

39.    When it appeared to Dr. Hines that his fee was a burden to someone in need, he refunded it and charged nothing. He tried to provide help to everyone who wrote him, whether they could pay or not.

40.    In 2011, Dr. Hines had gross income from his website of $2,797.24. This was all he made despite devoting most of his time to correspondence with animal owners across the country and around the world.

41.    The most interesting cases, and the cases in which Dr. Hines believes he did the most good, involved addressing a pet's chronic health problem, identifying miscommunication between a pet owner and veterinarian, or helping a pet owner decide how to proceed when local veterinarians had provided conflicting diagnoses. In many cases, Dr. Hines consulted veterinary journals and did independent research to guide the pet owner.

42.     Dr. Hines discovered many times that pets had been prescribed an appropriate medication for their diagnosed condition, but that front-end staff had made errors in filling prescriptions or providing dosing instructions. In those cases, Dr. Hines sent the pet's owner copies of the FDA guidelines and the manufacturer's dosage information. He always suggested that the pet owner return to his or her primary veterinarian and politely ask that the primary veterinarian review the prescription to correct any possible errors.

43.     Often Dr. Hines could not assist a pet owner because an in-person examination was necessary, because time was of the essence in an emergency, or because he felt that the pet's current veterinary care was excellent and most reliable under the circumstances. In such instances, Dr. Hines refunded any payments made to him, did not provide veterinary advice, and explained to the pet owner that providing advice would be inappropriate under the circumstances.

44.     In many instances, Dr. Hines instructed a pet owner to take his or her pet to a veterinary hospital immediately because Dr. Hines recognized a serious or even life-threatening condition. Dr. Hines telephoned these pet owners, rather than relying on email, and urged them to take their pets to the hospital at once.

45.     Dr. Hines did not try to be a pet owner's primary veterinarian. He did not prescribe medication. His website contained a clear disclaimer explaining to pet owners the inherent limitations of online veterinary advice.

46.     Dr. Hines has never—and would never—advise a pet owner to take any action that would not otherwise be legal for the pet owner to take without Dr. Hines's advice.

47.     To Dr. Hines's knowledge, no pet owner has ever complained to him or to the State Board about veterinary advice that he provided online.

48.     Dr. Hines estimates that fifty percent of the pet owners he helped were residents of foreign countries, forty-five percent were residents of the United States outside of Texas, and five percent or less were residents of Texas.

49.     As far as he knows, the pet owners whom Dr. Hines helped who were not residents of Texas had no connection with Texas and their animals had no connection with Texas.

**Dr. Hines's Helpful Veterinary Advice Was a Crime**

50.     Under the Texas Veterinary Licensing Act, Dr. Hines was practicing "veterinary medicine" when he provided individualized veterinary advice, whether for free or for compensation, to animal owners with whom he communicated online about their specific animals. The Act defines the "practice of veterinary medicine" as providing veterinary advice, holding oneself out as qualified and willing to provide veterinary advice, using the term "veterinarian" to describe oneself, or charging for veterinary advice. Tex. Occ. Code § 801.002(5). Dr. Hines's advice via his website met all four criteria defining the "practice of veterinary medicine."

51.     Veterinarians are authorized to render veterinary advice only in the context of a formal veterinarian-client-patient relationship. Tex. Occ. Code § 801.351(a). A veterinarian-client-patient relationship exists where the veterinarian assumes responsibility for veterinary-medical judgments, possesses adequate knowledge of the animal to provide sound advice, and is readily available for follow-up care. *Id*.

52.     Texas law states that a veterinarian has "adequate knowledge" of an animal for the purposes of a veterinarian-client-patient relationship only if the veterinarian has recently examined the animal or visited the premises where it is kept. Tex. Occ. Code § 801.351(b).

53.     In 2005, a statutory amendment clarified that the requirements of a formal veterinarian-client-patient relationship apply to veterinary advice communicated via telephone or the Internet by forbidding such a relationship from arising "solely by telephone or electronic means." H.B. 1767, 2005 Leg., 79th Reg. Sess. (Tex. 2005) (codified as Tex. Occ. Code § 801.351(c)).

54.     The 2005 statutory amendment does not require that the recent physical examination relate to the subject of the veterinary advice for that advice to be lawfully communicated electronically. The statute simply requires that a veterinarian have performed an in-person physical examination of an animal before providing advice electronically.

55.     Violations of the Texas Veterinary Licensing Act are criminal offenses. Tex. Occ. Code § 801.504; *see also id.* §§ 801.451-61 (administrative penalties).

56.     The Texas Veterinary Licensing Act makes no exceptions for pet owners and their animals outside of Texas or outside of the United States. As a result, the requirement that Texas-licensed veterinarians offer advice only after a recent physical examination applies to those outside of Texas just as it applies to those living in Texas.

57.     The Texas Veterinary Licensing Act does not make any exception to the requirement of a recent physical examination for veterinary advice offered by Texas-licensed veterinarians in contexts in which there is no realistic alternative to the sort of online veterinary advice that Dr. Hines provided, such as when a pet owner has no access to in-person veterinary care or cannot afford it.

58.     For example, if a pet owner in Africa were to ask Dr. Hines for advice online because there is no qualified veterinarian locally, the Texas Veterinary Licensing Act requires that pet owner and that pet to go entirely without veterinary care rather than consult Dr. Hines.

59.     The 2005 amendment to the Veterinary Licensing Act adopted a 2003 amendment to the Model Veterinary Practice Act of the American Veterinary Medical Association, which is the largest professional umbrella group for veterinarians in the United States.

60.     When the American Veterinary Medical Association amended its Model Veterinary Practice Act in 2003, there was no evidence—and there is none now—that online veterinary advice was harming animals in Texas or anywhere else at rates beyond what would be expected in a brick-and-mortar practice setting.

61.     When the American Veterinary Medical Association amended its Model Veterinary Practice Act in 2003, there was no evidence—and there is none now—that online veterinary advice was resulting in consumer fraud in Texas or anywhere else at rates beyond what would be expected in a brick-and-mortar practice setting.

62.     When the American Veterinary Medical Association amended its Model Veterinary Practice Act in 2003, there was no evidence—and there is none now—that online veterinary advice was resulting in public-health emergencies in Texas or anywhere else at rates beyond what would be expected in a brick-and-mortar practice setting.

63.     When the American Veterinary Medical Association amended its Model Veterinary Practice Act in 2003, there was evidence that online veterinary information and advice, as well as the ability to obtain prescription medications for pets via the Internet, was causing pet owners to visit conventional brick-and-mortar veterinary practices less often.

64.     The primary purpose and effect of the American Veterinary Medical Association's amendment to its Model Veterinary Practice Act was to protect the financial interests of conventional brick-and-mortar veterinary practices by making it more difficult for pet owners to consult online sources of veterinary advice.

65.     When Texas amended the Veterinary Licensing Act in 2005 to forbid veterinarians from creating a veterinarian-client-patient relationship solely by electronic means, the state had no evidence that online veterinary advice was harming animals in Texas or anywhere else at rates beyond what would be expected in a brick-and-mortar practice setting.

66.     When Texas amended the Veterinary Licensing Act in 2005 to forbid veterinarians from creating a veterinarian-client-patient relationship solely by electronic means, the state had no evidence that online veterinary advice was resulting in consumer fraud in Texas or anywhere else at rates beyond what would be expected in a brick-and-mortar practice setting.

67.     When Texas amended the Veterinary Licensing Act in 2005 to forbid veterinarians from creating a veterinarian-client-patient relationship solely by electronic means, the state had no evidence that online veterinary advice was resulting in public-health emergencies in Texas or anywhere else at rates beyond what would be expected in a brick-and-mortar practice setting.

68.     When Texas amended the Veterinary Licensing Act in 2005 to forbid veterinarians from creating a veterinarian-client-patient relationship solely by electronic means, the state had no evidence that online veterinary advice was adversely affecting the reputation of Texas's veterinary-licensing scheme or the perceived quality of care provided by Texas-licensed veterinarians.

### The State Board Punished Dr. Hines for Communicating Individualized Advice to Pet Owners Without First Performing a Physical Examination

69.     Ten years after Dr. Hines launched his website, the State Board informed him on March 19, 2012, that, based on an investigation of his website, he was violating the statutory prohibition on providing veterinary advice without a formal veterinary-client-patient relationship.

70.     On information and belief, Dr. Hines believes that the State Board launched an investigation after he contacted the New Hampshire Veterinary Board chairperson hoping to find *pro bono* help for an impoverished double amputee in that state who needed assistance caring for his dog. Dr. Hines presumes that the chairperson caused the State Board in Texas to become aware of Dr. Hines's use of the Internet to provide advice to pet owners.

71.     Dr. Hines was astonished to learn that he had been breaking the law by helping hundreds of pet owners across the country and around the world.

72.     Dr. Hines immediately stopped providing veterinary advice electronically because he feared punishment.

73.     On June 13, 2012, the State Board met and determined that Dr. Hines had in fact violated Texas law by offering to provide veterinary advice without first performing a physical examination of the animal.

74.     On June 26, 2012, the State Board sent Dr. Hines a proposed order that would punish him for providing veterinary advice electronically without first physically examining the animal. *See* Exhibit 1 (Letter and Proposed Order from State Board).

75.     The proposed order sought to impose a $1,000 fine, a one-year suspension of his Texas veterinary license, and a requirement that he retake the jurisprudence portion of the veterinary-licensing exam. *Id*.

76.     The statement of facts in the proposed order does not identify any person from anywhere in the world who complained to the State Board about any problem arising from Dr. Hines's rendering veterinary advice online without performing a recent physical examination. *Id*.

77.    The statement of facts in the proposed order does not identify any harm that any animal anywhere in the world suffered because Dr. Hines rendered veterinary advice electronically without performing a recent physical examination. *Id*.

78.    Here are just some of the websites accessible to anyone in the world with Internet access (including in Texas) that provide veterinary advice without a recent physical examination:

    a.   http://www.justanswer.com/pet;

    b.   http://allcreaturesnutrition.com/home;

    c.   http://www.tufts.edu/vet/nutrition;

    d.   http://www.vmth.missouri.edu;

    e.   http://www.petpoisonhelpline.com;

    f.   http://www.pearl.com/sip/veterinarians;

    g.   http://www.vetinfo.com/vets/answers;

    h.   http://www.vetlive.com;

    i.   http://www.wilnerveterinaryconsult.com;

    j.   http://petnutritionconsulting.com;

    k.   http://www.vet.cornell.edu/FHC;

    l.   http://www.rainbowbridgevet.com/Phone_Consult.html;

    m.  http://wizofpaws.net/laurie_coger-consultation.aspx;

    n.   http://www.askariel.com/product-p/72.htm; and

    o.   http://vet.tufts.edu/fhsa/veterinary_specialties/pain_clinic.html.

79.    The State Board has no evidence that any animal anywhere in Texas or around the world had been harmed by an animal owner's reliance on veterinary advice obtained electronically without a recent physical examination.

80.    On July 6, 2012, Dr. Hines asked the State Board to extend the response date to the proposed order so that he could retain counsel and make an informed decision. This request was granted.

81.    On September 27, 2012, Dr. Hines's counsel met with the State Board in an informal conference in which the State Board once again proposed punishment. The State Board reduced the proposed fine from $1,000 to $500 but kept the one-year suspension of his license and the requirement that he retake the jurisprudence exam.

82.    The State Board informed Dr. Hines in writing and through counsel that failure to accept the proposed punishment for his past speech online would automatically result in formal administrative procedures for imposing punishment.

83.    On November 1, 2012, Dr. Hines signed the State Board's order imposing punishment on him for his past speech online. *See* Exhibit 2 (Dr. Hines's Signed Agreed Order).

84.    On March 25, 2013, at its next regular meeting, the State Board ratified the punishment of Dr. Hines and his punishment commenced. *Id*.

85.    The State Board's punishment of Dr. Hines's past speech in the form of veterinary advice communicated online consisted of: (1) the suspension of his license for one year (although that suspension was probated, which means that he was still able to practice); (2) the requirement that he retake the jurisprudence portion of the veterinary licensing exam; and (3) a $500 fine. *Id*.

86.    On Tuesday, March 26, 2013, Dr. Hines retook the jurisprudence portion of the veterinary licensing exam. That same day, the State Board notified Dr. Hines that he passed the exam.

87.    On Tuesday, March 26, 2013, Dr. Hines paid the $500 fine.

17

88.    The probated suspension of his license ended on March 26, 2014, and Dr. Hines's license reverted to its previous status. He is presently authorized to practice veterinary medicine in Texas without having to perform any further act or seek additional permission or licensure.

**Dr. Hines Sued and Prevailed Against a Motion to Dismiss**

89.    Dr. Hines ceased his online and telephonic communications with pet owners immediately upon learning that the State Board believed those communications to be illegal. Dr. Hines has continued to refrain from such communications since the State Board imposed its punishment for his prior communications.

90.    Although he accepted his punishment for his past communications, Dr. Hines believed, and still believes, that he has a free-speech right under the First Amendment to communicate individualized veterinary advice to pet owners without first examining the animal in person or visiting the premises where it is kept.

91.    On April 23, 2013, in the Brownsville Division of the U.S. District Court for the Southern District of Texas, Dr. Hines sued the members of the State Board in their official capacities. *See* Exhibit 3 (Original Complaint (2013).

92.    The docket number for Dr. Hines's original 2013 lawsuit was 1:13-cv-00056. The case was assigned to the Honorable Hilda G. Tagle.

93.    The complaint in the original 2013 lawsuit consisted of four counts. Counts I and II alleged that the State Board's prohibition on Dr. Hines's online veterinary advice violated his free-speech rights under the First Amendment. Counts III and IV alleged violations of equal protection and substantive due process under the Fourteenth Amendment. Ex. 3 at 21-27.

94.     Dr. Hines did not challenge the punishment that the State Board imposed for his past communications. Instead, he sought declaratory and injunctive relief to prevent the State Board from continuing to stop his communications in the future. Ex. 3 at 27-28.

95.     On May 20, 2013, the State Board filed a Rule 12(b)(6) motion to dismiss all four counts for failure to state a claim. *See* Exhibit 4 (State Board's Motion to Dismiss).

96.     The State Board's May 20, 2013 Motion to Dismiss argued that Dr. Hines's online advice was a form of occupational conduct, not a form of protected speech, and hence that the regulation of his communications with pet owners was subject only to rational-basis review, not heightened scrutiny under the First Amendment:

> It is settled that a professional regulation is not subject to strict scrutiny under the First Amendment merely because it restricts some kind of speech. Instead, [the challenged statute] is an ordinary exercise of the state's police power to protect the public health and safety by regulating professional conduct. Because [the statute] and implementing regulations challenged by Dr. Hines are subject to the state's legitimate control over the veterinarian profession, the restrictions he complains of are valid under a rational basis review.

Ex. 4 at 6; *see also id.* at 7-19.

97.     On June 10, 2013, Dr. Hines filed a memorandum in opposition to the State Board's motion to dismiss, arguing that individualized professional advice is a form of speech protected by the First Amendment:

> In 2010, the Supreme Court unanimously rejected the exact argument that the Board advances here—that individualized advice is conduct, not speech. *Humanitarian Law Project*, 130 S. Ct. at 2723-24 (rejecting any constitutional distinction between "general or unspecialized knowledge" and specific "advice derived from 'specialized knowledge'"). In *Humanitarian Law Project*, a retired judge, a doctor, and several nonprofits brought a First Amendment challenge to a federal statute that prohibited material assistance to designated foreign terrorists. *Id*. at 2713-14. The statutory definition of material assistance included individualized advice, which forbade the plaintiffs from providing Kurdish and Sri Lankan groups designated as terrorist with technical and legal advice about how to resolve their grievances nonviolently. *Id*. at 2713-14. The State Department argued that the First Amendment did not apply because

19

individualized technical and legal advice for specific people—as opposed to general opinions for the public at large—were a form of conduct that, at most, only incidentally affected speech. *Id*. at 2723. In rejecting the proposition that advice is conduct rather than speech, the Supreme Court held that the government cannot declare speech to be conduct when the purported "conduct triggering coverage under the statute consists of communicating a message." *Id*. at 2724.

But that is exactly what triggered the punishment of Dr. Hines: communicating a message to pet owners. He communicated with pet owners across the country and around the world by writing to them and by reading what they wrote to him. Compl. ¶ 26-30, 35-40. He did not *do* anything. *Id*. ¶ 39. He performed no procedures and prescribed no medication. *Id*. If individually tailored advice to designated terrorists is protected speech and not conduct, then veterinary advice to pet owners is also protected speech, not conduct.

Exhibit 5 at 8-9 (Dr. Hines's Response in Opposition to State Board's Motion to Dismiss); *see also id.* at 10-14 (footnote omitted).

98.    On July 1, 2013, the State Board filed a response repeating its position that Dr. Hines's correspondence with pet owners was a form of occupational conduct wholly outside the First Amendment and subject only to rational-basis review: "Dr. Hines has failed to state a claim under the First Amendment because [the challenged statute] is a neutral regulation of professional conduct that is not subject to scrutiny under the First Amendment." Exhibit 6 at 1 (State Board's Reply in Support of Motion to Dismiss); *see also id.* at 2-9.

99.    On February 11, 2014, Judge Tagle denied the Motion to Dismiss as to Dr. Hines's First Amendment claims (counts I and II of the original complaint), holding that his online correspondence was a form of protected speech, that the challenged regulations were subject to First Amendment scrutiny, and that that scrutiny placed an affirmative burden on the State Board:

In sum, the Court finds that the First Amendment applies to the professional regulations at issue in this case, and that the regulations, as applied to Hines's professional speech, are subject to heightened scrutiny and

must be shown to be "reasonable." Against this legal backdrop, the Court finds that Hines has alleged sufficient facts, taken as true, to state a plausible claim for relief."

Exhibit 7 at 8 (Judge Tagle's Order Denying Motion to Dismiss).

100.    On March 27, 2014, Judge Tagle granted the State Board's unopposed motion to certify the denial of the motion to dismiss to the Fifth Circuit for interlocutory review. The certified question of law as to the First Amendment concerned whether Dr. Hines's communications with pet owners were a form of speech protected by the First Amendment or a form of occupational conduct subject to only rational-basis review: "The order [denying the motion to dismiss] involves a controlling question of law, namely whether Hines's professional speech is entitled to some measure of First Amendment protection and, if so, what level of scrutiny the regulations at issue must survive to be upheld." Exhibit 8 at 2 (citation omitted) (Judge Tagle's Order Granting State Board's Unopposed Motion for Interlocutory Appeal).

**The Fifth Circuit Reverses, Holding That Dr. Hines's Communications Were Not Speech**

101.    On April 17, 2014, the Fifth Circuit granted the State Board's unopposed motion for interlocutory review. Exhibit 9 (Fifth Circuit's Order Granting Motion for Interlocutory Appeal).

102.    On June 16, 2014, the State Board filed its opening brief on appeal, arguing that the motion-to-dismiss ruling should be reversed as to Dr. Hines's free-speech claims because his individualized veterinary advice was a form of occupational conduct not subject to First Amendment scrutiny: "Put simply, speech undertaken on behalf of a client, within a professional-client relationship, is akin to conduct that may be regulated without First Amendment scrutiny." Exhibit 10 at 15 (State Board's Opening Brief on Appeal).

103.    On July 21, 2014, Dr. Hines filed his response on appeal, arguing that the motion-to-dismiss ruling should be upheld as to his free-speech claims because his individualized veterinary advice was a form of protected speech, not occupational conduct outside the First Amendment: "The Board's broad [conduct argument] is wrong because the Supreme Court unanimously held in *Holder v. Humanitarian Law Project* that individualized technical advice is a form of speech—not a form of conduct—and that the First Amendment applies to that speech." Exhibit 11 at 23-24 (citation omitted) (Dr. Hines's Response Brief on Appeal).

104.    On August 21, 2014, the State Board filed its reply, reiterating its position that the "physical examination requirement is a professional-conduct regulation subject to rational-basis review notwithstanding any incidental effect on Hines's 'speech.'" Exhibit 12 at 3 (State Board's Reply Brief on Appeal).

105.    On January 6, 2015, the Fifth Circuit heard oral argument before a three-judge panel.

106.    On March 27, 2015, the Fifth Circuit issued an opinion reversing Judge Tagle's denial of the Motion to Dismiss, holding that Dr. Hines's communications with pet owners were a form of occupational conduct, not a form of protected speech:

> The challenged state law prohibits the practice of veterinary medicine unless the veterinarian has first physically examined either the animal in question or its surrounding premises. It does not regulate the content of any speech, require veterinarians to deliver any particular message, or restrict what can be said once a veterinary-client-patient relationship is established.

Exhibit 13 at 5-6 (Fifth Circuit Opinion).

107.    On June 25, 2015, Dr. Hines petitioned the Supreme Court for a writ of certiorari. His question presented was: "Are restrictions on occupational speech subject to First Amendment scrutiny or only rational-basis review." Exhibit 14 at i (Petition for Writ of Certiorari).

108.     On October 19, 2015, the State Board filed its brief in opposition to the petition for a writ of certiorari.

109.     On November 3, 2015, Dr. Hines filed his reply in support of his petition for a writ of certiorari.

110.     On November 30, 2015, the Supreme Court denied Dr. Hines's petition for certiorari.

111.     With the November 30, 2015 denial of the petition for a writ of certiorari, the judgment against Dr. Hines and in favor of the State Board based on the complaint he filed on April 18, 2013, became final.

112.     For the past five years and to his great regret, Dr. Hines has been prohibited from providing individualized veterinary advice electronically.

## On June 26, 2018, in *NIFLA v. Becerra*, the Supreme Court Adopted Dr. Hines's Position That the First Amendment Protects Occupational Speech

113.     On June 26, 2018, the Supreme Court issued its opinion in *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), invalidating certain notice requirements in the California Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act ("FACT Act").

114.     The FACT Act regulated clinics that primarily provided services to pregnant women. *NIFLA*, 138 S. Ct. at 2368-69. Licensed clinics were required "to notify women that California provides free or low-cost services, including abortions, and give them a phone number to call." *Id.* at 2368. Unlicensed clinics were required "to notify women that California has not licensed the clinics to provide medical services." *Id.*

115.     The Supreme Court reaffirmed the proposition that "[c]ontent-based regulations 'target speech based on its communicative content.'" *Id.* at 2371 (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)). The Court then held that the FACT Act notice

requirement for licensed clinics "is a content-based regulation of speech" because "such notices 'alter[ed] the content of . . . speech'" by requiring licensed clinics to say things they would not otherwise say. *Id.* (quoting *Riley v. Nat'l Federation of the Blind, N.C., Inc.*, 487 U.S. 781, 795 (1988)).

116.    The Supreme Court observed that some courts have recognized a category of professional speech outside the First Amendment, including the Ninth Circuit, which had issued the decision under review in *NIFLA*:

> Although the licensed notice is content-based, the Ninth Circuit did not apply strict scrutiny because it concluded that the notice regulates "professional speech." 839 F. 3d at 839. Some Courts of Appeals have recognized "professional speech" as a separate category of speech that is subject to different rules. *See, e.g.*, *King v. Governors of New Jersey*, 767 F. 3d 216, 232 (CA3 2014); *Pickup v. Brown*, 740 F. 3d 1208, 1227–1229 (CA9 2014); *MooreKing v. County of Chesterfield*, 708 F. 3d 560, 568–570 (CA4 2014). These courts define "professionals" as individuals who provide personalized services to clients and who are subject to "a generally applicable licensing and regulatory regime." *Id.* at 569; *see also*, *King*, *supra* at 232; *Pickup*, *supra* at 1230. "Professional speech" is then defined as any speech by these individuals that is based on "[their] expert knowledge and judgment," *King*, *supra*, at 232, or that is "within the confines of [the] professional relationship," *Pickup*, *supra*, at 1228. So defined, these courts except professional speech from the rule that content-based regulations of speech are subject to strict scrutiny. *See King*, *supra* at 232; *Pickup*, *supra* at 1253–1256; *Moore-King*, *supra* at 569.

*Id.* at 2371.

117.    The Supreme Court then rejected the proposition that "professional speech" is outside the protections of the First Amendment: "But this Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'" *Id.* at 2371-72.

118.    The Supreme Court noted that, contrary to recognizing "professional speech" as outside the First Amendment, its precedents have protected such speech:

> [T]his Court has applied strict scrutiny to content-based laws that regulate the noncommercial speech of lawyers, *see Reed*, 576 U. S., at ___ , 135 S. Ct., at 2228 (discussing *Button*, *supra*, at 438, 83 S. Ct. 328); *In re Primus*, 436 U.S. 412, 432, 98 S. Ct. 1893, 56 L.Ed.2d. 417 (1978); professional fundraisers, *see Riley*, 487 U.S., at 798, 108 S. Ct. 2667; and organizations that provided specialized advice about international law, *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28, 130 S. Ct. 2705, 177 L.Ed.2d. 355 (2010).

*Id.* at 2374.

119.    The Supreme Court recognized only two forms of speech by professionals that receive less than full First Amendment protection: (1) the words necessary to secure informed consent immediately before a surgical procedure; and (2) the compelled disclosure of purely factual, non-controversial information. *Id.* at 2372-73.

120.    The *NIFLA* opinion establishes that the Fifth Circuit was incorrect as a matter of constitutional law when it reversed the denial of the State Board's motion to dismiss Dr. Hines's free-speech claims. *NIFLA* establishes that the State Board's regulation of Dr. Hines's individualized veterinary advice is a content-based restriction on fully protected speech.

121.    Had the *NIFLA* decision existed when Dr. Hines appeared before the Fifth Circuit, that court would have reached a different outcome. Had the Fifth Circuit concluded that the State Board's regulation of Dr. Hines's individualized veterinary advice was a content-based restriction on fully protected speech, the Fifth Circuit would have affirmed the denial of the motion to dismiss Dr. Hines's free-speech claims. On remand, the State Board would have had to carry its affirmative First Amendment burden.

122.    With respect to Dr. Hines's original First Amendment challenge to the State Board's regulation of his individualized veterinary advice, *NIFLA* represents an outcome-determinative change in free-speech law.

**Texas Does Not Require Doctors to Perform an In-Person Physical Examination When Providing Individualized Medical Advice to Human Patients**

123.    In May 2017, Governor Abbott signed Senate Bill 1107, which amended Chapter 111 of the Texas Occupations Code. S.B. 1107, 85th Leg., Reg. Sess. (Tex. 2017) (codified as Tex. Occ. Code § 111.005).

124.    Chapter 111 of the Texas Occupations Code establishes the law governing telemedicine for health professionals, including medical doctors.

125.    Before S.B. 1107 was passed, section 111.004(5) of the Texas Occupations Code authorized the Texas Medical Board—the entity regulating medical doctors—to promulgate telemedicine rules that "require a face-to-face consultation between a patient and a physician providing telemedicine medical service within a certain number of days following an initial telemedicine medical service only if the physician has never seen the patient." S.B. 1107 (note deletions to Tex. Occ. Code § 111.004).

126.    S.B. 1107 removed Texas Occupations Code § 111.004(5) entirely, thus stripping the Texas Medical Board of the authority to require an in-person examination as part of a telemedical service.

127.    S.B. 1107 authorizes doctors to engage in telemedicine with human patients without any in-person physical examination or preexisting relationship if the telemedicine consultation occurs via a secure real-time, audio-visual service like FaceTime or Skype and advises the patient about appropriate follow-up.

128.    S.B. 1107 authorizes doctors to write prescriptions based solely on a telemedical interaction and without any in-person physical examination.

129.    Texas-licensed doctors practice telemedicine under S.B. 1107 without ever conducting in-person examinations. Nationwide telemedicine providers that operate lawfully in

Texas include Doctors on Demand, Zipnosis, and Teledoc. Countless in-state medical providers, such as Dell Children's Hospital in Austin, offer telemedical services.

130.    Texas's telemedicine regulations apply to a wide range of healthcare providers, not just doctors. These providers include physician assistants, nurse practitioners, psychologists, social workers, and dieticians. Tex. Occ. Code § 111.0004(5).

131.    S.B. 1107 represents a legislative judgment that doctors and other healthcare providers can safely and responsibly give individualized advice without first performing an in-person examination.

**Injury to Dr. Hines**

132.    On March 19, 2012, Dr. Hines stopped providing veterinary advice via his website after the State Board informed him that it believed he was violating the Veterinary Practice Act. He has posted an explanation on his website stating that Texas law forbids him from providing online advice and that Texas has formally punished him for providing online veterinary advice in the past.

133.    From March 19, 2012, until the present, the enforcement actions of the State Board have impaired Dr. Hines's ability to provide individualized veterinary advice to the readers of his website, despite countless requests for such advice.

134.    These impairments intensified on March 25, 2013, when the State Board formally punished Dr. Hines for providing such advice by fining him $500, suspending his license, and requiring him to retake the jurisprudence portion of the veterinary-licensing exam.

135.    These impairments of Dr. Hines's speech were ratified by the U.S. Court of Appeals for the Fifth Circuit, which ruled on March 27, 2015, that his advice was a form of occupational conduct, not speech protected by the First Amendment, and that there is a rational

basis for prohibiting him from offering advice without first examining an animal in person, as required by the Veterinary Practice Act.

136.    Because the State Board and the U.S. Court of Appeals for the Fifth Circuit agree that the State Board may constitutionally prohibit Dr. Hines from providing individualized veterinary advice electronically, and because the State Board has already punished him for such advice, Dr. Hines has a credible fear that he would be punished again—and more severely—were he to provide individualized veterinary advice electronically.

137.    Dr. Hines would immediately resume providing individualized veterinary advice solely electronically, as he did before 2012, including via a real-time video chat service, if it were declared legal to do so.

138.    Dr. Hines continues to maintain his website and he continues to receive inquiries from pet owners across the country and around the world seeking his individualized veterinary advice.

139.    Many of these inquiries are from low-income Americans or people overseas who cannot afford or do not have access to qualified veterinarians.

140.    Many of the animals that are the subject of these inquiries from readers across the country and around the world will get no veterinary care because Texas has forbidden Dr. Hines from providing such care electronically.

141.    Some of the animals that are the subject of these inquiries from readers across the country and around the world are inadvertently being given an incorrect dose of a prescription medication—an error that Dr. Hines sees frequently and is easily able to identify so that the pet owner can return to his or her primary veterinarian to have the dose adjusted. These animals will continue to be given the wrong dose of medicine because Texas has forbidden Dr. Hines from

communicating with pet owners about their animals, which in turn will prevent those pet owners from being able to communicate effectively with their primary veterinarians.

142.    Animals and pet owners across the country and around the world who otherwise would have been able to benefit from Dr. Hines's veterinary advice online are harmed because Texas refuses to allow him to communicate his knowledge to willing pet owners electronically unless he has performed a physical examination, which is impossible as a practical matter due to the location of the animals, his physical disabilities, and the fact that he does not have a facility in which to perform such examinations.

143.    But for Texas's prohibition on electronic veterinary advice, Dr. Hines would help pet owners in the situations described in the previous four paragraphs, as well as other situations. This inability to help animals in need interferes with the core professional and moral objectives of his life.

144.    This free-speech lawsuit is not a challenge to the State Board's March 25, 2013 Order punishing Dr. Hines for his communication in the past. Dr. Hines does not seek a judgment from this Court that would nullify or otherwise alter the State Board's past punishment or compel the State Board to return the $500 fine.

145.    This free-speech lawsuit is not seeking to reopen and undo the final judgments of either the U.S. Court of Appeals for the Fifth Circuit (Case No. 14-40403) or the U.S. District Court for the Southern District of Texas (Case No. 1:13-cv-00056) that were issued based on Dr. Hines's original complaint filed on April 18, 2013.

146.    Instead, this free-speech lawsuit seeks only prospective declaratory and injunctive relief from the date of this filing forward to prevent the State Board from punishing Dr. Hines again for providing individualized veterinary advice solely via electronic means.

147.    Following a change in the controlling case law, the proper vehicle for vindicating constitutional rights that were erroneously denied in a prior lawsuit is a new lawsuit, not a motion to reopen the prior case and alter the final judgment.

## CONSTITUTIONAL VIOLATIONS

### Count I: First Amendment—content-based speech regulation

148.    Paragraphs 1 through 148 are incorporated as though fully set forth herein.

149.    Dr. Hines's individualized veterinary advice consists of ideas, opinions, and guidance that he communicates based on his extensive education in veterinary medicine and microbiology, and his decades of professional experience.

150.    Dr. Hines's individualized veterinary advice is not related to securing informed consent immediately before a surgical procedure.

151.    Dr. Hines's individualized veterinary advice is not related to any state-mandated disclosure of purely factual, non-controversial information.

152.    Dr. Hines's individualized veterinary advice is a form of speech fully protected by the First Amendment, not a form of occupational conduct outside the First Amendment.

153.    Dr. Hines's individualized veterinary advice is a form of speech fully protected by the First Amendment, whether he charges for that advice or provides it for free.

154.    By forbidding Dr. Hines from giving pet owners individualized veterinary advice, the State Board is presently engaging in the content-based regulation of Dr. Hines's fully protected speech, not in the regulation of his occupational conduct.

155.    Protecting pet owners within Texas from the remote possibility that Dr. Hines—a state-licensed veterinarian with over 40 years of experience—may provide bad advice is not a compelling state interest.

156.    Protecting pet owners outside Texas from the remote possibility that Dr. Hines—a state-licensed veterinarian with over 40 years of experience—may provide bad advice is not a compelling state interest.

157.    Even if Texas possessed a compelling state interest in the suppression of Dr. Hines's fully protected speech, a blanket prohibition on his speech until he has physically examined the animal in question is not the least restrictive means of advancing that hypothetical compelling state interest.

158.    The State Board's suppression of Dr. Hines's fully protected speech cannot survive any degree of heightened scrutiny, strict or intermediate.

159.    By suppressing Dr. Hines's fully protected speech, the State Board is inflicting an ongoing irreparable harm on him, his readers, and their pets.

160.    Without declaratory and injunctive relief from this Court, that irreparable harm will continue indefinitely.

### Count II: First Amendment—content-based discrimination

161.    Paragraphs 1 through 161 are incorporated as though fully set forth herein.

162.    Dr. Hines's individualized veterinary advice consists of ideas, opinions, and guidance that Dr. Hines communicates based on his extensive education in veterinary medicine and microbiology, and his decades of professional experience.

163.    Dr. Hines's individualized veterinary advice is not related to securing informed consent immediately before a surgical procedure.

164.    Dr. Hines's individualized veterinary advice is not related to any state-mandated disclosure of purely factual, non-controversial information.

31

165.    Dr. Hines's individualized veterinary advice is a form of speech fully protected by the First Amendment, not a form of occupational conduct outside the First Amendment.

166.    Dr. Hines's individualized veterinary advice is a form of speech fully protected by the First Amendment, whether he charges for that advice or provides it for free.

167.    Texas allows medical doctors to provide individualized medical advice to human patients solely through electronic means (*i.e.* without first examining the patient in person), and this is true even if the patient, such as a baby, is not capable of communicating directly with the physician and must rely on a parent or guardian.

168.    Given that Texas does not require doctors to perform an in-person physical exam before providing individualized medical advice solely via electronic means, Texas is discriminating in favor of the protected professional speech of medical doctors and against the protected professional speech of veterinarians.

169.    The health and safety of humans is more important than the health and safety of animals. If Texas does not prohibit doctors from providing individualized medical advice solely via electronic means, Texas does not have a compelling state interest in prohibiting veterinarians from providing individualized veterinary advice solely via electronic means.

170.    Even if Texas hypothetically possessed a compelling state interest in the suppression of Dr. Hines's protected speech, a blanket prohibition on his speech until he has physically examined the animal is not the least restrictive means of advancing that interest, as evidenced by the less restrictive form of telemedicine regulation for medical services.

171.    The State Board's content-based discrimination in favor of medical speech and against Dr. Hines's veterinary speech cannot survive any degree of heightened scrutiny, strict or intermediate.

172.    By suppressing Dr. Hines's fully protected speech, the State Board is inflicting an ongoing irreparable harm on him, his readers, and their pets.

173.    Without declaratory and injunctive relief from this Court, that irreparable harm will continue indefinitely.

### Count III: Fourteenth Amendment Equal Protection

174.    Paragraphs 1 through 174 are incorporated as though fully set forth herein.

175.    Dr. Hines's individualized veterinary advice consists of ideas, opinions, and guidance that Dr. Hines communicates based on his extensive education in veterinary medicine and microbiology, and his decades of professional experience.

176.    If Dr. Hines were a medical doctor, he could provide individualized medical advice to human patients without performing an in-person examination.

177.    The health and safety of humans is more important than the health and safety of animals. If Texas does not prohibit doctors from providing individualized medical advice solely via electronic means, Texas does not have any interest in prohibiting veterinarians from providing individualized veterinary advice solely via electronic means.

178.    With respect to any plausible governmental interest—whether health and safety or consumer protection—Dr. Hines is similarly situated to a medical doctor in Texas insofar as he wants to provide individualized professional advice to animal owners without performing an in-person examination in the same way that medical doctors in Texas provide individualized professional advice without performing an in-person examination.

179.    There is no basis under any standard of review for allowing medical doctors to engage in telemedicine without performing an in-person examination but not allowing veterinarians to engage in telemedicine without performing an in-person examination.

33

180.    By subjecting Dr. Hines to unequal treatment without a legitimate justification, the State Board is inflicting an ongoing irreparable harm on him, his readers, and their pets.

181.    Without declaratory and injunctive relief from this Court, that irreparable harm will continue indefinitely.

**PRAYER FOR RELIEF**

A.    For entry of judgment declaring that Tex. Occ. Code § 801.351; Tex. Occ. Code §§ 801.401-02; Tex. Admin. Code Title 22, Part 24, § 573.27 (Rule of Professional Conduct involving "Honesty, Integrity and Fair Dealing"); and related regulations and practices promulgated or carried out under the Texas Veterinary Licensing Act are unconstitutional as applied and on their face to the extent that they prohibit Dr. Hines from providing veterinary advice solely through electronic means without first physically examining the animal that is the subject of that advice;

B.    For entry of a permanent prospective injunction enjoining Defendants from enforcing these unconstitutional statutes, regulations, and practices against Dr. Hines and others similarly situated;

C.    For an award of attorneys' fees and costs under 42 U.S.C. § 1988; and

D.    For such further legal and equitable relief as the Court may deem just and proper.


Dated: October 2, 2018                    Respectfully submitted,

                                          /s/ *Anya Bidwell*
                                          Anya Bidwell, Attorney-in-Charge
                                          Texas Bar No. 24101516
                                          Federal ID No. 3063390
                                          Jeffrey Rowes* (TX Bar No. 24104956)
                                          INSTITUTE FOR JUSTICE
                                          816 Congress Avenue, Suite 960
                                          Austin, TX 78701

Tel: (512) 480-5936
Fax: (512) 480-5937
Email: abidwell@ij.org
        jrowes@ij.org

Andrew Ward* (NY Bar No. 5364393)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: ahward@ij.org

*Attorneys for Plaintiff*

*\*Application pro hac vice to be filed*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2018, I electronically filed the foregoing Complaint

and accompanying exhibits with the Clerk of Court using the CM/ECF system.

I further certify that the foregoing Complaint and accompanying exhibits, and the

Summons in this civil action will be served upon the following via a process server:


Jessica Quillivan, DVM
Keith Pardue
Sandra "Lynn" Criner, DVM
Michael White, DVM
Samantha Mixon, DMV
Randall Skaggs, DVM
Carlos Chacon
Sue Allen, LVT
George Antuna
Texas State Board of Veterinary Medical Examiners
333 Guadalupe Street,
Tower III, Ste. 810
Austin, Texas 78701


/s/Anya Bidwell