United States District Court
Southern District of Texas

**ENTERED**
June 11, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| RONALD S. HINES, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. 1:18-CV-155 |
| § | |
| JESSICA QUILLIVAN, *et al.*, § | |
| § | |
| Defendants. § | |

## OPINION AND ORDER

Plaintiff Ronald S. Hines, a licensed veterinarian in Texas, seeks declaratory and injunctive relief to permit him to give medical advice to animal owners without having physically examined the animal or made medically appropriate and timely visits to the premises where the animal is kept, as Texas law requires. Hines challenges the law as violating his free speech rights under the First Amendment. In addition, because recent law changes in Texas allow medical doctors to provide care to human patients without a physical examination, Hines challenges the law applicable to veterinarians as violating his right to equal protection under the Fourteenth Amendment.[1]

The Board moved to dismiss Hines's lawsuit. (Motion to Dismiss, Doc. 25) A Magistrate Judge recommended dismissal as to Hines's First Amendment claim, and dismissal in part as to his Fourteenth Amendment cause of action. (Report and Recommendation, Doc. 30.) Both sides filed objections. After reviewing the record and the applicable law, the Court holds that the Defendants' Motion to Dismiss should be granted in its entirety.[2]

---

[1] Hines advances his claims against numerous members of the Texas State Board of Veterinary Medical Examiners. He sues them only in their official capacities. For convenience, the Court will refer to the defendants as the "Board".

[2] For convenience, the Court includes the adopted portions of the Report and Recommendation in this Opinion and Order.

I.   **Allegations and Procedural History**

A.   **Hines's Veterinary Career**

Hines is a Texas-licensed veterinarian who has worked at the National Institutes of Health, SeaWorld San Antonio, and private animal hospitals throughout his career. (Compl., Doc. 1, ¶¶ 16–22)  In 1977, he suffered a serious spinal cord injury that limited his ability to maintain an active veterinarian practice.  (*Id.* at ¶ 17)  Although accommodations and perseverance enabled Hines to continue his practice for over two decades despite his disability, by February 2002, Hines was "effectively retired from veterinary medicine." (*Id.* at ¶ 23)

At this point, Hines began publishing articles about "pet health and pet care" on a personal website. (*Id.* at ¶ 24)  The popularity of his articles led to him being "inundated with emails from across the country and around the world seeking his advice about specific animals." (*Id.*)  Hines began giving personalized medical advice to animal owners, by email, telephone calls and video conferencing. (*Id.*)  He alleges that most of his correspondence broke down into five categories: (1) people from overseas who had "no ready access to trustworthy veterinary care"; (2) animal owners who received conflicting diagnoses from local veterinarians and wanted his advice; (3) people who could not afford to take their animal to their local veterinarian; (4) "email from distressed people, frequently the elderly, who had dying pets and simply wanted a sympathetic ear"; and, (5) consultations from other licensed veterinarians. (*Id.* at ¶ 32)

Hines "did not prescribe medication" or attempt to serve as "a pet owner's primary veterinarian." (*Id.* at ¶ 45)  Hines admits that "he never physically examined the animals that were the subject of his advice." (*Id.*)  If an animal owner contacted him, Hines "always requested the complete medical records from the owner's local veterinarian." (*Id.* at ¶ 23)  "If none existed, he attempted when practicable to find the most qualified veterinarian in the client's area and urged that he or she have the pet examined physically." (*Id.* at ¶ 29)  He listed his key areas of help as: (1) diagnosing prescription errors; (2) helping animal owners recognize

serious or life-threatening conditions that required immediate assistance; (3) "identifying miscommunication" between an animal owner and veterinarian; (4) and/or "helping a pet owner decide how to proceed when local veterinarians had provided conflicting diagnoses." (*Id.* at ¶¶ 41–42) It is undisputed that Hines's conduct constituted veterinary care under Texas law.

In March 2012, the Board informed Hines that he violated the statutory prohibition on practicing veterinary medicine without a valid veterinarian-client-patient relationship. (*Id.* at ¶ 69) Under Texas law, "[a] person may not practice veterinary medicine unless a veterinarian-client-patient relationship exists." TEX. OCC. CODE § 801.351(a). As is relevant here, one of the statutory prerequisites for establishing a veterinarian-client-patient relationship is that the veterinarian must possess "sufficient knowledge of the animal to initiate at least a general or preliminary diagnosis of the animal's medical condition." *Id.* at § 801.351(a)(2). A veterinarian obtains sufficient knowledge by either "examining the animal, or making medically appropriate and timely visits to the premises on which the animal is kept." *Id.* at § 801.351(b) ("Examination Requirement"). State law further provides that "[a] veterinarian-client-patient relationship may not be established solely by telephone or electronic means." *Id.* at § 801.351(c). Violations of this statute are a class A misdemeanor. *Id.* at § 801.504. The Examination Requirement prohibits veterinarians from practicing what is referred to as telemedicine without having physically examined the animal or visited the premises where the animal is kept.

After receiving the Board's notice, "Hines immediately stopped providing veterinary advice electronically because he feared punishment." (Compl., Doc. 1, ¶ 72) He ultimately signed an agreed order through which he admitted wrongdoing, paid a fine, received a formal reprimand, and had his license suspended for one year, although the board converted his suspension to a probationary status. (Agreed Order, Doc. 1-2) He also agreed to re-take the jurisprudence exam. Having now taken and passed the exam, Hines "is presently authorized to practice veterinary medicine in Texas without having to perform any further act or seek additional permission or licensure." (Compl., Doc. 1, ¶ 88)

But Hines has ceased providing veterinary advice over email, phone, and/or videoconferencing, lest he again run afoul of the Texas statute. (*Id.* at ¶ 132) "Hines would immediately resume providing individualized veterinary advice solely electronically, as he did before 2012, including via a real-time video chat service, if it were declared legal to do so." (*Id.* at ¶ 137)

### B.    *Hines I*

In 2013, Hines sued the then-members of the Board in this Court, alleging that the Examination Requirement violated: (1) his First Amendment right to freedom of speech; (2) his equal protection rights under the Fourteenth Amendment; and (3) his substantive due process rights under the Fourteenth Amendment.  He sought declaratory and injunctive relief. The Board moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  The District Court denied the motion as to the First Amendment claim.  With respect to the equal protection and the substantive due process claims, the Court applied a rational basis review and concluded that the statute satisfied the standard: "[A]t a minimum, [it was] rational for the state to believe that requiring a physical examination of an animal to establish a veterinarian-client-patient relationship and allow a veterinarian to treat the animal would tend to prevent misdiagnosis, improper treatment, and the subsequent increased risk of zoonotic disease." *Hines v. Alldredge*, No. 1:13-CV-56, 2014 WL 11320417, at *6 (S.D. Tex. Feb. 11, 2014).

The Fifth Circuit reversed as to Hines's First Amendment claim, reasoning that the Examination Requirement constituted a content-neutral regulation of professional conduct:

> We begin – and end – our First Amendment analysis by recognizing the statute at issue in this case for what it is.  The challenged state law prohibits the practice of veterinary medicine unless the veterinarian has first physically examined either the animal in question or its surrounding premises.  It does not regulate the content of any speech, require veterinarians to deliver any particular message, or restrict what can be said once a veterinarian-client-patient relationship is established.

*Hines v. Alldredge*, 783 F.3d 197, 201 (5th Cir. 2015) (*Hines I*), *cert. denied*, 193 L.Ed.2d 426 (U.S. Nov. 30, 2015) (No. 14-1543).  The Examination Requirement fell "squarely" within

Texas's "broad power to establish standards for licensing practitioners and regulating the practice of professions." *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgm't Ass'n*, 505 U.S. 88, 108 (1992)). The Fifth Circuit also noted that "state regulation of the practice of a profession, even though that regulation may have an incidental impact on speech, does not violate the Constitution" and "denies the veterinarian no due First Amendment right." *Id.*

The Fifth Circuit affirmed the District Court's dismissal of Hines's equal protection and substantive due process claims. *Id.* at 201–02. On remand, the District Court entered final judgment in favor of the Board.

### C.     New Developments and New Lawsuit

After *Hines I*, two events ensued on which Hines premises the current lawsuit. First, in 2017, Texas amended its Occupations Code to allow medical doctors to treat humans by telemedicine.[3] Specifically, the law now provides that a medical doctor may establish "a valid practitioner-patient relationship" by telemedicine and need not physically examine the patient or make timely visits to the premises where the patient is domiciled. TEX. OCC. CODE § 111.005.[4] The statute regulating veterinary practice has remained unchanged in relevant aspects, meaning that while Texas law now allows medical doctors to establish a practitioner-patient relationship and provide medical advice by telemedicine, veterinarians still cannot do so.

Second, in 2018 the Supreme Court of the United States decided *National Institute of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361 (2018) ("*NIFLA*"), which affirmed that "professional speech" is not a separate category of speech, and that it receives the same protection as private speech.

Based on these events, Hines brought suit again. He alleges that *NIFLA* abrogated *Hines I* and breathes life into his cause of action based on the First Amendment. (Complaint, Doc. 1,

---

[3] The Court refers to physicians who provide medical care to humans as "medical doctors".

[4] If the medical doctor does not have a preexisting "practitioner-patient relationship" with the patient, the physician can use telemedicine to establish such a relationship by one of three specified methods. TEX. OCC. CODE § 111.005(a)(3)(A)-(C).

¶¶ 4–7) He also alleges that by allowing medical doctors to provide telemedicine to humans, Texas law violates the Equal Protection Clause of the Fourteenth Amendment by not allowing veterinarians to do the same with respect to animals. (*Id.* at ¶¶ 175–181)

## II. Standard of Review

As the parties filed timely objections to the Report and Recommendation, the Court conducts a de novo review. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3). Defendants seek dismissal because Hines does not state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion, a court considers only the allegations in the complaint and must accept them as true, viewing them in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). This plausibility standard requires the plaintiff to plead facts sufficient to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The pleadings must suffice to nudge a plaintiff's claims across the line from conceivable to plausible. *Twombly*, 550 U.S. at 570.

## III. Analysis

### A. First Amendment Claim

When considering Hines's cause of action under the First Amendment, the threshold question is whether the Supreme Court's decision in *NIFLA* abrogated *Hines I*. The Court concludes that it did not and, as a result, *Hines I* governs and requires dismissal of Hines's First Amendment claim. (*See, e.g.*, Pl's Resp. to Defs' Mt. to Dism., Doc. 26, 7 ("[I]f NIFLA did not abrogate *Hines I*, Dr. Hines concedes that his free-speech claim fails."))

Under the rule of orderliness, when the Fifth Circuit issues a decision that directly

resolves a legal question, later Fifth Circuit panels and the district courts "may not overrule the decision, right or wrong." *Lyda Swinerton Builders, Inc. v. Oklahoma Sur. Co.*, 903 F.3d 435, 455 (5th Cir. 2018); *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121, n. 8 (5th Cir. 1992) (superseded by statute on other grounds) ("It has been long established that a legally indistinguishable decision of this court must be followed by other panels of this court and district courts."). Exceptions to the rule arise only from an intervening change in the law, or a decision by the Supreme Court or the Fifth Circuit en banc. *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012). "In particular, for a Supreme Court decision to change [a Circuit's] law, it must be more than merely illuminating with respect to the case before the court and must unequivocally overrule prior precedent." *Id.* (internal brackets and quotation marks omitted). Alternatively, if "the Supreme Court disavows the mode of analysis on which" the prior precedent relied, then a court has "the authority and obligation to declare and implement this change in the law." *Stokes v. Sw. Airlines*, 887 F.3d 199, 204 (5th Cir. 2018).

In *Hines I*, the Fifth Circuit recognized that the Texas veterinary statute at issue regulated only the practice of a profession and not speech. Indeed, the statute only concerns how a veterinarian establishes a veterinarian-client-patient relationship, and does not address the nature or substance of the communications between a veterinarian and a client-patient, once the relationship exists. The Fifth Circuit highlighted the nature of the challenged statute:

> It does not regulate the content of any speech, require veterinarians to deliver any particular message, or restrict what can be said once a veterinarian client-patient relationship is established.

*Hines I*, 783 F.3d at 201. This content-neutral regulation of professional conduct fell within the Board's "broad power to establish standards for licensing practitioners and regulating the practice of professions", and such regulations do not offend the First Amendment. *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgm't Ass'n*, 112 S.Ct. 2374 (1992)). The Fifth Circuit questioned whether the challenged regulation even burdened speech at all. *Id.* (noting that the statute

"may" have an incidental burden on veterinarians' speech); *id.* at 202 ("Whether Hines's First Amendment rights are even implicated by this regulation is far from certain."). But even if the regulation did affect speech, the Fifth Circuit reasoned that any such impact would not violate the long-established principle that "the First Amendment does not prevent restrictions aimed at commerce or conduct from imposing incidental burdens on speech." *Id.* (quoting *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2664 (2011)).

Hines argues that *NIFLA* abrogated the Fifth Circuit's decision. The Court disagrees. As an initial matter, although Hines appears to contend that *NIFLA* unequivocally overruled *Hines I*, (Resp. to Mt. to Dismiss, Doc. 26, 10), the argument is unavailing. *NIFLA* does not reference *Hines I* or otherwise make any statement that directly controverts the Fifth Circuit's holding. Hines's argument more appropriately concerns whether *NIFLA* undermined the mode of analysis on which the Fifth Circuit relied, and Hines indirectly acknowledges as much in his briefing regarding the Magistrate Judge's Report and Recommendation. (Hines's Resp. to Board's Objs., Doc. 34, 5 (arguing only that *NIFLA* "fatally undermined the 'mode of analysis'" of *Hines I*)) As to this issue, an examination of *NIFLA* confirms that the Supreme Court's decision not only turned on a fundamentally different standard under First Amendment law that was not at issue in *Hines I*, but also that the Supreme Court reaffirmed the legal principles on which the Fifth Circuit relied.

*NIFLA* concerned the constitutionality of California's Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act ("FACT Act"), which required pregnancy centers to disseminate or post a government-drafted notice. *NIFLA*, 138 S.Ct. at 2369 (citing CAL. HEALTH & SAFETY CODE § 123472(a)(1)). The notice stated, in part: "California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women." *Id.* at 2369. The petitioners—"a licensed pregnancy center, an unlicensed pregnancy center, and an organization composed of crisis pregnancy centers"—

challenged the mandatory notice as an unlawful abridgement of their First Amendment right to freedom of speech. *Id.* at 2370. The district court denied the pregnancy centers' motion for a preliminary injunction, and the Ninth Circuit affirmed that decision on the grounds that a "lower level of scrutiny" applied to laws that regulated "professional speech." *Id.*

The Supreme Court reversed. Applying established legal principles, the Supreme Court found that the required notice was a "content-based regulation of speech" that compelled individuals to "speak a particular message." *Id.* at 2371. Having concluded that the law constituted a content-*based* regulation of speech, the Supreme Court applied strict scrutiny and determined that the law was not narrowly tailored to meet the stated government objective of "providing low-income women with information about state-sponsored services." *Id.* at 2375. As a result, the Supreme Court held that the challenged law violated the petitioners' First Amendment right to free speech.

The Supreme Court did not alter the analysis to determine whether a statute is content-neutral or content-based. Instead, the Supreme Court wrote that if a state enacts a content-based regulation of speech, the speech does not receive less protection merely because it is made in a professional or commercial context. *Id.* at 2371–72. The Ninth Circuit had applied a standard lower than strict scrutiny based on its finding that the regulation concerned professional speech. The Supreme Court rejected this approach, in part because professional speech is not "a separate category of speech . . . unprotected merely because it is uttered by professionals." *Id.* at 2371–72.

In discussing two circumstances in which it has afforded less protection for professional speech, the Supreme Court reaffirmed that "States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 2372. While states cannot be given "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement," states retain the authority to regulate professional conduct. *Id.* at 2373–75. And while the Supreme Court acknowledged that "drawing the line between speech and conduct can

be difficult," it confirmed that its "precedents have long drawn it". *Id.* (citing cases). Importantly, while the Supreme Court summarized and reaffirmed these principles related to the regulation of professional conduct, it also acknowledged that the case before it did not implicate this line of precedents. *Id.* at 2372. As a result, the Supreme Court had no need to and did not consider the law concerning the regulation of professional conduct that incidentally burdened speech.

Turning back to *Hines I*, the Fifth Circuit stated that the Examination Requirement was a content-*neutral* regulation because it "does not regulate the content of any speech, require veterinarians to deliver any particular message, or restrict what can be said once a veterinary-client-patient relationship is established." *Hines I*, 783 F.3d at 201. This conclusion fundamentally distinguishes *Hines I* from *NIFLA*, as the latter concerned the application of a standard of review wholly inapplicable to the content-neutral regulation at issue in *Hines I* (and in the current lawsuit). As *NIFLA* did not concern a content-neutral regulation of speech, the Supreme Court did not consider the standard applicable to such regulations. In addition, *NIFLA* did not modify the mode of analysis on which the Fifth Circuit relied to determine that the Texas statute is content-neutral. And *NIFLA* confirmed that states may regulate professional conduct in a manner that incidentally burdens speech.

To the extent that Hines now urges that the Texas statute is content-based, he is merely arguing that the Fifth Circuit reached an erroneous conclusion in *Hines I*. Under the rule of orderliness, the Court cannot reconsider that decision. *Hines I* forecloses the re-urged First Amendment claim, meaning that Hines has failed to state a claim upon which relief can be granted and this claim should be dismissed.

### B. Fourteenth Amendment Claim

Hines brings suit under 42 U.S.C. § 1983 for alleged violations of the Equal Protection Clause in the Fourteenth Amendment. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United

10 / 17

States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979). To prevail upon a § 1983 claim, a plaintiff must establish two elements: (1) a constitutional violation; and (2) that the defendants were acting under color of state law when they committed the constitutional violation. *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). A plaintiff can seek "monetary, declaratory, or injunctive relief" based on the promulgation of an unconstitutional policy, regulation or statute. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).

To state a claim under the Equal Protection Clause of the Fourteenth Amendment, the plaintiff "must either allege that (a) a state actor intentionally discriminated against [him] because of membership in a protected class or (b) he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Gibson v. Texas Dep't of Ins.–Div. of Workers' Comp.*, 700 F.3d 227, 238 (5th Cir. 2012) (internal citations omitted). Hines alleges the latter—i.e., a disparate treatment claim—which involves "a discrete group of people, who do not themselves qualify as a suspect class, alleging the government has singled them out for differential treatment absent a rational basis." *Integrity Collision Ctr. v. City of Fulshear*, 837 F.3d 581, 586 (5th Cir. 2016).

Although the rational basis review is not a "toothless one," *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston, Tex.*, 660 F.3d 235, 239 (5th Cir. 2011), "[s]tatutory classifications are given broad deference under rational basis review and will survive if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)) (internal quotations omitted). The party challenging the statute has the burden to negate "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001).

When performing its analysis, the Court is "compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321. The Board is "under no obligation to prove its reasons; it need only offer them." *Harris*, 827 F.3d at 365. "As long as there is *a* conceivable rational basis for the official action, it is immaterial that it was not *the* or *a* primary factor in reaching a decision or that it was not *actually* relied upon by the decisionmakers or that some *other* nonsuspect irrational factors may have been considered." *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 754 (5th Cir. 1988) (emphasis in original). "[W]hen faced with the task of hypothesizing a legitimate purpose to support a state's system of classification, a court may go outside the pleadings even if the question is whether the complaint fails to state a claim." *Mahone v. Addicks Util. Dist. of Harris Cty.*, 836 F.2d 921, 936 (5th Cir. 1988). At the motion to dismiss stage, a court should grant the motion to dismiss if it can hypothesize a rational purpose for the state action. *Glass v. Paxton*, 900 F.3d 233, 245 (5th Cir. 2018).

### 1. *Hines I*

As an initial matter, *Hines I* does not foreclose the current Fourteenth Amendment claim. The initial case turned on the difference between licensed veterinarians who have physically examined their animal patients and licensed veterinarians who have not. *See Hines v. Alldredge*, No. 1:13-CV-56, 2014 WL 11320417, at *11 (S.D. Tex. Feb. 11, 2014). In contrast, in the current matter, Hines centers his allegations on the different treatment of medical doctors—who are allowed to practice telemedicine with human patients—and veterinarians—who are not with respect to animal patients. Texas enacted the law that created this distinction after *Hines I*. The intervening change in the law enables Hines to bring his current lawsuit under the Fourteenth Amendment. *See Tech. Automation Servs. Corp.*, 673 F.3d at 405.

### 2. **Similarly Situated**

"The fundamental directive of the Equal Protection Clause is that similarly-situated persons should be treated alike by government actors." *Hernandez v. Bailey*, 716 F. App'x 298,

304 (5th Cir. 2018) (unpubl.) (citing *Mahone v. Addicks Util. Dist. of Harris Cty.*, 836 F.2d 921, 932 (5th Cir. 1988)).  Accordingly, the starting point for the Court's equal protection analysis is determining whether medical doctors and veterinarians are similarly situated for purposes relevant to the challenged regulation.  *See Beeler v. Rounsavall*, 328 F.3d 813, 816 (5th Cir. 2003) (noting that a similarly situated person being treated differently is a "prerequisite" to a valid equal protection claim).  Determining whether another person or group is similarly situated to the plaintiff is "is not a requirement susceptible to rigid, mechanical application," because "there is no precise formula to determine whether an individual is similarly situated to comparators."  *Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 233 (5th Cir. 2012).  The Fifth Circuit has observed that "the inquiry is case-specific and requires [the Court] to consider the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision."  *Id.* (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007)) (internal quotation marks omitted).  "What is relevant in one case might not be relevant in another, . . . and the degree to which others are viewed as similarly situated necessarily will depend substantially on the facts and context of the case."  *Lindquist*, 669 F.3d at 234 (internal quotations omitted).

Although medical doctors and veterinarians have important differences in their respective professions, the Court finds that they should be considered similarly situated for purposes of analyzing the laws that concern telemedicine.  Both groups of professions provide medical advice.  Telemedicine offers some of the same benefits to each profession, such as the ability to help patients who cannot physically travel to their offices and the likely ability to help more patients in a single day.  And the practice of telemedicine also suffers some of the same drawbacks for each profession, such as the inability to physically touch the patient, fewer diagnostic instruments available, and having to rely more heavily on a written or verbal description of the symptoms.  While doctors and veterinarians are subject to different licensing boards and are considered separate professions, that fact is not dispositive for purposes of

analyzing the Texas laws related to telemedicine.[5]  While veterinarians and medical doctors may not be similarly situated in every matter concerning an equal protection claim, the Court finds that they are sufficiently identical in relevant aspects related to the governmental action being challenged in this lawsuit.

### 3. Rational Basis

In *Hines I*, the Fifth Circuit concluded that it was rational for Texas to treat veterinarians who physically examine an animal differently from veterinarians who do not.  *Hines I*, 783 F.3d at 203.  "[T]he requirement that veterinary care be provided only after the veterinarian has seen the animal is, at a minimum, rational: it is reasonable to conclude that the quality of care will be higher, and the risk of misdiagnosis and improper treatment lower, if the veterinarian physically examines the animal in question before treating it."  *Id*.  This analysis showed that a rational reason supported the Examination Requirement for veterinarians.

Hines argues that the new law applicable to medical doctors requires the Court to determine whether the Board has a rational basis to maintain the Examination Requirement for veterinarians, after Texas law has removed a similar requirement for medical doctors who treat humans.  The Court finds that a rational basis exists for the distinction.[6]

The Board offers at least two reasons to support the distinction.  As an initial matter, the Board argues that because animals cannot speak, a physical examination is important because absent one, veterinarians would have to rely on animal owners to convey information about symptoms, responses to treatment, etc.  In contrast, humans can often communicate about their own symptoms with a medical doctor, even if by email.  In addition, the Board contends that a human's unfamiliarity with animal physiology also supports the distinction:  "[The physical examination requirement] is especially critical in the context of animals, *as opposed to human*

---

[5] The Court notes that the grounds that the Board offers to support the distinct treatment of veterinarians and medical doctors with regard to telemedicine have nothing to do with differences in the education or licensing of these professionals.
[6] Hines does not challenge the long-standing principle that state actors can enact distinct regulations as to different professions.  *See, e.g., Semler v. Oregon State Board of Dental Examiners*, 294 U.S. 608, 610 (1935) ("[The State of Oregon] could deal with different professions according to the needs of the public in relation to each.").  He challenges whether the distinction at issue survives a rational basis review.

*medical care*, because . . . pet owners . . . are unfamiliar with animal physiology, to recognize/describe symptoms and accurately rely (sic) this information via email." (Def.'s Obj. to R&R, Doc. 35, 7 (emphasis added))  These reasons, argues the Board, further the interest in promoting proper diagnoses of animals and protecting the public from zoonotic diseases. (Reply, Doc. 29, 7)

The Court finds that these rationales reasonably support the disparate treatment of veterinarians and medical doctors with respect to the Examination Requirement before the creation of a patient-client relationship.  The Board possesses a legitimate interest in promoting proper veterinary care and protecting the public from zoonotic diseases.  It is logical that a veterinarian who has physically examined an animal or made timely visits to the premises on which the animal is kept is in a better position to provide medical advice to the animal's owner. *See Hines I*, 783 F.3d at 203.  The same could be said of medical doctors as to their human patients.  But an important distinction is that in most instances, humans can communicate about their own symptoms.  This ability for direct communication between the patient and the medical doctor reduces some of the risks inherent in providing medical advice without a physical examination.  In contrast, with veterinary care, direct communication with the animal patient is impossible.  Moreover, the fact that humans typically understand human physiology better than animal physiology further supports the Board's determination to not allow veterinarians to practice telemedicine, even though medical doctors can do so with humans.

The Court need not fully agree with the offered reasons, and the Board need not prove them.  *See Harris*, 827 F.3d at 365.  The proposed rationales are reasonable, even if some individuals would disagree with them.  Despite an "imperfect fit" between the offered means and the ends, the Court will accept a legislature's generalizations.  *Heller*, 509 U.S. at 321.

In addition, the Courts finds that a rational basis supports the disparate treatment even if the rationales do not hold true in all situations.  For example, sometimes a human patient, such as an infant or a disabled adult, is as incapable of speech or communication as an animal.

In such situations, the medical doctor providing telemedicine would have to rely on a third-party's description of the patient's symptoms, much as a veterinarian would have to do with respect to an animal.  In other instances, an animal owner may be highly knowledgeable of an animal's physiology, and would be capable of communicating effectively with the veterinarian about the animal's symptoms, perhaps even more effectively than some parents would be able to do with respect to their children.

But the fact that exceptions to the rationales exist does not render those reasons untenable.  "[E]ven if [a] classification . . . is to some extent both underinclusive and overinclusive, and hence the line drawn by [the State is] imperfect, it is nevertheless the rule that . . . 'perfection is by no means required.'" *Harris v. Hahn*, 827 F.3d 359, 369 (5th Cir. 2016) (quoting *Vance v. Bradley*, 440 U.S. 93, 108 (1979) and *Phillips Chem. Co. v. Dumas Sch. Dist.*, 361 U.S. 376, 385 (1960)); *see also Vance*, 440U.S. at 111-112 (upholding mandatory retirement at age 60 for foreign service officers that did not apply to civil service officers, even though "many people over age 60 are healthy and many younger people are not" and "many overseas posts are as pleasant as those in the United States").  The Board does not have to offer a rationale that holds true in every situation.

Hines also argues that the distinction is irrational because it affords "animal life greater protection than human life".  (Resp. to Mt. to Dism, Doc. 26, 17)  The Board disagrees with Hines's conclusion, responding that ultimately, the Examination Requirement seeks to protect humans by reducing zoonotic diseases.  (Reply, Doc. 29, 7)  The Board reasons that better veterinarian care not only benefits animals, but also results in greater protection for humans.  (Def's Reply on Mt. to Dism., Doc. 29, 7)  Although Hines and the Board may disagree regarding this argument, the Court finds that the Board's position is not irrational.

As a reasonably conceivable state of facts exists that provides a rational basis for the classification of veterinarians distinct from the treatment of medical doctors with respect to telemedicine, Hines's challenge under the Fourteenth Amendment fails.

## IV.     Conclusion

For these reasons, it is:

**ORDERED** that the Motion to Dismiss is **GRANTED**; and

**ORDERED** that Hines's causes of action are **DISMISSED WITH PREJUDICE**.

SIGNED this 11th day of June, 2019.

*Fernando Rodriguez, Jr.*
Fernando Rodriguez, Jr.
United States District Judge