United States District Court
Southern District of Texas
**ENTERED**
December 16, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RONALD S. HINES,                        §
          Plaintiff,                    §
                                        §
v.                                      §        CIVIL ACTION NO. 1:18-cv-155
                                        §
KEITH PARDUE, <u>et al</u>.,          §
          Defendants.                   §

## <u>REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE</u>

On October 2, 2018, Plaintiff Ronald S. Hines ("Hines") filed suit against Defendants Jessica Quillivan, Keith Pardue, Sandra "Lynn" Criner, Michael White, Samantha Mixon, Randall Skaggs, Carlos Chacon, Sue Allen, and George Antuna, all in their official capacities[1] as members of the Texas State Board of Veterinary Examiners[2] (collectively "Defendants" or "The Board"). Dkt. No. 1.  Hines, a licensed veterinarian, seeks declaratory and injunctive relief to permit him to give medical advice to pet owners without first physically examining the animal in question. <u>Id</u>.  As relevant here, Hines alleges that the state law violates his First Amendment right to freedom of speech. <u>Id</u>.

On September 30, 2022, the parties each filed cross motions for summary judgment. Dkt. Nos. 82, 83.  On October 21, 2022, the parties filed responses. Dkt. Nos. 84, 85.  On November 4, 2022, the parties filed reply briefs. Dkt. Nos. 87, 88.

After reviewing the record and the relevant case law, it is recommended that the motions for summary judgment be granted in part and denied in part.  The Board's motion for summary judgment should be granted as to any diagnosis of animals that are located in

---

[1] A suit against a government employee in their official capacity is "to be treated as a suit against the entity" which employs that defendant. <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Thus, the Court must treat the suit as one against the Texas State Board of Veterinary Examiners.

[2] Quillivan, Chacon and Antuna are no longer members of the Board.  Pursuant to FED. R. CIV. P. 25(d), Steven Golla, Raquel Oliver and Victoria Whitehead are automatically substituted as the proper defendants.  The District Clerk's Office shall update the docket to reflect this change and shall change the caption of the case to show that Keith Pardue is the lead defendant.

a state where Hines is not licensed to practice veterinary medicine.  However, Hines's motion for summary judgment should be granted as to his ability to diagnose animals in a state where he is licensed, or an animal located in a foreign nation.  Hines should be granted permanent injunctive relief in accordance with his partially successful motion for summary judgment.  To the degree he seeks relief beyond this, his motion should be denied and the Board's motion for summary judgment should be granted.

## I. Factual Background

Briefly put, Hines is a licensed veterinarian who has dispensed personalized medical advice to pet owners from across the country via email, phone calls, and video chats.  Texas law prohibits licensed veterinarians from entering into a veterinarian-client-patient relationship, unless they have personally examined the animal at issue or the premises where the animal lives.  In 2013, Hines was disciplined by the state veterinary board for violating this law; Hines sued at that time to challenge the law.  After the district court found that Hines stated a claim to relief for violations of his First Amendment rights, the state veterinary board filed an interlocutory appeal.

On appeal, the Fifth Circuit held that the law did not violate Hines's First Amendment rights, because it was a content-neutral occupational regulation that only had an incidental impact on speech.  Hines v. Alldredge, 783 F.3d 197 (5th Cir. 2015) ("Hines I").  In Hines I, the Fifth Circuit also found that Hines did not state a viable claim that his equal protection rights had been violated.

In the current case, Hines has returned to the Court, seeking only prospective relief, namely that he be permitted to resume his practice of dispensing medical advice to pet owners, even if he has never physically examined the animal or the premises where it lives.  Hines asserted that the Supreme Court implicitly abrogated the Fifth Circuit's analysis in Hines I, when it issued its decision in National Inst. of Family & Life Advocates v. Becerra, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018) ("NIFLA").  Hines further argues that in 2017, Texas law was amended to permit medical doctors to practice telemedicine and it is a violation of his equal protection rights that he cannot do the same as a veterinarian.

On June 11, 2019, the District Court ruled that <u>NIFLA</u> did not abrogate <u>Hines I</u>, obligating the Court to follow the holding of <u>Hines I</u>. Dkt. No. 40.  It also ruled that Hines's equal protection rights were not violated. <u>Id</u>.

On February 14, 2020, the Fifth Circuit issued its decision in <u>Vizaline, L.L.C. v. Tracy</u>, 949 F.3d 927, 933 (5th Cir. 2020).  The district court in <u>Vizaline</u> had relied on <u>Hines I</u> in rejecting a challenge to a Mississippi law regulating professional surveyors. <u>Id</u>., at 930-31.  The Fifth Circuit held that NIFLA abrogated <u>Hines I</u> "to the extent that [<u>Hines I</u>] relied on the professional speech doctrine." <u>Id</u>., at 933.  The Fifth Circuit noted that it had "no opinion on whether the Texas regulation at issue in [<u>Hines I</u>] would have been upheld under the proper conduct-versus-speech analysis." <u>Id</u>., at 934, n. 9.

On December 2, 2020, in deciding the present case, the Fifth Circuit, in light of its holding in <u>Vizaline</u>, remanded the case to the Court to determine if the applicable Texas law regulates speech or conduct. Dkt. No. 48 ("<u>Hines II</u>").  It affirmed the finding that Hines's equal protection rights were not violated. <u>Id</u>.

On July 29, 2021, the undersigned issued a report and recommendation, which recommended that the motion to dismiss be denied. Dkt. No. 65.  It held that the law in question in this case is a content-based regulation of noncommercial speech, subject to strict scrutiny. <u>Id</u>.  On December 9, 2021, the District Judge adopted the report and recommendation in full. Dkt. No. 68.

After a period of discovery, each party filed a motion for summary judgment. Dkt. Nos. 82, 83.

To fully understand this case, the Court must set out the factual background of the state law regarding veterinary practice, Hines's background, and his correspondence with animal owners.

### A. State Law

Texas law defines veterinary medicine as "the diagnosis, treatment, correction, change, manipulation, relief, or prevention of animal disease, deformity, defect, injury, or other physical condition, including the prescription or administration of a drug, biologic,

anesthetic, apparatus, or other therapeutic or diagnostic substance or technique." TEX. OCC. CODE § 801.002(5).

Furthermore, "[a] person may not practice veterinary medicine unless a veterinarian-client-patient relationship exists." TEX. OCC. CODE § 801.351(a).

A veterinarian must meet three statutory pre-requisites in order to have a client-patient relationship:

(1) assumes responsibility for medical judgments regarding the health of an animal and a client, who is the owner or other caretaker of the animal, agrees to follow the veterinarian's instructions;

(2) possesses sufficient knowledge of the animal to initiate at least a general or preliminary diagnosis of the animal's medical condition; and

(3) is readily available to provide, or has provided, follow-up medical care in the event of an adverse reaction to, or a failure of, the regimen of therapy provided by the veterinarian.

Id.

Sufficient knowledge is established by either "examining the animal, or making medically appropriate and timely visits to the premises on which the animal is kept." TEX. OCC. CODE § 801.351(b) (hereafter "examination requirement").   State law further provides that "[a] veterinarian-client-patient relationship may not be established solely by telephone or electronic means." TEX. OCC. CODE § 801.351(c).

Violations of this statute are a class A misdemeanor. TEX. OCC. CODE § 801.504.

**B. Hines's Practice**

Hines is a Texas-licensed veterinarian, who received his doctorate in veterinary medicine from Texas A&M University in 1966. Dkt. No. 83-4.   Around 2000, Hines created a website called 2ndchance.info, where he disseminated articles about veterinary medicine for a lay audience. Dkt. No. 82-1, p. 11.  Hines created the website because it was becoming increasingly difficult for him to be on his feet all day, so he wanted to do something to "help animals" and because his "professional experience has been that people

around the world do not have access to the type of sophisticated veterinary services available in North America." Id.

In response, readers began to reach out to Hines with questions about issues or symptoms facing their pet. Dkt. No. 82-1, p. 15.  Hines testified at his deposition that, "I would tell them what their choices might be, and I would tell them what I had done in that situation in the past, and what I might do in that situation in the future." Id.  Hines began to ask readers for donations in exchange for the personalized veterinary advice. Id., p. 17. Hines testified that between 2000 and 2020, the most revenue he ever generated from his website in a single year was "less than a thousand dollars." Id., p. 18.  Hines estimated that he took inquiries from hundreds and "perhaps" thousands of people between 2000 and 2020. Dkt. No. 82-1, p. 29.  Hines said that in response to these inquiries, he "offered them an opinion based on my prior experience," but that he "never offered to treat their pet." Id. Hines also testified that he never prescribed medication for an animal without first conducting a physical examination of the animal. Id., p. 32.

On March 25, 2013, Hines entered into an agreed disciplinary order with the State Board of Veterinary Medical Examiners. Dkt. No. 82-1, p. 382.  Hines was disciplined for engaging in the practice of veterinary medicine by providing animal owners with specific veterinary advice without first personally examining the animal, in violation of TEX. OCC. CODE § 801.351. Id.  Hines was formally reprimanded, fined $500, ordered to retake the Texas veterinary jurisprudence examination, and had his license suspended for one year, with that suspension probated. Id.

After being disciplined by the State Board, Hines "stopped charging" animal owners for individualized advice but continued to furnish that advice. Dkt. No. 82-1, p. 60.  Hines testified that "I've always answered every email I receive." Id.  Hines was asked how, in the time since the disciplinary action, "the State Vet Board [has] impaired your ability to provide individualized veterinary advice to readers of your website?" Dkt. No. 82-1, p. 62. Hines replied, "It's impossible for a person to do their best under constant harassment." Id. When asked for examples of this "constant harassment," Hines replied, "my wife and I often fear some sort of raid on our residence.  I fear loss of my veterinary license.  I fear

loss of my health.  I [fear] loss of my wife's health.  I feel an inability to ever feel safe from government action against me or my family or retribution in some other manner against me in revenge for the services I provide to animals." Id.  Hines admitted that the State Veterinary Board had only contacted him about paying his dues to renew his veterinary license and seeking proof that he had complied with continuing education requirements and had not directly threatened him with further disciplinary actions. Id., p. 63.

Kandace Van Vlerah testified as the official representative of the Texas Board of Veterinary Medical Examiners, pursuant to FED. R. CIV. P. 30(b)(6). Dkt. No. 83-15.  Van Vlerah testified that the Board of Examiners prioritizes investigating cases where veterinarians are showing signs of substance abuse and cases that result in animal deaths. Id., p. 4.  She did admit that the ban on veterinary telemedicine, performed without any prior in-person examination of the animal, was "a statute and we are required to enforce the statute." Id., pp. 7-8.  When asked if the Board continues to enforce the statute, Van Vlerah replied, "Yes." Id., p. 13.

When Van Vlerah was asked what "matters to the Board" when Hines gives advice about an animal that is not located in the United States, she replied, "if the veterinarian is in Texas, then they're still, you know, within the Board's jurisdiction. If they are giving this advice while they are in Texas, then it's -- then we would have the interests of it." Id., pp. 9-10.

Van Vlerah was asked if the Board was "aware that there are various websites available to Texans, that answers questions about their pets." Dkt. No. 83-15, p. 12.  She said that she did not know.  She was then asked if any of those websites had been investigated for providing veterinary telemedicine without a prior in-person examination and Van Vlerah testified that she was "not aware" of any such investigations. Id.

### C. Representative Correspondence

As part of this litigation, the parties have entered some of Hines's correspondence with pet owners into the record to allow the Court to analyze its contents.  The Court notes that Hines testified that the email account he uses to receive emails from pet owners has "has a rather low data cap," so when it comes full, he deletes older emails, including emails

from pet owners. Dkt. No. 82-1, pp. 17-19.[3]  The emails have been submitted as evidence of Hines's past practices – which he was never formally disciplined for – to show the type of activity that he wishes to engage in without fear of discipline.

The Board maintains that it is necessary to stop Hines's correspondence to protect animals and public confidence in the veterinary profession. Dkt. No. 90, p. 14.  The Board further claims jurisdiction over Hines's correspondence, no matter where the animal is located, because Hines is licensed by – and physically located in – the state of Texas. Dkt. No. 83-15, pp. 9-10.  Additionally, the Defendants have produced two expert witnesses who opined about Hines's correspondence: Dr. Lori Teller and Dr. Carly Patterson.  To the extent that any expert opined about Hines's correspondence, it is noted at the end of the description of each case study.  Additionally, Van Vlerah also opined on some of Hines's correspondence.

### 1. Iranian Bird

On August 31, 2021, "Mali Zia," who lives in Iran, sent Hines a picture of a bird's broken leg. Dkt. No. 83-11, p. 13.  Zia reported that she found the bird when it was 3 weeks old and fed her. Id., p. 15.  Zia reported that she gave the bird a chance to fly and "broke her leg accidentally." Id.  Zia further reported that a local doctor tied up the leg and sent a picture of what the leg currently looked like and asked if the bird had any chance of healing. Id.

On that same day, Hines responded that "[i]t appears from your photograph that the broken bone has now healed in the wrong position." Dkt. No. 83-11, p. 42.  Hines notified Zia that fixing the bone would "require cutting the bone if possible and putting it in a proper

---

[3] The Board argues that it is entitled to "an adverse inference due to spoliation," because Hines deleted emails after the filing of this suit. Dkt. No. 84, p. 27., n. 10.  The Court can draw such an adverse inference against "a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party." Whitt v. Stephens Cnty., 529 F.3d 278, 284 (5th Cir. 2008).  For electronically stored information, an adverse inference is appropriate only in cases where there is a finding "that the party acted with the intent to deprive another party of the information's use in the litigation." Eagan v. Walgreen Co., 2022 WL 683636, at *3 (5th Cir. Mar. 8, 2022) (per curiam).  The Court finds that there is no evidence that Hines intentionally deleted emails to prevent the Board or the Court from viewing adverse evidence.  The Board is not entitled to an adverse inference.

splint." Id.  Hines advised Zia that the person in Iran who would be in the best position to help would be a hand surgeon or a jewelry maker, because they would have the tools necessary to make the splint. Id.

Zia replied with an x-ray of the bird's leg, noting that she couldn't move the bird in a good position. Dkt. No. 83-11, pp. 2-3.  Zia also reported that she couldn't sleep at night because she blamed herself for breaking the bird's leg. Id.

Hines responded that the x-ray showed that the bird's bones were too soft and that it was calcium deficient. Dkt. No. 83-11, p. 20.  He recommended that Zia add crushed calcium carbonate, like Tums, to the bird's diet. Id.  Hines told Zia that it was not her fault that the leg broke, it was because of the calcium deficiency. Id.  Hines finished the email by saying, "This is what needs to be done:", but the email cut off at that point.

Dr. Patterson opined that Hines was practicing veterinary telemedicine by "detailing a fracture management plan" for a bird that he had never personally examined. Dkt. No. 83-12, p. 6.

Van Vlerah also opined that Hines was practicing veterinary medicine, because Hines was "diagnosing a calcium deficiency and he is also recommending treatment with the use of calcium supplements." Dkt. No. 83-15, p. 19.

Dr. Teller agreed that Hines was practicing veterinary medicine, because Hines "reviewed photos and an x-ray and diagnosed the bird with calcium deficiency. He recommended a specific course of treatment for the bird's calcium deficiency." Dkt. No. 82-1, p. 252.

### 2. Indian Dog

On May 4, 2022, Uday Bhaskar, who lives in India, emailed Hines about his dog, who was recovering from a surgery to remove a tumor near his eyelid. Dkt. No. 83-11, p. 32.  The surgery removed the dog's upper eyelid as well as the dog's "third eyelid[4]." Id.  Bhaskar asked Hines if a dog can "survive without his upper eyelid to cover his eye and

---

[4] The third eyelid is a "protective membrane that, under normal circumstances, rests comfortably tucked below the medial canthus of the eye." Jake Tedaldi, WHAT'S WRONG WITH MY DOG?: A PET OWNER'S GUIDE TO 150 SYMPTOMS AND WHAT TO DO ABOUT THEM 29 (2007).

third eyelid to moist the same," and attached a photo of the dog from before the surgery. Id.

On May 5, 2022, Hines responded by asking how old the dog was and noting that the picture seemed to only show a benign papilloma, which would not normally require such a "radical surgery." Dkt. No. 83-11, p. 32.  Hines noted that the dog faced the possibility of "dry cornea keratoconjunctivitis sicca." Id.  Hines advised Bhaskar that it could be prevented with a "bland petroleum-based ophthalmic ointment applied 2-3 times a day or saline eye drops applied more frequently." Id.  Hines also recommended that, "should dry eye occur," Bhaskar could use "cyclosporine ophthalmic eye drops for dogs." Id.

On that same day, Bhaskar responded that his dog was 14 years old and that he had been using saline eye drops, but only once a day. Dkt. No. 83-11, p. 31.  Bhaskar told Hines that, "[y]our help is important to many pet lovers and an inspiration to many." Id.

### 3. Indian Puppy

On May 27, 2022, Bhaskar again emailed Hines about a different dog, a two-month old puppy that was run over by a car tire. Dkt. No. 83-11, p. 43.  Bhaskar noted that the puppy couldn't move one of its legs and appeared to be in pain. Id.  He asked Hines if he could "advise any first aid or course of treatment as I don't have any vet within a range of 25 km." Id.

On May 28, 2022, Hines replied that there wasn't much he could do to help. Dkt. No. 83-11, p. 43.  Hines stated that if the problem was  "just one leg, then the leg is probably broken." Id.  He added that if both rear legs were problematic, then the puppy's spine was likely broken and that there was no treatment option for the broken spine. Id.  Hines noted that the treatment for a broken leg was stainless steel rods or external supports, but that any external supports would need to be frequently changed for a growing dog. Id.

Dr. Patterson opened that Hines was practicing veterinary medicine by advising a specific prognosis for a spinal injury on a dog that he had never personally examined. Dkt. No. 83-12, pp. 4-5.  She expressed concern as to whether the dog had suffered internal or neurological injuries that could also be causing the symptoms. Id.  In her deposition, Dr.

Patterson admitted that Hines's email in this instance did not affect any animals or people in Texas. Dkt. No. 83-13, p. 17.

Van Vlerah opined in her deposition that Hines was practicing veterinary medicine because was "providing treatment recommendations and a potential diagnosis." Dkt. No. 83-15, p. 14.

Teller also opined that Hines was practicing veterinary medicine because he "provided a differential diagnosis that Uday's [Bhaskar] puppy either had a broken leg or back, and made a prognosis (which is incorrect) that there is no treatment for a broken back." Dkt. No. 82-1, p. 247 (parenthetical original).

### 4. Glasgow Cat

In April 2021, Marie Shannon, who lives in Glasgow, Scotland, emailed Hines about her cat, named Butterfly, who had accumulated fluid in her chest. Dkt. No. 83-11, p. 4.  Her exact email to Hines was not provided, but his response was.

Hines began by noting that "a big problem" for him in helping her was that he did not have access to "Butterfly's radiologist's report or her laboratory blood analysis report." Dkt. No. 83-11, p. 4.  Hines noted that there were several possible causes of fluid in the chest, including heart issues, cancers, and mutant coronaviruses. Id.  Hines stated that was he was "disappointed in the University of Glasgow that they are not treating this as a crisis situation and are making you wait until Monday" to be seen. Id.  Hines recommended that Shannon ask her local veterinarian what Butterfly's systolic blood pressure and oxygen saturation levels were at, because "an extremely low blood protein level and/or anemia might also exhibit the symptoms that you describe." Id.  He also noted that Butterfly should be tested for feline leukemia. Id.

### 5. Indian Bird

On July 30, 2021, Devadharsanan Senthilkumar, who lives in India, emailed Hines about his three-year African grey parrot. Dkt. No. 83-11, p. 24.  The parrot "broke her wrist bone while accidentally running into the ceiling fan," causing the wrist bone to become "completely detached from the right wing of her body." Id.  Senthilkumar wanted to know "what are the possibilities of healing as well as flying." Id.

Hines responded that he did not know of any veterinarians in India who could assist in this. Dkt. No. 83-11, p. 24.  Hines also stated that the attached photograph did not give him sufficient information to know how much damage was done to the blood vessels near the fracture site. Id.  Hines stated that the chances of the parrot ever flying again "are close to none." Id.  Hines opined that the wing could possibly still be saved, possibly by a hand surgeon, but that any surgery would need to be done "very soon." Id.  Hines also noted that if the wing was amputated, the parrot could still live a happy life in a cage. Id.

### 6. Florida Deer

On May 13, 2022, a woman from Tampa, Florida, named Gail, emailed Hines with some x-rays of a fawn. Dkt. No. 83-11, p. 5.  Her email simply read, "Can you please look and assess the damage?" Id.

On that same day, Hines responded with a series of questions:

Does this fawn respond to pin pricks from its lumbar spine and farther posterior?  Is it able to move its rear legs? If you do an abdominal needle tap what is withdrawn? Does it have an anal wink?  Can you palpate its bladder? Is this a HBC fawn?  Either the DV view is cockeyed or the wing of the pelvis appears fractured and there is a sacral avulsion.

Dkt. No. 83-11, p. 33.

### 7. Dog (Location Unknown)

On March 18, 2022, Keitheley Wilkinson, whose location was not identified, emailed Hines about "a canine organophosphate test which showed a lowered cholinesterase level." Dkt. No. 83-11, p. 40.  Wilkinson had a 10-year female terrier mix that was diagnosed with lymphoma and died on February 15, 2022. Id., p. 37.  The dog lived in an area that had Kikuyu grass and the dog was allergic to the grass.  Glufosinate-ammonium was used as an herbicide for the grass and the dog likely ingested the herbicide when eating the grass.  Wilkinson wanted to know about the relationship between the herbicide and the lowered cholinesterase levels as well as any possible links between the herbicide and canine cancers. Id., pp. 38-39.

On March 23, 2022, Hines responded, noting that he wanted to know if the dog had been diagnosed with a T lymphocyte lymphoma or a B lymphocyte lymphoma and whether the lymphoma was "specific enzyme positive." Dkt. No. 83-11, p. 36.

On March 27, 2022, Wilkinson replied that the veterinarian's office informed her that it would cost $500 to run the necessary tests. Dkt. No. 83-11, p. 35.  Wilkinson asked Hines if the test "was absolutely necessary to assess the findings of the dog's organophosphate findings." Id.

On that same day, Hines responded, advising Wilkinson not to order the test. Dkt. No. 83-11, p. 35.  Hines added that, "No information exists as to any connection between exposure to herbicides and insecticides in dogs and the particular lymphocyte involved." Id.

On March 29, 2022, Wilkinson responded with thanks for the advice and that she would wait for any assessment by Hines of the information she had already provided. Dkt. No. 83-11, p. 35.

On March 30, 2022, Hines responded with an analysis of whether the herbicide could cause dog cancer. Dkt. No. 83-11, p. 34.  He noted that the active ingredient had not been linked to cancers "of any kind," but that it was "conceivable" that it contributed to the dog's chronic gastroenteritis. Id.  He also noted that Wilkinson had reported that the dog had received Cytopoint injections, which "contributes to the growth of follicular lymphoma" in humans. Id., p. 35.  However, it is related solely to T-cell origin lymphomas, which was why Hines had originally asked if the lymphomas were T-cell or B-cell. Id.

### 8. Texas Dog

On December 6, 2021, Miguel Garcia, who appeared to live in the Rio Grande Valley, emailed Hines about stray dog he found. Dkt. No. 83-11, p. 44.  He noted that the dog looked like it had the mange, but that he didn't have the funds to have the dog examined. Id.

On that same day, Hines replied that he does not directly work with dogs and cats anymore. Dkt. No. 83-11, p. 44.  But Hines noted that stray dogs often have fleas, mange

and hookworms and pointed Garcia toward local resources to acquire medications to treat each ailment. Id.

### 9. Florida Dog

On March 10, 2021, Amy Pentkowski, a woman living in Florida, emailed Dr. Hines about her sister's dog, Zippy. Dkt. No. 83-11, p. 47.  Pentkowski asked Hines if he "would go forward with radiation and/or chemo" if Zippy was his dog. Id.  She attached a veterinarian's report, which indicated that Zippy had an anal sac carcinoma and that the local veterinarian was not recommending surgery or radiation. Id., pp. 50-51.

On that same day, Hines replied that he "would just keep Zippy comfortable," as the tumor's location was unfortunate. Dkt. No. 83-11, p. 47.  Hines added that he couldn't think "of any place more difficult to get to surgically or as unlikely to remove all the cancer" and that he was worried about the chances that Zippy would be unable "to defecate or urinate after such a surgery." Id.  Hines did add that the choice was ultimately about "what your sister and her family members are capable and willing to agree to." Id.

### 10. Iranian Pigeon

On July 11, 2021, Mohammad Reza Koohpaee, a man living in Iran, emailed Hines about a pigeon that he found in a parking lot. Dkt. No. 83-11, p. 18.  Koohpaee noted that the pigeon's wing was injured and that on the advice of an Iranian veterinarian, he had wrapped the wing with a "figure eight style wrap." Id.  Koohpaee asked if the wing could heal and how long to use the bandage. Id.

On that same day, Hines replied that the hard spot that Koohpaee identified on the pigeon's left wing was "probably a healing fracture." Dkt. No. 83-11, p. 18.  Hines also told him that the local veterinarian "gave you good advice." Id.  Hines also opined that the pigeon "will never fly normally again," but could live a happy life as Koohpaee's pet or in a park where pigeons are routinely fed by humans. Id.  He added that pigeons often have mites, lice and pigeon flies and that the best method for combatting this was carbaryl powder, mixed with powdered corn starch, that would be sprinkled on the pigeon's feathers via a saltshaker. Id.

Dr. Patterson opined that Hines was practicing veterinary telemedicine by "recommending specific bandages and dietary management" for a bird that he had never personally examined. Dkt. No. 83-12, pp. 5-6.  She opined that Hines was "only making an estimated guess based on very limited information from a layperson." Id.

Van Vlerah opined that Hines was practicing veterinary medicine because he was "providing treatment recommendations regarding the injury of an animal -- or bird." Dkt. No. 83-15, p. 18.

Teller also agreed that Hines engaged in the practice of veterinary medicine because he "recommended a specific course of treatment for Reza's pigeon and even provided him with a diagram showing the location of the likely injury." Dkt. No. 82-1, p. 250.

### 11. New Hampshire Dog

On November 3, 2021, Anne Broussard, a woman living in New Hampshire, emailed Hines about her 19-month old Japanese Chin dog. Dkt. No. 83-11, p. 26.  Her dog was given a Cytopoint injection to prevent scratching. Id.  After receiving the shot, the dog slept 60 to 90 minutes each night before waking up, shaking frantically, scratching the floor repeatedly and barked frantically before falling back asleep. Id.  Broussard noted that these were new behaviors after receiving the shot and wondered if this was a side effect of the shot. Id.

On November 8, 2021, Hines responded, opining that her dog's behavior "might be related to an antibiotic resistant staphylococcus skin infection, exposure to fleas, a dietary allergy or even mange mites," but that it was "extremely unusual for Apoquel and Cytopoint not to stop itching due to environmental allergies." Dkt. No. 83-11, p. 26.  He included a link to an article on his website as to the best products to prevent fleas and mites. Id.  Hines added that Broussard's decision on what to do next "need to be made in consultation with your local veterinarians." Id.

Dr. Patterson opined that Hines was not practicing veterinary telemedicine in this email exchange. Dkt. No. 83-12, pp. 7-8.  She did not explain how she came to this conclusion or what separated this email from the others where she thought he did practice veterinary telemedicine.

On the other hand, Van Vlerah opined that it was the practice of veterinary medicine, because Hines was "providing a diagnosis and treatment recommendations." Dkt. No. 83-15, pp. 16-17.

### 12. West Virginia Dog

On November 24, 2020, Linda Riley, a woman living in West Virginia, emailed Hines about her seven-year old golden retriever. Dkt. No. 83-11, pp. 28-29.  Her dog received a Cytopoint injection for excessive itching and scratching, but the dog's itching and scratching increased after receiving the shot. Id.  Riley noted that the dog began throwing up a few days after receiving the shot and the local veterinarian gave the dog hydration and a corticosteroids shot. Id.  Riley noted that the dog continued to suffer from diarrhea, despite being placed on a bland diet. Id.

On November 25, 2020, Hines responded with a series of questions:

Did your vet run any laboratory tests and if so might you know the results? You mentioned that "nothing has returned to baseline". Are the corticosteroids helping? Was it a long-term steroid shot like Depo? It's not that I want to interfere, it's just that I would like to make some sense out of all the data that folks like you are willing to share with me.
Dkt. No. 83-11, p. 28.

Hines added that Riley should consider contacting the manufacturer of Cytopoint and asking for their advice, noting that some manufacturers have been known to cover the veterinary bills associated with side effects from their medications. Id.

On that same day, Riley replied to the email, noting that her local veterinarian did not think her dog's symptoms were related to the injection, because the adverse reaction was not close enough in time. Dkt. No. 83-11, pp. 27-28.  She added that her dog would go from throwing up and having diarrhea to being able to keep food down and normal bowel movements for a time before the symptoms would return. Id.  Riley also added that the dog had not had any blood work done yet. Id.  Riley also stated that she had recently adopted a new puppy before the diarrhea began and the local veterinarian thought that the new puppy might be a cause of her dog's gastrointestinal issues. Id.

On November 26, 2020, Hines replied, asking if her dog had a history of intermittent diarrhea and if Riley had ever noticed extraneous things, like leaves or food wrappers, in her dog's stools. Dkt. No. 83-11, p. 27.  He also asked a series of questions, such as whether her dog was small for a golden retriever and whether the dog was a purebred golden retriever. Id.  Hines noted that the new puppy could be a source of intestinal parasites. Id.

Hines also noted that Riley would need to make sure that her dog had no other health issues that would predispose it to suffering from diarrhea, such as inflammatory bowel disease. Dkt. No. 83-11, p. 27.  He added that blood tests could tell her more, but if the dog was "already on the road to recovery," then the blood tests would likely come back as normal or close to it. Id.

Dr. Patterson opined that Hines was not practicing veterinary telemedicine in this email exchange. Dkt. No. 83-12, pp. 7-8.  She did not explain how she came to this conclusion or what separated this email from the others where she thought he did practice veterinary telemedicine.

### 13. Dog (Location Unknown)

On March 23, 2022, Cathy Armstrong, whose location was not given, emailed Hines about her Australian cattle dog. Dkt. No. 83-11, p. 30.  Armstrong stated that her dog received Cytopoint injections for itching, but that after the injections, her dog's energy waned. Id.  The dog eventually died of a brain cancer and Armstrong opined that the Cytopoint injections "either caused or made the tumor worse." Id.

On March 26, 2022, Hines responded that was he was "so sorry" to read about what happened to the dog. Dkt. No. 83-11, p. 30.  He inquired as to where Armstrong lived and whether the dog had also received oral Apoquel for the scratching. Id.  He opined that he believed that the manufacturer of Cytopoint should place "an age warning" on the medication, notifying pet owners of the dangers associated with the treatment. Id.

Dr. Patterson opined that Hines was not practicing veterinary telemedicine in this email exchange. Dkt. No. 83-12, p. 10.  She did not explain how she came to this conclusion or what separated this email from the others where she thought he did practice veterinary

telemedicine.  In her deposition, Dr. Patterson admitted that it was sometimes difficult for her to determine if Hines was practicing veterinary telemedicine. Dkt. No. 83-13, p. 13.

Van Vlerah also opined that this email was not the practice of veterinary medicine, categorizing it as "just a simple conversation between him and Cathy Armstrong in regards to Cytopoint injections." Dkt. No. 83-15, p. 21.

### 14. Cat (Location Unknown)

On April 29, 2022, Yael Rosen, whose location was unknown, emailed Hines about her five-year seal point ragdoll cat, named Sofia. Dkt. No. 83-11, p. 45.  The local veterinarian recently ran blood tests on Sofia, removed 200 cc of fluid from the cat's chest and diagnosed the cat with heart failure. Id.  Rosen listed the medications that the cat was receiving and asked if Sofia should be seen by a veterinary cardiologist. Id.

On that same day, Hines responded that there were several possibilities for what ailed Sofia: cardiomyopathy, feline infections peritonitis or lymphoma. Dkt. No. 83-11, p. 45.  He sent links to various articles on his website about each disease. Id.  He added that if Sofia was suffering from cardiomyopathy, he would recommend giving the cat "a human taurine supplement." Id.

Dr. Patterson opined that Hines was practicing veterinary telemedicine by recommending the taurine supplement for a cat that he had not personally examined. Dkt. No. 83-12, pp. 10-11.

Dr. Teller agreed that Hines was practicing veterinary telemedicine because he "provided differential diagnoses for Yael's cat and provided several treatment plans" and because Hines "recommended taurine without indicating the strength, dosage, frequency, and length of time to administer, nor the route of administration and potential side-effects." Dkt. No. 82-1, p. 255.

### 15. British Bird

On June 16, 2022, Helen Scott, a woman living in the United Kingdom, emailed Hines about a young great tit bird in her care. Dkt. No. 83-11, p. 49.  Scott noted that the bird suffered an injured leg, had it splinted by a local veterinarian and the bird managed to

get the splint off. Id.  Scott was concerned that the uninjured leg would cross the injured leg and inhibit the bird's motion. Id.

On that same day, Hines responded that the bird would need to have both legs in tape shackles "for a while," and sent her a link to an article he had written about curing spraddle leg in birds. Dkt. No. 83-11, p. 49.  He told her that he would need her telephone number so he could walk her through how to safely accomplish this. Id.

The next day, Hines sent a follow up email, noting that the bird appeared to be fully grown, which complicates its healing. Dkt. No. 83-11, p. 11.  He advised Scott that she did "not need a veterinarian, you need an arborist because bones assume the same position a shrub or tree assumes if it is held at a certain angle." Id.  Hines suggested that Scott use "the construction of some very light weight wire device that can slowly be adjusted to guide the bones to a more proper angle," and included a diagram of what he proposed. Id.

Dr. Patterson opined that Hines was practicing veterinary telemedicine, because he was recommending a treatment plan for a bird that he had never personally examined. Dkt. No. 83-12, p. 4.  She was concerned that Hines may have estimated the age incorrectly and whether Scott would be able to construct the device correctly. Id.

Dr. Teller also opined that this email exchange was the practice of veterinary medicine, on the grounds that Hines "recommended a specific course of treatment for Helen's great tit and even provided her with a diagram of how to construct the device." Dkt. No. 82-1, pp. 245.

### D. Hines I

On April 4, 2013, Hines sued the then-members of the State Board in the United States District Court for the Southern District of Texas. Hines v. Alldredge, et al., Civil Case No. 1:13-56, Dkt. No. 1 (S.D. Tex. 2013) (Tagle, J.) (hereafter "District Case"). Hines alleged that the prohibition on providing veterinary advice without a pre-existing relationship violated:  (1) his First Amendment right to freedom of speech; (2) his equal protection rights under the Fourteenth Amendment; and (3) his substantive due process rights under the Fourteenth Amendment. Id.  Hines sought declaratory and injunctive relief. Id.

On May 20, 2013, the State Board filed a motion to dismiss, asserting that Hines had failed to state a claim upon which relief can be granted. District Case, Dkt. No. 44.

On February 11, 2014, the District Court denied the motion to dismiss in part and granted it in part. District Case, Dkt. No. 57.

As to the First Amendment claim, the District Court found that "the First Amendment applies to the professional regulations at issue in this case, and that the regulations, as applied to Hines's professional speech, are subject to heightened scrutiny and must be shown to be reasonable." District Case, Dkt. No. 57, p. 8 (internal quotations omitted). The District Court further found that, based on the facts pled in the complaint, it was "plausible that the regulations are not tailored to achieve a substantial state interest, and are therefore not reasonable regulations of speech within the confines of a professional relationship." Id, pp. 8-9.

As to the equal protection claim, the District Court found that, because the regulations at issue did not impede "fundamental personal rights" and was not "drawn upon inherently suspect distinctions," they were subject to rational basis review. District Case, Dkt. No. 57, p. 11. The District Court found that the regulations met the rational basis standard because, it was, "at a minimum, rational for the state to believe that requiring a physical examination of an animal to establish a veterinarian-client-patient relationship and allow a veterinarian to treat the animal would tend to prevent misdiagnosis, improper treatment, and the subsequent increased risk of zoonotic disease." District Case, Dkt. No. 57, p. 12. The motion to dismiss was granted as to this claim. Id.

The Court found that the same rational basis analysis, that was used in dismissing the equal protection claim, applied to the substantive due process claim. District Case, Dkt. No. 57, pp. 13-14. Accordingly, the Court found that there was a rational basis for the statute and granted the motion to dismiss. Id.

On March 5, 2014, the State Board filed an unopposed motion for interlocutory appeal of the Court's resolution of the First Amendment claim. District Case, Dkt. No. 60. On March 27, 2014, the District Court granted the motion for interlocutory appeal. Id., Dkt.

No. 63.  On April 22, 2014, the State Board timely filed a notice of appeal. Id., Dkt. No. 64.

On March 27, 2015, the Fifth Circuit reversed the District Court, holding that the state statute did not infringe on Hines's First Amendment rights. Hines v. Alldredge, 783 F.3d 197, 198 (5th Cir. 2015) (Hines I).  The Court wrote that:

> We begin – and end – our First Amendment analysis by recognizing the statute at issue in this case for what it is.  The challenged state law prohibits the practice of veterinary medicine unless the veterinarian has first physically examined either the animal in question or its surrounding premises.  It does not regulate the content of any speech, require veterinarians to deliver any particular message, or restrict what can be said once a veterinary-client-patient relationship is established.

Hines I, 783 F.3d at 201.

The Fifth Circuit held that the examination requirement fell "squarely" within Texas's "broad power to establish standards for licensing practitioners and regulating the practice of professions." Hines I, 783 F.3d at 201 (quoting Gade v. National Solid Wastes Mgm't Ass'n, 505 U.S. 88, 108 (1992)).  It also noted that "state regulation of the practice of a profession, even though that regulation may have an incidental impact on speech, does not violate the Constitution." Hines I, 783 F.3d at 201.

The Fifth Circuit found that the examination requirement was a "narrow" and content-neutral regulation. Hines I, 783 F.3d at 201-02.  It further found that, to whatever extent the regulation implicated Hines's First Amendment rights, it was "incidental" to the regulation and "denies the veterinarian no due First Amendment right." Id.

The Fifth Circuit affirmed the District Court's dismissal of the equal protection and due process claims. Hines I, 783 F.3d at 201-02.  The Fifth Circuit remanded the case "for the entry of judgment in favor of the defendants." Hines I, 783 F.3d at 203.

On April 23, 2015, the District Court entered final judgment in favor of the State Board. District Case, Dkt. No. 72.

On November 30, 2015, the Supreme Court denied Hines's petition for writ of certiorari. Hines v. Alldredge, 136 S. Ct. 534 (2015).

### E. **Hines II**

On October 2, 2018, Hines again sued the State Board, seeking declaratory and injunctive relief. Dkt. No. 1.  Hines claims that the examination requirement violates his First Amendment right to free speech and his Fourteenth Amendment right to equal protection.

Hines argued that his First Amendment claim is not barred by the decision in Hines I, because the Supreme Court's decision in NIFLA "establishes that the Fifth Circuit was incorrect as a matter of constitutional law" when it decided Hines I. Dkt. No. 1, p. 25.  He argues that his Fourteenth Amendment claim is similarly not barred because a change in Texas law, allowing doctors to practice telemedicine without including an examination requirement, changed the operative facts that Hines I was based on.

Hines seeks to have the examination requirement declared to be unconstitutional and an injunction enjoining the State Board from enforcing it against him and other veterinarians. Dkt. No. 1, p. 34.  Hines seeks only prospective relief and does not seek "to reopen and undo the final judgments of either" the district court or Fifth Circuit decision in Hines I. Id., p. 29.

On December 14, 2018, the State Board timely filed a motion to dismiss, pursuant to FED. R. CIV. P. 12(b)(6). Dkt. No. 25.  As to the First Amendment claim, the State Board argued that this Court is bound by the Fifth Circuit's decision in Hines I and that NIFLA "did not unequivocally overrule" the Fifth Circuit's analysis in Hines I. Dkt. No. 25, p. 19. As to the Equal Protection Clause claim, the state board argued that "(1) a veterinarian is not similarly situated to a medical doctor and (2) even if they were, the physical examination requirement passes rational basis review, just as it did in Hines I." Dkt. No. 25, p. 14.

On February 19, 2019, the undersigned issued a Report and Recommendation, recommending that the motion to dismiss be granted as to the First Amendment claim, but denied as to the Equal Protection Claim. Dkt. No. 30.  As to the First Amendment claim, the Report and Recommendation stated that it was "foreclosed by the Fifth Circuit's decision in Hines I." Id., p. 21.

On June 11, 2019, the District Court adopted the Report and Recommendation in part and declined to adopt it in part. Dkt. No. 40.   It adopted the Report and Recommendation as to the First Amendment claim, finding that it was foreclosed by Hines I. Id., p. 10.  It also dismissed the Equal Protection claim, declining to adopt the Report and Recommendation. Id.  On July 2, 2019, Hines filed a notice of appeal. Dkt. No. 41.

On February 14, 2020, the Fifth Circuit issued its decision in Vizaline, holding that "that NIFLA abrogated [Hines I] to the extent that [Hines I] relied on the professional speech doctrine." Vizaline, 949 F.3d at 933.

Accordingly, on December 2, 2020, the Fifth Circuit remanded the First Amendment claim back to this Court, to determine whether the examination requirement was a regulation of speech or conduct, in light of its holding in Vizaline. Dkt. No. 48.  At the same time, the Fifth Circuit affirmed the dismissal of Hines's Equal Protection claim. Id.  On February 17, 2021, the case was formally remanded to the District Court. Id.

On February 25, 2021, this Court ordered the parties to brief the issue of whether the examination requirement regulates speech or conduct, in light of the Fifth Circuit's remand order. Dkt. No. 49.

On July 29, 2021, the undersigned issued a report and recommendation, which recommended that the motion to dismiss be denied as to the First Amendment claim. Dkt. No. 65.   The report and recommendation found that, under the facts as pled, the examination requirement was a content-based regulation of speech that was subject to strict scrutiny. Id.   On December 9, 2021, the District Judge adopted the report and recommendation in full. Dkt. No. 68.

On September 30, 2022, after a period of discovery, the parties filed cross motions for summary judgment. Dkt. Nos. 82, 83.

In the Board's motion for summary judgment, it argues that Hines lacks standing because he has not suffered an injury-in-fact; his speech is not chilled; and his injuries will not be redressed with a favorable decision. Dkt. No. 82.  It also argues that Hines's speech is not protected because it is integral to the criminal conduct of the unlicensed practice of veterinary medicine in the places where the animal is located.  The Board further argues

that the examination requirement regulates conduct rather than speech, but that even if it regulates speech, it is content-neutral and survives intermediate scrutiny. Id.

In Hines's motion for summary judgment, he argues that the examination requirement is a content-based regulation of his speech. Dkt. No. 83. As such, he argues that the requirement is subject to strict scrutiny and that the Board cannot carry its burden to show that the regulation is narrowly tailored. Id.

On October 21, 2022, the parties filed responses to the opposing party's motion for summary judgment. Dkt. Nos. 84, 85. In its response, the Board argues that the examination requirement is content-neutral and that this issue was foreclosed by the Fifth Circuit's holding in Hines I. Dkt. No. 84. The Board further argues that NIFLA left open the door for courts to hold that there can be categories of speech that are entitled to less protection because there is a long tradition of restricting that speech and that the examination requirement meets that standard. The Board also argues that the examination requirement is narrowly tailored to meet a compelling state interest.

In his response brief, Hines argued that he has standing, arguing that his injuries are real and redressable. Dkt. No. 85. Hines also argued that his speech is not integral to criminal conduct. He reiterated that the applicable standard for the Board's burden is strict scrutiny, but that the Board could not even meet intermediate scrutiny. Id.

On October 26, 2022, the Court ordered the parties to brief the following questions: (1) if Hines has "a First Amendment right to offer personalized veterinary advice in a jurisdiction where he is not a licensed veterinarian;" (2) if the answer to the first question would still be the same if Hines had never been licensed in any jurisdiction and was a 'self-taught' veterinarian; and (3) if states have the authority to criminalize the unlicensed practice of veterinary medicine, are Hines's emails considered speech integral to criminal conduct? Dkt. No. 86. The parties were ordered to brief these questions in their reply briefs.

On November 4, 2022, the parties filed their reply briefs. Dkt. Nos. 87, 88. In his reply brief, Hines argues that he has a First Amendment right to offer personalized veterinary advice in a state where he is not licensed and that any restriction would be

subject to strict scrutiny and that would still hold true even if he had never been licensed anywhere as a veterinarian. Dkt. No. 87.   Hines reiterated his argument that the examination requirement operates as a content-based restriction on speech and that any holding to the contrary in Hines I was abrogated by NIFLA, Vizaline, and Hines II.   Hines also urged the Court to reject the Board's argument that veterinary advice is a category of speech that qualifies under the long tradition of restricted speech.

In its reply brief, the Board asserts that Hines does not have a First Amendment right to offer personalized veterinary advice in jurisdictions where he is not licensed and that such speech is integral to criminal conduct. Dkt. No. 88.   The Board reiterated its position that the examination requirement regulates conduct rather than speech, but that even as a restriction on speech, it survives intermediate scrutiny. Id.

On November 18, 2022, the Court ordered the parties to file supplemental briefing as to whether Hines met the standard for the issuance of permanent injunctive relief. Dkt. No. 89.

On December 9, 2022, the parties filed their supplemental briefing. Dkt. Nos. 90, 91.   Hines argued that he has met the applicable standard for permanent injunctive relief, largely because a permanent injunction is needed to protect his First Amendment freedoms. Dkt. No. 91.   The Board asserted that Hines is not entitled to permanent injunctive relief because he waited too long to seek such relief and the balance of hardships and public interest are not served by a ruling in Hines's favor. Dkt. No. 90.

## II. Applicable Law

### A. Section 1983

As relevant here, 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall

not be granted unless a declaratory decree was violated or declaratory relief
was unavailable.

Id.

Section 1983 "is not itself a source of substantive rights, but a method for
vindicating federal rights elsewhere conferred by those parts of the United States
Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144,
n. 3 (1979).  To prevail upon a § 1983 claim a plaintiff must establish two elements: (1) a
constitutional violation; and (2) that the defendants were acting under color of state law
when they committed the constitutional violation.  Whitley v. Hanna, 726 F.3d 631, 638
(5th Cir. 2013).

**B. Summary Judgment**

Summary judgment is appropriate when the moving party has established that the
pleadings, depositions, answers to interrogatories, admissions, and affidavits – if any –
demonstrate that there is no genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

A "genuine issue of material fact exists where evidence is such that a reasonable
jury could return a verdict for the non-movant." Piazza's Seafood World, L.L.C. v. Odom,
448 F.3d 744, 752 (5th Cir. 2006).  The movant "can show there's no material dispute if
he demonstrates that the [non-movant] could not prevail even if each factual question were
resolved in their favor." Freedom From Religion Found., Inc. v. Mack, 49 F.4th 941, 950
(5th Cir. 2022).

If the non-movant would bear the burden of proof at trial, the moving party may
satisfy its summary judgment burden "by merely pointing out that the evidence in the
record contains insufficient proof concerning an essential element of the nonmoving
party's claim." Ortega Garcia v. U.S., 986 F.3d 513, 533 (5th Cir. 2021).  The burden then
shifts to the nonmoving party, who must, by submitting or referring to evidence, set out
specific facts showing that a genuine issue exists. Id.

"All facts must be viewed in the light most favorable to the nonmovant and all
justifiable inferences must be drawn in his favor." Crane v. City of Arlington, Texas, 50
F.4th 453, 461 (5th Cir. 2022).  Thus, factual controversies are resolved in favor of the

non-movant, "but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp., 7 F.4th 315, 321 (5th Cir. 2021).  In the "absence of any proof," the Court cannot and will not assume that the non-moving party could or would prove the necessary facts. McCarty v. Hillstone Rest. Grp., Inc., 864 F.3d 354, 358 (5th Cir. 2017).

"In cases involving cross-motions for summary judgment, the motions are reviewed independently, with evidence and inferences taken in the light most favorable to the nonmoving party." Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Engineers & Surveyors, 916 F.3d 483, 487 (5th Cir. 2019) (internal quotation marks omitted).  "Where the evidentiary facts are not disputed, a court in a nonjury case may grant summary judgment if trial would not enhance its ability to draw inferences and conclusions." Id. (internal quotation marks omitted).

### C. Permanent Injunctive Relief

Hines has sought the entry of a "permanent prospective injunction enjoining Defendants from enforcing these unconstitutional statutes, regulations, and practices against Dr. Hines and others similarly situated." Dkt. No. 1, p. 34. "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." Abraham v. Alpha Chi Omega, 708 F.3d 614, 627 (5th Cir. 2013).

"The party seeking a permanent injunction must meet a four-part test.  It must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." VRC LLC v. City of Dallas, 460 F.3d 607, 611 (5th Cir. 2006).

## III. Analysis

The Defendants have challenged whether Hines has standing to prosecute his claim. The Court will first address standing before determining the proper standard of review for Hines's First Amendment claim and then examining each motion for summary judgment.

## A. Standing

The Defendants argue that Hines lacks standing in this case because his speech was never chilled.  The Court finds that this argument is not well-taken.

"To establish standing, a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." Houston Chron. Pub. Co. v. City of League City, Tex., 488 F.3d 613, 617 (5th Cir. 2007).  The Court will address each of these elements in turn.[5]

### 1. Injury In Fact

As to the injury-in-fact requirement, Hines has brought a pre-enforcement challenge to the examination requirement, asserting that the Texas law violates his First Amendment rights.  "A plaintiff bringing such a challenge need not have experienced 'an actual arrest, prosecution, or other enforcement action' to establish standing." Barilla v. City of Houston, Texas, 13 F.4th 427, 431 (5th Cir. 2021).  In this context, "a plaintiff has suffered an injury in fact if he (1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." Speech First, Inc. v. Fenves, 979 F.3d 319, 330 (5th Cir. 2020) (cleaned up).[6]

---

[5] Hines has sought relief on behalf of "others similarly situated." Dkt. No. 1, p. 34.  The "usual rule that litigation is conducted by and on behalf of the individual named parties only," and class actions are the exception to that rule. Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013).  Any class action must comply with the requirements of Fed. R. Civ. P. 23. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  Hines has not moved for class certification under Rule 23.  Thus, he only has standing to represent his own interests and not the interests of any person who is similarly situated.

[6] "Cleaned up" is a parenthetical that signals to the reader that the author "has removed extraneous, non-substantive clutter such as brackets, quotation marks, ellipses, footnote signals, internal citations or made un-bracketed changes to capitalization," in order to make the quotation more readable, but has not altered the substance of the quotation. Na v. Gillespie, 2017 WL 5956773, at *3 (Md. Ct. Spec. App. Dec. 1, 2017); see also Flores-Abarca v. Barr, 937 F.3d 473, 479-81 (5th Cir. 2019) (using "cleaned up").

Hines meets all three requirements to demonstrate an injury-in-fact.  Hines has an intention to engage in a course of conduct – communicating with pet owners – that is arguably affected with a constitutional interest.  See Hines II, 982 F.3d at 271 ("general licensing regulations are not automatically immune from First Amendment scrutiny").

Furthermore, his intended future conduct of communicating with pet owners is nearly identical to his past conduct, which has been held to be proscribed by the statute.  Indeed, Van Vlerah, the Board's official representative, described several of Hines's emails as violating the statute. Dkt. No. 83-15, pp. 14-19.

Lastly, the threat of future enforcement is substantial.  Where the State "has not disavowed any intention of invoking" the law, the plaintiff is "not without some reason in fearing prosecution." Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 302 (1979).  Van Vlerah admitted that the ban on veterinary telemedicine, performed without any prior in-person examination of the animal, was "a statute and we are required to enforce the statute." Dkt. No. 83-15, pp. 7-8.  When asked if the Board continues to enforce the statute, Van Vlerah replied, "Yes." Id., p. 13.  Also, Hines was subjected to administrative penalties in the past for violating the statute.  This enforcement of the statute bolsters his claim that he faces a substantial threat of enforcement. Barilla, 13 F.4th at 434.

The Defendants argue that there is no substantial threat of future enforcement because over a decade has passed since Hines was administratively disciplined, Hines has continued to engage in the prohibited conduct and no further enforcement actions have been taken against him. Dkt. No. 82, pp. 18-20.  This argument misses the mark.

The Fifth Circuit has held that "a lack of past enforcement does not alone doom a claim of standing." Speech First, 979 F.3d at 336.  The Board cites no caselaw to show that a decade of non-enforcement against a particular litigant renders a statute moribund.  The Fifth Circuit has stated that "a plaintiff who mounts a pre-enforcement statutory challenge on First Amendment grounds need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute." Id. (cleaned up) (quoting Majors v. Abell, 317 F.3d 719, 721 (7th Cir. 2003)).  The Board has indicated that it still

enforces the statute. Dkt. No. 83-15, p. 13. So long as the statute "remains non-moribund," Hines faces a credible threat of enforcement. Speech First, 979 F.3d at 336-37.

The Defendants argue that because Hines's speech was not chilled – he admitted that he never stopped answering emails from pet owners – then he did not suffer an injury that would confer standing. Dkt. No. 82, pp. 16-18.[7] It is true that chilled speech can often provide an injury-in-fact that is sufficient to confer standing. See Houston Chron. Pub. Co., 488 F.3d at 618 ("Chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement."). It is equally true that Hines's speech was never chilled because he continues to communicate with pet owners in violation of the statute. Dkt. No. 82-1, p. 60. However, chilled speech is not the only method for proving injury-in-fact in a First Amendment pre-enforcement case. A credible threat of enforcement is sufficient to create standing, even if the speech was not chilled. Seals v. McBee, 898 F.3d 587, 591 (5th Cir. 2018). Hines has faced previous administrative discipline for his actions and the Board has not disavowed enforcement of the statute. Thus, Hines has demonstrated an injury in fact.

### 2. Traceable

Hines must show that his injury is fairly traceable to the Board's conduct. He has made this showing.

The Board is tasked with enforcing the physical examination requirement and has enforced this statute in the past against Hines. Hines can sue the Board in their official capacity because they have "some connection with the enforcement of the act in question"

---

[7] The complaint alleged that Hines's speech was chilled. From this, the Defendants argue that Hines engaged in a fraud on the court by making a claim that was unsupported by the facts. Dkt. No. 82, p. 18. "To establish fraud on the court, it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its discretion. Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court. Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court." Lave v. Davis, 655 F. App'x 255, 259 (5th Cir. 2016) (quoting Fierro v. Johnson, 197 F.3d 147, 153–54 (5th Cir. 1999)). The allegations made against Hines and his attorneys – that the complaint alleged that Hines's speech was chilled when it was not – do not rise to the level of fraud on the court. This claim by the Defendants should be denied.

and are "specially charged with the duty to enforce the statute and be threatening to exercise that duty." Texas Democratic Party v. Abbott, 978 F.3d 168, 179 (5th Cir. 2020) (cleaned up).  Accordingly, Hines's injuries are traceable to the Defendants.

### 3. Redressability

Hines must show that his injury can be redressed through a favorable decision. Again, he has met this standard.

Hines seeks a declaratory judgment that "Tex. Occ. Code § 801.351; Tex. Occ. Code §§ 801.401-02; Tex. Admin. Code Title 22, Part 24, § 573.27 (Rule of Professional Conduct involving 'Honesty, Integrity and Fair Dealing'); and related regulations and practices promulgated or carried out under the Texas Veterinary Licensing Act are unconstitutional as applied and on their face to the extent that they prohibit Dr. Hines from providing veterinary advice solely through electronic means without first physically examining the animal that is the subject of that advice." Dkt. No. 1, p. 34.  He also seeks an injunction preventing the Defendants from enforcing those "unconstitutional statutes, regulations, and practices against Dr. Hines and others similarly situated." Id.

Hines satisfies the redressability requirement if "he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n, 760 F.3d 427, 432 (5th Cir. 2014).  If the Court issues the requested declaratory judgment and injunction, it will relieve the discrete injury of the threat of criminal prosecution and administrative penalties.

The Defendants argue that Hines's injury is not redressable because his conduct is prohibited by a different regulation.  Texas regulations provide that:

> a veterinarian shall have a duty to a client to suggest a referral to a specialist, or otherwise more qualified veterinarian, in any case where the care and treatment of the animal is beyond the veterinarian's capabilities. A veterinarian's decision on whether to accept or continue care and treatment of an animal, which may require expertise beyond the veterinarian's capabilities, shall be based on the exercise of sound judgment within the prevailing standard of care for a veterinarian faced with the same or similar circumstances.

22 TEX. ADMIN. CODE § 573.24(a).

In determining whether a veterinarian violated this provision, the Board must consider "the training and experience of the veterinarian, the availability of a specialist or more qualified veterinarian, the timeliness and adequacy of information provided to the client regarding the possible need for a referral, the requests of the client, and the likelihood that an adverse result could have been prevented by a timely referral." § 573.24(b).  The Defendants argue that their experts all testified that Hines's emails fell below this standard of care and that in every case, Hines should have referred the animals to a local veterinarian.

Hines has sought a declaratory judgment that any statute, regulation, or rule which flatly prohibits him from offering personalized advice to pet owners without a prior physical examination is unconstitutional and cannot be enforced against him.  The Defendants argue that Hines cannot be given this relief, because they interpret a regulation as impliedly requiring a physical examination, so even if the physical examination requirement was enjoined, they would enforce it by other means.[8]  Any declaratory judgment or injunction would cover any statute, regulation or rule which has a per se prohibition on communicating personalized advice to pet owners without first examining the animal in person.  As such, Hines's injuries would be redressed by a favorable decision.

### B. Protected Speech

The Defendants argue that Hines's speech is not protected because it is integral to criminal activity, namely the unlicensed practice of veterinary medicine.  The Court finds this argument to be partially persuasive.

"Core criminal speech such as extortion, bribery, or perjury has no First Amendment protection." Seals, 898 F.3d at 597 n. 25.  Speech that is "an integral part of conduct in violation of a valid criminal statute" is not protected by the First Amendment. U.S. v. Stevens, 559 U.S. 460, 471 (2010).  However, "Congress may not define speech as a crime,

---

[8] This line of reasoning also cuts against the Board's argument that Hines does not face a credible threat of prosecution.  The Board is arguing that even if the physical examination statute was enjoined, it would still enforce its spirit through other regulations.

and then render the speech unprotected by the First Amendment merely because it is integral to speech that Congress has criminalized.  To qualify as speech integral to criminal conduct, the speech must be integral to conduct that constitutes another offense that does not involve protected speech." U.S. v. Sryniawski, 48 F.4th 583, 588 (8th Cir. 2022).  The Defendants argue that Hines's speech is integral to the crime of the unlicensed practice of veterinary medicine.

As the Court understands the record, Hines is solely licensed in Texas today. Dkt. No. 83-1.  Every state in the country requires a veterinarian to be licensed in that state in order to provide veterinary medical services to animals located within that state.[9]  Thus, when Hines diagnoses an animal in another state via email or telephone, he is engaged in the practice of veterinary medicine in that state.  Hines's actions violate the laws of the state where the animal is located.  The Board has the legal authority to discipline Hines for violating the laws of other states, "if the act is connected with the licensee's professional practice." 22 TEX. ADMIN. CODE § 573.4.

Furthermore, a "complaint, indictment, or conviction of a law violation is not necessary" for the Defendants to enforce this rule. Id.  Rather, all that is needed is proof "of the commission of the act while in the practice of" veterinary medicine. Id.  The Board has the authority under this regulation to discipline Hines for violating the law of the state where the animal is located.  Thus, when Hines diagnoses an animal via telemedicine in a

---

[9] ALA. CODE § 34-29-76(9); ALASKA STAT. § 08.98.120(A); ARIZ. REV. STAT. § 32-2238; ARK. CODE § 17-101-307; CAL. BUS. & PROF. CODE § 4825; COLO. REV. STAT. § 12-315-105(1); CONN. GEN. STAT. § 20-197(A); DEL. CODE TIT. 24, § 3303; FLA. STAT. § 474.213(I); GA. COMP. R. & REGS. 700-8-.01(B)(2); HAW. REV. STAT. § 471-15; IDAHO CODE § 54-2104(1); 225 ILL. COMP. STAT. 115/5; IND. CODE § 25-38.1-4-10; IOWA CODE § 169.19(1); KAN. STAT. § 47-817; KY. REV. STAT. § 321.190; LA. STAT. § 37:1531; ME. REV. STAT. TIT. 32, § 4860; MD. CODE, AGRIC. § 2-313(A)(2)(I); MASS. GEN. LAWS CH. 112, § 59; MICH. COMP. LAWS § 333.18811; MINN. STAT. § 156.10; MISS. CODE. § 73-39-91; MO. STAT. § 340.216(1); MONT. CODE § 37-18-301; NEB. REV. STAT. § 38-3321; NEV. REV. STAT. § 638.090; N.H. REV. STAT. § 332-B:2; N.J. STAT. § 45:16-9; N.M. STAT. § 61-14-18; N.Y. EDUC. LAW § 6702; N.C. GEN. STAT. § 90-187.10; N.D. CENT. CODE § 43-29-17; OHIO REV. CODE § 4741.19; OKLA. STAT. ANN. TIT. 59, § 698.89(A); OR. REV. STAT. § 686.020(1)(A); 63 PA. STAT. § 485.9(A); 5 R.I. GEN. LAWS § 5-25-8; S.C. CODE § 40-69-270(A); S.D. CODIFIED LAWS § 36-12-27; TENN. CODE § 63-12-112; TEX. OCC. CODE § 801.251; UTAH CODE § 58-28-301(1)(A); VT. STAT. TIT. 26, § 2402; VA. CODE § 54.1-3805; WASH. REV. CODE § 18.92.051; W. VA. CODE § 30-10-1; WIS. STAT. § 89.05; WYO. STAT. § 33-30-203.

state where he is not licensed, he violates Texas's physical examination requirement as well as the law of the state where the animal is located, and the Board can discipline for violating either or both laws.

However, this regulation only allows the Board to discipline Hines for violations of "the laws of the State of Texas, other states, or of the United States" and not foreign nations. Id. When Hines diagnoses an animal via telemedicine in a foreign country where he is not licensed, he violates Texas's physical examination requirement, but the Board cannot discipline him for violating foreign laws. Thus, the Board lacks the jurisdiction to discipline him solely for violating foreign laws.[10]

The unauthorized practice of veterinary medicine within the United States constitutes an offense that does not involve protected speech. As such, Hines's speech would appear to be integral to criminal conduct and not protected by the First Amendment. However, the Supreme Court made clear that a state may not obliterate a person's "First Amendment rights by simply imposing a licensing requirement." NIFLA, 138 S. Ct. at 2375. At the same time, states "may regulate professional conduct, even though that conduct incidentally involves speech." Id. at 2372. As applied to Hines's conduct, the laws of the other 49 states restrict his speech, but those restrictions stand up to even strict scrutiny.

The Court does not consider whether the unauthorized practice laws are generally aimed at regulating conduct, but whether Hines's actions that would trigger the unauthorized practice laws of 49 other states are speech or conduct. Holder v. Humanitarian L. Project, 561 U.S. 1, 28 (2010); Vizaline, 949 F.3d at 934. The Court finds that Hines engaged in speech, which would trigger the unauthorized practice laws. Pet owners would email Hines describing a scenario they were facing with a pet – a bird with a broken wing,

---

[10] Van Vlerah testified that the Board has jurisdiction over acts committed by a Texas-licensed veterinarian. Dkt. No. 83-15, pp. 9-10. The regulation at issue gives the Board jurisdiction over acts that violate "the laws of the State of Texas, other states, or of the United States," but does not give jurisdiction over acts which violate foreign laws. 22 TEX. ADMIN. CODE § 573.4. Thus, Van Vlerah's view of the Board's jurisdiction is more expansive than the law. The Court will apply the law as written.

dogs with digestive issues, or cats with fluid built up in their lungs – and ask for his advice. Hines would reply with an email, giving his opinion based on the facts presented. It is this response email that would trigger the unauthorized practice laws. Thus, the law restricts Hines's speech.

The Court will assume, for the sake of argument, that the law is a content-based regulation of Hines's speech. As such, the unauthorized practice laws must further "a compelling interest" and be "narrowly tailored to achieve that interest." Willey v. Harris Cnty. Dist. Att'y, 27 F.4th 1125, 1129 (5th Cir. 2022). Each of the 50 states has a compelling interest in ensuring that its veterinarians meet the minimum standards of knowledge, competence, and ethical conduct. Licensed veterinarians treat everything from house pets to livestock to exotic animals in zoos. The state clearly has a compelling interest in the ethical treatment of animals, prevention of zoonotic disease, and preventing unqualified veterinarians from providing fraudulent treatment.

Furthermore, these laws are narrowly tailored to achieve that interest. "The essence of narrow tailoring is to focus on the source of the evils the government seeks to eliminate without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." Willey, 27 F.4th at 1134 (cleaned up). The states have created a process by which veterinarians can prove their competence, knowledge, and ethics, via testing and an application process. These laws promote the state's compelling interests in veterinary medicine and allows interested persons to show that they will promote the state's interests in quality veterinary care. As such, the laws are valid criminal statutes which do not run afoul of the First Amendment.

When Hines is offering a medical opinion and diagnosis to an animal owner in an American jurisdiction where he is not licensed to practice veterinary medicine, he is engaging in speech that is integral to criminal conduct and his speech is not protected by the First Amendment.

This, however, does not end the analysis. Hines is licensed in Texas, so any communications with Texas-based animal owners would not fall under this analysis. Furthermore, his communications with foreign animal owners would also not fall under

this analysis, as the Board cannot discipline Hines solely for violating foreign laws.  As such, the Court must consider whether the examination requirement regulates speech or conduct.

### C. Speech or Conduct

The Court begins the analysis by noting that this case is an "as applied" challenge to the physical examination requirement.  That is, Hines is challenging the application of the law to his past practices and future plans.  The Court is only examining the statute in relation to the facts of this particular case, and not whether the law would be constitutional as applied to every action taken by every veterinarian in Texas. Justice v. Hosemann, 771 F.3d 285, 292 (5th Cir. 2014); see also Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir. 1998) ("An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others.").

Because this is an "as applied" challenge, the Court must consider whether the examination requirement regulates Hines's speech or conduct.  See Vizaline, L.L.C. v. Tracy, 949 F.3d 927, 931 (5th Cir. 2020) ("the relevant question is whether, as applied to Vizaline's practice, Mississippi's licensing requirements regulate only speech, restrict speech only incidentally to their regulation of non-expressive professional conduct, or regulate only non-expressive conduct") (emphasis added).  Indeed, "a statute or a rule may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question." Boddie v. Connecticut, 401 U.S. 371, 379 (1971).

The Court does not consider whether the law is generally aimed at regulating conduct, but whether Hines's actions that triggered coverage of the examination requirement were speech or conduct. Holder v. Humanitarian L. Project, 561 U.S. 1, 28 (2010) (citing Cohen v. California, 403 U.S. 15 (1971)).

The record shows that Hines engaged in speech, which triggered the examination requirement.  Pet owners would email Hines describing a scenario they were facing with a pet – a bird with a broken wing, dogs with cancer, or cats with fluid built up in their lungs

– and ask for his advice.  Hines would reply with an email, giving his opinion based on the facts presented.  Sometimes, he would give advice on over the counter supplements for the pet, such as taurine or calcium carbonate.  Sometimes, he would advise the pet owner as how to help the animal, such as a diagram for a splint for an injured bird's leg.  Sometimes, he would advise the pet owner as to questions and/or concerns they could raise with the treating veterinarian.  Notably, he does not prescribe controlled substances to pets that he has not personally examined. Dkt. No. 1, pp. 9-10.  All of his actions are taken <u>via</u> email and telephone communications.

The State Board argues that Hines "engaged in conduct by diagnosing, treating, prescribing, and otherwise practicing veterinary medicine." Dkt. No. 82, p. 26.  Obviously, there are times when a veterinarian engages in conduct, such as physically touching an animal to treat it.  There are other instances where a veterinarian engages in conduct that incidentally involves speech, such as sending a prescription for a controlled substance to a pharmacy.  Hines, however, has engaged in speech by responding to pet owners with personalized veterinary advice.  There can be no question, but that, "the creation and dissemination of information are speech within the meaning of the First Amendment." <u>Sorrell v. IMS Health Inc.</u>, 564 U.S. 552, 570 (2011).

The Court must be careful not to manipulate the law to construe Hines's speech as conduct.  The "enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." <u>Wollschlaeger v. Governor, Fla.</u>, 848 F.3d 1293, 1308 (11th Cir. 2017).  The Court should label speech as speech when conducting this analysis. See <u>Pacific Coast Horseshoeing Sch., Inc. v. Kirchmeyer</u>, 961 F.3d 1062, 1069 (9th Cir. 2020) (a law that "regulates what kind of educational programs different institutions can offer to different students" was a regulation of speech and not conduct); <u>Otto v. City of Boca Raton, Fla.</u>, 981 F.3d 854, 862 (11th Cir. 2020) (law prohibiting therapists from offering therapy to eliminate or reduce same-sex attractions was a regulation of speech and not conduct); <u>New Hope Fam. Servs., Inc. v. Poole</u>, 966 F.3d 145, 176 (2d Cir. 2020) (law banning private adoption agency from discriminating against same-sex couples was a regulation of speech, not conduct, as applied

36

to a faith-based organization); <u>Expressions Hair Design v. Schneiderman</u>, — U.S. —, 137 S. Ct. 1144, 1151 (2017) (law which regulated how stores could communicate prices for paying with cash versus paying with a credit card was a regulation of speech rather than conduct).

As applied to Hines, the examination requirement regulates speech and not conduct. It prevents him from engaging in phone calls and emails with animal owners to give them specific medical advice.  If he were prescribing medication or otherwise treating the animals, he would be engaging in conduct.  <u>See</u> <u>Trustees of Indiana Univ. v. Curry</u>, 918 F.3d 537, 543 (7th Cir. 2019) (laws prohibiting the use of aborted fetal tissue in research regulated conduct, not speech, because the plaintiffs could still "say, write, and teach anything they want," but were not allowed just not use certain tissue for experiments and/or research).

To use an example, Hines sent the owner of a bird a diagram for how to construct a splint for a bird's leg.  Had Hines constructed a splint himself and mailed it to the bird's owner, that would be conduct.  Any speech connected with constructing the splint would be incidental to the conduct.  But in this case, Hines merely sent her an email, so the prohibition on that communication "is not tied to a procedure at all." <u>NIFLA</u>, 138 S. Ct. at 2373.  Hines only engaged in speech.  The examination requirement serves as a barrier to prevent Hines from engaging in protected speech.  As such, it regulates speech and not conduct.

### D. Content Neutral or Content Based

Having determined that the examination requirement regulates Hines's speech, the Court must determine what level of scrutiny applies to the examination requirement.  The key question in this instance is whether the regulation is content neutral or content based. The Court must first address whether this issue has been foreclosed by the holding in <u>Hines I</u> and then whether it is content neutral based on recent Supreme Court decisions.

### 1. **Hines I**

The Board argues that "Fifth Circuit ruling in <u>Hines I</u> that the physical examination requirement is content neutral remains good law," and that the Court is required to follow it.  This argument is not well-taken.

As a general rule, the Court must faithfully apply Fifth Circuit precedent.  <u>See</u> <u>Alvarez v. City of Brownsville</u>, 904 F.3d 382, 398 (5th Cir. 2018) (Ho, J., concurring) ("it is long established that district courts are bound to follow circuit precedent unless it directly conflicts with Supreme Court precedent").  However, "Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent." <u>In re Bonvillian Marine Serv., Inc.</u>, 19 F.4th 787, 792 (5th Cir. 2021) (cleaned up).  <u>NIFLA</u> implicitly overruled <u>Hines I</u>, as was recognized in <u>Hines II</u>.

In <u>Hines I</u>, the Fifth Circuit held that because the physical examination requirement did not directly "regulate the content of any speech, require veterinarians to deliver any particular message, or restrict what can be said once a veterinary-client-patient relationship is established," it was a content neutral regulation of the practice of a profession. <u>Hines I</u>, 783 F.3d at 201.  The Fifth Circuit even questioned whether the physical examination requirement implicated the First Amendment but held that it was a generally applicable licensing requirement. <u>Id.</u>, at 202.

The Fifth Circuit further cited cases from other circuits, including <u>Moore–King v. Cnty. of Chesterfield, Va.</u>, 708 F.3d 560, 569–70 (4th Cir. 2013), in support of the notion that regulations of the professional-client relationship did not violate the First Amendment. <u>Hines I</u>, 783 F.3d at 202.  The <u>Hines I</u> Court clearly relied on the professional speech doctrine to conclude that the physical examination requirement was a content neutral regulation of speech that did not violate the First Amendment.

In <u>NIFLA</u>, the Supreme Court held that "[s]peech is not unprotected merely because it is uttered by professionals." <u>NIFLA</u>, 138 S. Ct. at 2371–72 (internal quotations omitted). The Supreme Court directly held that <u>Moore-King</u> was no longer good law because it excepted "professional speech from the rule that content-based regulations of speech are subject to strict scrutiny." <u>Id</u>.  Thus, <u>NIFLA</u> established a rule of law – that the government

cannot be given "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement" – that is inconsistent with the holding of Hines I. NIFLA, 138 S. Ct. at 2375.  In Vizaline, the Fifth Circuit recognized that NIFLA overruled the reasoning of Hines I, rendering its reasoning to be "unsound." Vizaline, 949 F.3d at 933.

The Board argues that while NIFLA overruled the Hines I decision as to the applicability of the professional speech doctrine, it left the content neutrality analysis undisturbed. Dkt. No. 84, p. 14.  The Court finds that the Hines I analysis of professional speech and the content neutrality analysis cannot be separated in this way.  The Fifth Circuit relied solely on the professional speech doctrine to conclude that the physical examination requirement was a "content-neutral regulation of the professional-client relationship." Hines I, 783 F.3d at 202.  As such, this analysis has been implicitly overruled by NIFLA and the Court is not bound by it.  The Court now turns to whether the physical examination requirement is a content-neutral or content-based regulation of speech.

### 2. Content Neutral or Content Based

"A regulation of speech is facially content based under the First Amendment if it targets speech based on its communicative content — that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC, — U.S. —, 142 S. Ct. 1464, 1471 (2022). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 165 (2015).

Reed and Reagan National are two recent Supreme Court decisions which shed a great deal of light on whether a regulation of speech is content-neutral or content-based.  A review of those cases shows that the facts of this case are closer to those in Reed, showing that the regulation at issue in this case is content based.

In Reed, the town of Gilbert, Arizona, enacted a comprehensive ordinance for signs, with differing rules based on the content of the sign. Reed, 576 U.S. at 160–61.  For

example, there were different rules for political signs versus ideological signs versus directional signs, designed to direct passersby to a nearby event. Id. However, the code did not discriminate within those categories. While it gave more favorable treatment to political signs over directional signs, it did not favor Republicans over Democrats or favor garage sales over concerts. Id.

The Supreme Court found that the sign regulations were a content-based regulation of speech, because the regulations "that apply to any given sign thus depend entirely on the communicative content of the sign." Reed, 576 U.S. at 164. It added that:

> If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government.

Id.

In Reed, the Supreme Court stated that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." Reed, 576 U.S. at 163–64.

In Reagan National, the Supreme Court further defined what it meant by speech that was regulated based on "its function or purpose." The city of Austin, Texas, enacted a regulation of "signs that advertise things that are not located on the same premises as the sign, as well as signs that direct people to offsite locations." Reagan Nat'l, 142 S. Ct. at 1468. Thus, the regulation drew distinctions between outdoor advertising that was located on the premises of the business versus outdoor advertising that was not located on the premises of the business. Id. A business which owned billboards in Austin sought a permit to digitize those billboards and the city denied the request on the grounds that the code did not allow digitization of off-premises billboards. Id. at 1470. The business challenged the

regulations as a content-based regulation of speech because it defined the speech by its function or purpose. Id.

The Supreme Court found that the regulation was content neutral because the content of the billboard was irrelevant to the regulation, the only dispositive factor for the differing treatment was its location. Reagan Nat'l, 142 S. Ct. at 1473.  It held that "[t]he on-/off-premises distinction is therefore similar to ordinary time, place, or manner restrictions." Id.  The fact that the city had to read the sign to determine if it was advertising on- or off-premises did not mean that the regulation was content based.  As to the "function or purpose" language from Reed, the Supreme Court explained, "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result. That does not mean that any classification that considers function or purpose is always content based." Reagan Nat'l, 142 S. Ct. at 1474.

The regulation at issue in this case is content based.  The Board must scrutinize Hines's emails to determine if he is diagnosing an animal, which depends on razor-sharp distinctions.  Van Vlerah, in her deposition, was shown a hypothetical email from a dog owner, concerned about the dog's increased water consumption and weight loss. Dkt. No. 83-15, pp. 26-27; Dkt. No. 83-19, p. 3.  The hypothetical response from the veterinarian began with "[t]he most common thing in dogs that will cause increased water consumption, especially with associated weight loss, is diabetes. It's similar to diabetes in people, except that dogs are almost always insulin dependent." Dkt. No. 83-19, p. 3.  Van Vlerah stated that this was not the practice of veterinary medicine, because it was generalized advice not directed at a specific animal. Dkt. No. 83-15, pp. 26-27.

She was asked if the response would be the practice of veterinary medicine if it read, "Because of the increased water consumption and associated weight loss, the most likely problem with your dog is diabetes." Id.  She replied that she thought it would constitute the practice of veterinary medicine. Id.  The only substantive difference between the responses is describing the problem as either "common" or "likely" and the personalization of "your dog" as opposed to dogs generally.  Hines can make all of the general comments on animals

that he wants to, but the minute that the advice is personalized, he is required to have personally examined the pet before he can speak. This is a subject-matter distinction which is content based. As such, it is subject to strict scrutiny.

### 3. Long Tradition

The Board has asked the Court to "recognize a new category of content-based speech that is not subject to strict scrutiny." Dkt. No. 84, p. 14. The Court should decline this invitation.

The Supreme Court has stated that governments are not permitted to engage in content-based regulation of speech "without persuasive evidence of a long (if heretofore unrecognized) tradition to that effect." NIFLA, 138 S. Ct. at 2372. It has speculated that "[m]aybe there are some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law." Stevens, 559 U.S. at 472. The Board argues that there is a long tradition of regulating veterinary medicine, which means the Court should recognize the physical examination requirement as such a new category. Dkt. No. 84, pp. 14-16.

The Court does recognize that there is a long tradition of licensing medical professionals within the state of Texas. See Pistole v. State, 68 Tex. Crim. 127, 130, 150 S.W. 618, 620 (1912) (holding that the state could require a license to practice veterinary medicine). But the Board cannot simply declare that there is a long tradition of licensing and use that tradition to curtail Hines's free speech rights.

There is a similarly long tradition of regulating the practice of medicine in California, yet that tradition did not grant that state carte blanche to regulate the speech of licensed medical practitioners within its borders. See Ex parte McNulty, 77 Cal. 164, 167, 19 P. 237, 239 (1888) (holding that California could require a license to practice medicine) & NIFLA, 138 S. Ct. at 2375 (striking down a requirement on licensed pregnancy centers to provide certain information to patients). The Board has not identified a long tradition of requiring veterinarians to personally examine an animal prior to offering a diagnosis. Indeed, the first patent for the telephone was issued in 1876, but Texas did not ban veterinarians from using the telephone to establish a veterinarian-client relationship until

2005. <u>See</u> U.S. Patent No. 174,465 (issued Mar. 7, 1876) & 2005 Tex. Sess. Law Serv. Ch. 971 (H.B. 1767) (amending the law to state that "[a] veterinarian-client-patient relationship may not be established solely by telephone or electronic means.").

While the Court accepts that there is a long tradition of requiring veterinarians to be licensed, it does not accept that there is a long unrecognized tradition of requiring veterinarians to engage in an in-person examination of the animal prior to offering a diagnosis. Thus, the Court should not recognize that the physical examination requirement is part of "a new category of content-based speech that is not subject to strict scrutiny."

Given these conclusions, the Court will turn to examining the competing motions for summary judgment to determine if the regulation can survive strict scrutiny.

### E. Board's Motion for Summary Judgment

As previously noted, to survive strict scrutiny, the Board must show that the examination requirement furthers "a compelling interest" and be "narrowly tailored to achieve that interest." <u>Willey</u>, 27 F.4th at 1129. Indeed, it is the Board's burden to meet this test, rather than Hines's burden to show that the Board fails to meet it. <u>Reed</u>, 576 U.S. at 171. Accordingly, the Court will analyze the Board's motion for summary judgment.

The Court finds that the examination requirement furthers a compelling interest, but it is not narrowly tailored to achieve that interest. As discussed below, the Board has not met its burden.

The Board asserts that the examination requirement advances the following state interests: "(1) protecting public, and animal, health and safety; (2) promoting public confidence in the integrity of state occupational licensing regime and the uniform application of the law; (3) ensuring that veterinarians meet the minimum standards of care and medical recordkeeping; and (4) preventing the spread of zoonotic diseases." Dkt. No. 82, p. 27. The Court will assume for the sake of argument that these interests are compelling. <u>See</u> <u>Williams-Yulee v. Fla. Bar</u>, 575 U.S. 433, 447 (2015) (noting that compelling interests do "not easily reduce to precise definition").

Accordingly, the Court turns to the question of whether the statute is narrowly tailored. "A speech restriction is narrowly tailored to a compelling state interest where it

does no more 'than is necessary to further' the interest." <u>Willey</u>, 27 F.4th at 1133–34. In this instance, whether the statute is narrowly tailored is partially dependent upon how the statute is interpreted.

Under the statute, a veterinarian may not treat an animal unless a veterinarian-client-patient relationship exists. TEX. OCC. CODE § 801.351(a). A veterinarian must have "sufficient knowledge of the animal to initiate at least a general or preliminary diagnosis of the animal's medical condition." § 801.351(a)(2). Sufficient knowledge is present "if the veterinarian has recently seen, or is personally acquainted with, the keeping and care of the animal by examining the animal." § 801.351(b)(1). Furthermore, "veterinarian-client-patient relationship may not be established solely by telephone or electronic means." § 801.351(c).

There are two possible readings of the statute. The first is that once a veterinarian has personally examined an animal and has established the necessary relationship, then the relationship exists in perpetuity and all future contact can be done by telephonic or electronic means. Under this reading of the statute, a veterinarian could offer advice by telephonic or electronic means so long as they had conducted a single physical examination, even if the examination occurred years earlier.

The second reading is that the veterinarian-client-patient relationship exists so long as the veterinarian has sufficient knowledge, which is gained by either by examining the animal or having conducted a recent examination. Accordingly, long gaps between examinations would end the relationship until another examination is conducted. Under this reading of the statute, a veterinarian could not offer services via telephonic or electronic means unless it was done after a recent examination.

The Court finds that the second interpretation is a more faithful reading of the statute: the relationship exists only if the veterinarian has done a recent examination. The statute requires the existence of the relationship and requires the veterinarian to have "sufficient knowledge of the animal to initiate at least a general or preliminary diagnosis of the animal's medical condition." § 801.351(a)(2). The statute requires knowledge of the animal's medical condition, as opposed to just general knowledge of the animal. Like any

living being, an animal's medical condition will change over time.  Thus, the state requires the veterinarian to have performed a recent physical examination in order to have sufficient knowledge.

The Board's argument can be boiled down to this: a recent physical examination is necessary to protect its identified compelling interests, which are, protecting health and safety, promoting public confidence in the integrity of state occupational licensing regime, ensuring that veterinarians meet the minimum standards of care, and the prevention of zoonotic diseases.  It argues that without a physical examination, the risk of misdiagnosis is too great to allow a veterinarian to diagnose an animal's condition. Dkt. No. 82, p. 27. Indeed, the Board argues that the examination requirement is the least restrictive way of achieving these interests. Id., n. 6.

The "essence of narrow tailoring is to focus on the source of the evils the government seeks to eliminate without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." Willey, 27 F.4th at 1134.  Accordingly, the Court finds that the statute is not the least restrictive means for achieving the Board's interests.

In order to prevent misdiagnosis, the Board has placed a blanket restriction on all speech that it not preceded by a recent examination.  There may be instances where Hines's speech, itself, is a misdiagnosis, which creates the evils that the Government seeks to eliminate: unnecessary animal suffering, the spread of zoonotic disease and the loss of public confidence in the state's licensing and supervision of veterinarians.  At the same time, there will also be instances where Hines's speech is not a misdiagnosis and accurately conveys information to animal owners that allows them to care for the animal.

This becomes even more apparent when reviewing the record in the light most favorable to Hines.   Indeed, Dr. Patterson was asked if, after reviewing Hines's correspondence, she could "identify any specific harm that has come to any specific animal because of Dr. Hines' advice." Dkt. No. 83-13, p. 38.  She replied, "No." Id.  She was also unable to identify an instance where Hines's advice resulted in the spread of zoonotic disease. Id.  She did state that there was the "potential" for harm in Hines's advice. Id.

45

A narrowly tailored statute would permit veterinarians to use their professional judgment to determine if they can help an animal owner solely <u>via</u> electronic communication and then discipline veterinarians whose advice falls below professional standards.  This is what Texas veterinarians do now after examining an animal in person; they use their best professional judgment to determine if they can help and disastrous advice leads to professional discipline.  Van Vlerah admitted that the Board places a high priority on investigating cases where an animal dies as a result of a veterinarian's subpar care. Dkt. No. 83-15, p. 4.

Indeed, this is also how Texas treats medical doctors.  It allows a doctor to engage in telemedicine when he or she feels it is appropriate but holds the doctor to "the same standard of care that would apply to the provision of the same health care service or procedures in an in-person setting" and disciplines doctors who fall short of that standard. 22 TEX. ADMIN. CODE § 174.6(a)(1); 22 TEX. ADMIN. CODE § 174.7.  This standard permits speech that does not create the evils that the state is trying to prevent, while allowing the state to discipline medical professionals who do create those evils.

The Court notes that "the government has the burden in strict scrutiny cases of demonstrating that the alternative measures would fail to achieve their interests, not simply that the chosen route is easier." <u>McAllen Grace Brethren Church v. Salazar</u>, 764 F.3d 465, 479 n. 15 (5th Cir. 2014) (internal quotation marks omitted).  There is no evidence in the record that <u>post-hoc</u> enforcement against speech that does not meet professional standards – as opposed to a blanket ban on speech that is not preceded by a recent physical examination – would fail to achieve the state's interests.  If Hines's speech results in harm to animals within the state of Texas, the Board can investigate him and revoke his license.  But a blanket prohibition on his speech sweeps up both the good speech and the bad speech.  The Board has not met its burden of showing that the statute is narrowly tailored.

### F. Hines's Motion for Summary Judgment

Hines is seeking declaratory and injunctive relief.  The Court will analyze whether he has met his burden for this relief.

"The party seeking a permanent injunction must meet a four-part test.  It must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." VRC LLC v. City of Dallas, 460 F.3d 607, 611 (5th Cir. 2006).  The Court notes that when the Government is the defendant, the third and fourth factors "merge." Nken v. Holder, 556 U.S. 418, 435 (2009).  The Court will analyze each element of this test.

### 1. Success on the Merits

Hines must show success on the merits in order to receive permanent injunctive relief. MWK Recruiting Inc. v. Jowers, 833 F. App'x 560, 562 (5th Cir. 2020) (citing Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).  As set out above, Hines has shown that he will succeed on the merits as to his claims that the physical examination requirement violates his First Amendment rights as to animals located in a state where he is licensed to practice veterinary medicine or animals located in a foreign nation.  As such, Hines has met this element.

### 2. Irreparable Injury

Hines must also show that the failure to issue an injunction will result in irreparable injury.  The Court finds that he has met this element.

The Fifth Circuit has held that the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury." Texans for Free Enter. v. Texas Ethics Comm'n, 732 F.3d 535, 539 (5th Cir. 2013).  This is because "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976).  Thus, to the extent that the physical examination requirement unlawfully impinges on Hines's First Amendment rights, it constitutes an irreparable injury.

The Board has argued that Hines has waited too long to vindicate his rights, which cuts against any finding of irreparable harm.  It is true, as a general proposition, that "[a] long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."

11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1.  Courts have routinely rejected motions for preliminary injunctions in cases where the plaintiff waited too long to seek injunctive relief. See Texas v. U.S., 328 F. Supp. 3d 662, 739 (S.D. Tex. 2018) (collecting cases).

The Court has found no cases where a court has denied permanent injunctive relief on the basis that, while the plaintiff had succeeded on the merits, it had waited too long to be entitled to such relief.  Indeed, this very court has declined to grant a preliminary injunction in a case because the plaintiffs waited too long to seek relief, but ultimately granted permanent relief after analyzing cross-motions for summary judgment. See Texas v. U.S., 328 F. Supp. 3d 662, 739 (S.D. Tex. 2018) (declining to issue a preliminary injunction on the grounds that the plaintiff waited too long to seek such relief) & Texas v. U.S., 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021), aff'd in part, vacated in part, remanded, 50 F.4th 498 (5th Cir. 2022) (issuing injunctive relief after analyzing cross motions for summary judgment).

Under the Board's reasoning, it could violate Hines's First Amendment rights with impunity and, if Hines waits too long to vindicate those rights, the Court should hold it against Hines and not stop the Board from engaging in unconstitutional behavior.  This cannot be the proper standard.  While the alleged delay is relevant for the issuance of a preliminary injunction, it is not relevant to the issuance of permanent injunctive relief.  This factor weighs in Hines's favor.

### 3. Balance of Harms & Public Interest

As previously noted, the third and fourth factors – the balance of harms and the public interest – are merged together when the Government is the defendant. Nken, 556 U.S. at 435.  Thus, the Court will analyze them together.

The Court begins by noting that the Board will not be irreparably damaged by being prevented from violating Hines's First Amendment rights. See McDonald v. Longley, 4 F.4th 229, 255 (5th Cir. 2021) (the Government suffers "no harm at all" from being enjoined from violating a plaintiff's First Amendment rights).  Furthermore, protection of constitutional freedoms is always in the public interest. See Agudath Israel of Am. v.

Cuomo, 983 F.3d 620, 637 (2d Cir. 2020) ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal.").

The Board argues that an injunction in Hines's favor would "do irreparable damage to the public's trust in the state's occupational licensing regime" if "the Board cannot regulate the minimum standards of care in the veterinarian profession by imposing the physical examination requirement." Dkt. No. 90, p. 14. The Court finds that the physical examination requirement is not a necessary component of ensuring the minimum standards of care.

Under Texas law, "[a] person providing veterinary telemedicine is subject to the professional standard of care that would apply to the provision of the same services in an in-person setting." 22 TEX. ADMIN CODE § 573.68(d). The Court should not enjoin this provision; if Hines offers veterinary advice that falls below the standard of care required of all veterinarians, he can still be disciplined. Hines would not be given carte blanche to offer substandard opinions over email without fear of discipline any more than he would be given carte blanche to offer substandard veterinary care to an animal that he physically examined. Furthermore, the Court should not enjoin the Texas law which requires veterinarians to keep accurate records of his diagnosis and treatment of animals. 22 TEX. ADMIN. CODE § 573.52. Such provisions protect animals and their owners by ensuring that medical histories are accurate and complete and do not infringe on Hines's First Amendment rights.[11]

The injunction will not create the parade of horribles envisioned by the Board, nor will it leave the Board powerless to prevent substandard veterinary care. The balance of hardships and public interest weigh in favor of permanent injunctive relief.

---

[11] The Court notes that the application of this rule may force Hines to change his record-keeping process to save his emails for at least three years to comply with the law.

## IV. Recommendation

It is recommended that the motion for summary judgment filed by the Board be granted in part and denied in part.  It is also recommended that the motion for summary judgment filed by Hines be granted in part and denied in part.

As to any relief sought to allow Hines to diagnose animals which are located in an American jurisdiction where Hines is not licensed to practice veterinary medicine, the Board's motion for summary judgment should be granted and Hines's motion for summary judgment should be denied.

However, as to any relief sought to allow Hines to diagnose animals which are located in an American jurisdiction where he is licensed to practice veterinary medicine or are located outside of the United States, the Board's motion for summary judgment should be denied and Hines's motion for summary judgment should be granted. 22 Tex. Admin. Code § 573.4.

The Court should issue a declaratory judgment that declaring that Tex. Occ. Code § 801.351; Tex. Occ. Code §§ 801.401-02; Tex. Admin. Code Title 22, Part 24, § 573.27 (Rule of Professional Conduct involving "Honesty, Integrity and Fair Dealing"); and related regulations and practices promulgated or carried out under the Texas Veterinary Licensing Act are unconstitutional as applied to the extent that they prohibit Dr. Hines from providing veterinary advice solely through electronic means without first physically examining the animal that is the subject of that advice, provided that Hines is licensed to practice veterinary medicine in the state where the animal is located or if the animal is located outside of the United States.

The Court should also issue an injunction which enjoins the Texas Board of Veterinary Medical Examiners from enforcing those provisions against Hines in any disciplinary proceedings.  However, the injunction would not enjoin Defendants from enforcing any disciplinary proceedings against Hines – or others similarly situated – for giving veterinary advice and diagnoses that falls below the same standard of care that would apply to the provision of the same health care service after an in-person examination of the animal.  The injunction would also not prevent the Defendants from enforcing the

record-keeping provisions found at TEXAS ADMIN. CODE Title 22, Part 24, § 573.52 for any veterinary care performed by email, telephone, or videoconference.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation in which to file written objections, if any, with the United States District Judge. 28 U.S.C. § 636(b)(1). A party filing objections must specifically identify the factual or legal findings to which objections are being made. The District Judge is not required to consider frivolous, conclusive, or general objections. Battle v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

If any party fails to timely object to any factual or legal findings in this Report and Recommendation, the District Judge is not required to conduct a de novo review of the record before adopting these findings. If the District Judge chooses to adopt such findings without conducting a de novo review of the record, the parties may not attack those findings on appeal, except on the grounds of plain error. Alexander v. Verizon Wireless Servs., L.L.C., 875 F.3d 243, 248 (5th Cir. 2017).

DONE at Brownsville, Texas on December 16, 2022.

Ronald G. Morgan
United States Magistrate Judge