United States District Court
Southern District of Texas
**ENTERED**
August 15, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RONALD S. HINES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:18-CV-155 |
| | § | |
| KEITH PARDUE, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER AND OPINION

Plaintiff Ronald S. Hines is a Texas veterinarian who wishes to provide veterinary advice to pet owners worldwide without having to physically examine their animals. In 2013, the Texas State Board of Veterinary Medical Examiners disciplined Hines for this practice. The Board found that Hines violated Texas law by practicing veterinary medicine without first conducting a physical examination of the animal. Since then, Hines has spent over a decade challenging the law, arguing that these statutory requirements violate his First Amendment right to free speech.[1]

Hines and the Board have cross-moved for summary judgment. Based on the record and the applicable law, the Court agrees with Hines that he has standing to bring his lawsuit. The Court finds, however, that the statutory requirements that he challenges represent a content-neutral regulation of Hines's speech, and that the summary judgment evidence conclusively demonstrates that the Board has met its burden under intermediate scrutiny to support the law's continued enforcement. As a result, Hines is not entitled to any of the relief that he seeks in this lawsuit.

---

[1] Hines filed suit against numerous individual members of the Board. A suit against government employees in their official capacity is "to be treated as a suit against the entity" that employs the defendants. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Three of the named defendants—Jessica Quillivan, Carlos Chacon, and George Antuna—no longer serve on the Board. The new Board members—Steven Golla, Raquel Olliver, and Victoria Whitehead—have been substituted in as proper defendants. *See* Fed. R. Civ. P. 25(d).

## I.      Factual Background and Procedural History

### A.  Texas Veterinary Law

Texas law defines veterinary medicine as "the diagnosis, treatment, correction, change, manipulation, relief, or prevention of animal disease, deformity, defect, injury, or other physical condition, including the prescription or administration of a drug, biologic, anesthetic, apparatus, or other therapeutic or diagnostic substance or technique."  TEX. OCC. CODE ANN. § 801.002(5)(A).   An individual may not practice veterinary medicine without obtaining a license, which requires passing the state licensing exam.  *Id.* at §§ 801.251–801.252.  A person who provides veterinary care without being licensed commits a Class A misdemeanor, punishable by no more than one year of imprisonment, a fine of up to $4,000, or both.  *Id.* at § 801.504(a)–(b); TEX. PENAL CODE ANN. § 12.21.

A licensed veterinarian in Texas "may not practice veterinary medicine unless a veterinarian-client-patient relationship exists".  TEX. OCC. CODE ANN. § 801.351(a).  Establishing such a relationship requires that the veterinarian:

1)  assumes responsibility for medical judgments regarding the health of an animal and a client, who is the owner or other caretaker of the animal, agrees to follow the veterinarian's instructions;

2)  possesses sufficient knowledge of the animal to initiate at least a general or preliminary diagnosis of the animal's medical condition; and

3)  is readily available to provide, or has provided, follow-up medical care in the event of an adverse reaction to, or a failure of, the regimen of therapy provided by the veterinarian.

*Id.* at § 801.351(a)(1)–(3).  In the current case, the second element proves critical.  Under state law, a veterinarian can only possess "sufficient knowledge of the animal" by either "examining the animal; or making medically appropriate and timely visits to the premises on which the animal is kept."  *Id.* at § 801.351(b)(1)–(2).  Texas law expressly precludes a veterinarian from establishing the veterinarian-client-patient relationship "solely by telephone or electronic

means." *Id.* at § 801.351(c).   Together, this set of rules represents the "Examination Requirement" that Hines challenges.

### B. Hines's Veterinary Practice

In 1966, Hines graduated from Texas A&M University with a doctorate in veterinary medicine. (Hines Decl., Doc. 83-1, ¶ 2)  "[S]oon after," he obtained his Texas veterinary license, which he holds to this day.  (*Id.*)  Over the next four decades, he worked for animal hospitals, SeaWorld, and the National Institutes of Health.  (*Id.* at ¶¶ 4, 6)  In 2002, he retired from active practice because the long-term effects of a spinal injury left him unable to "be on [his] feet all day" and "made it too hard to keep up daily veterinary practice."  (*Id.* at ¶¶ 5, 7)

Unable to maintain a veterinary practice in person, Hines created a website called 2ndchance.info, where he posted articles he wrote about pets and pet care.  (*Id.* at ¶ 8)  He created the website because he desired to "help animals" and was concerned that "people around the world do not have access to the type of sophisticated veterinary services available in North America." (Hines 1st Dep., Doc. 82-1, 11, 23:6–22)

Readers of his website began to reach out to him with questions about issues or symptoms facing their pets.  In response, Hines "would tell them what their choices might be, and [] would tell them what [he] had done in that situation in the past, and what [he] might do in that situation in the future."  (*Id.* at 15, 41:21–24)  In general, he "offered them an opinion based on [his] prior experience," but "never offered to treat their pet" and never prescribed medication for an animal. (*Id.* at 29, 96:22–24; *id.* at 32, 109:5–8)

At some point, he began charging readers $8.95 in exchange for the personalized veterinary advice, and at some point, requested only donations.  (*Id.* at 19, 54:19–23; Hines Decl., Doc. 83-1, ¶ 10)  He estimates that between 2000 and 2020, he received inquiries from hundreds and perhaps thousands of people, but he never generated more than a thousand dollars in a single year. (Hines 1st Dep., Doc. 82-1, 18, 53:1–5; *id.* at 29, 96:7–16)

### C.  *Hines I*

In 2012, the Texas State Board of Veterinary Medical Examiners initiated disciplinary proceedings against Hines, alleging that he was providing veterinary care without satisfying the Examination Requirement.  Hines waived a formal adjudicative hearing and, in March 2013, entered into an Agreed Order through which he agreed to discipline, but "without admitting the truth" of the Board's findings and conclusions.  (Agreed Order, Doc. 83-8)  He accepted a year of probation and a $500 fine, and agreed to retake the jurisprudence section of the veterinary licensing exam.

In April 2013, Hines sued the members of the Board in their official capacity.  *See Hines v. Alldredge*, Civil Action Case No. 1:13-cv-056 (S.D. Tex. 2013).  He alleged that by enforcing the Examination Requirement, the Board violated his First Amendment right to free speech, as well as his Fourteenth Amendment rights to equal protection of the law and to engage in one's chosen occupation without arbitrary and irrational interference.

After the Board moved to dismiss Hines's Complaint, the Court dismissed Hines's equal protection and substantive due process claims, but denied the motion as to Hines's First Amendment claim.  The Board then filed an unopposed Motion to Certify for Interlocutory Appeal, which the Court granted.

On appeal, the Fifth Circuit affirmed the dismissal of the equal protection and substantive due process claims, but reversed as to the First Amendment claim.  *See Hines v. Alldredge (Hines I)*, 783 F.3d 197, 201 (5th Cir. 2015).  The court reasoned that because "[s]tates have 'broad power to establish standards for licensing practitioners and regulating the practice of professions'", the "requirement that veterinarians physically examine an animal or the animal's premises before treating it (or otherwise practicing veterinary medicine) falls squarely within this long-established authority, and does not offend the First Amendment."  *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992)).  In doing so, the Fifth Circuit relied on "the professional speech doctrine", which "'except[s]' from normal First Amendment

scrutiny regulations of speech by 'professionals.'" *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 928 n.1, 931 (5th Cir. 2020) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 138 S. Ct. 2361, 2371 (2018)).

As the Fifth Circuit concluded that Hines failed to state a claim under the First Amendment, on remand, this Court entered Final Judgment in the Board's favor as to all of Hines's causes of action.  (Final Judgment, 1:13-cv-056, Doc. 72)

### D. *Hines II*

In June 2018, the U.S. Supreme Court issued *National Institute of Family & Life Advocates v. Becerra*.  In that case, the Supreme Court expressly rejected the professional speech doctrine, explaining that it had not previously "recognized 'professional speech' as a separate category of speech" and that "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *NIFLA*, 138 S. Ct. at 2371–72.

Later that year, motivated by the *NIFLA* decision, Hines filed the current lawsuit to re-urge his cause of action under the First Amendment.  Hines argued that *NIFLA* abrogated *Hines I*, and that he presented a valid free speech claim.  In addition, he alleged anew his claim under the Equal Protection Clause, based on changes to Texas law that allowed doctors to perform telemedicine without first physically examining human patients.

The Board again moved to dismiss, and the Court granted the motion in its entirety, dismissing Hines's causes of action. (Order, Doc. 40 (adopting Report and Recommendation (Doc. 30) in part))

Hines appealed.  While his appeal was pending, the Fifth Circuit issued *Vizaline, L.L.C. v. Tracy*, in which the Fifth Circuit "recognize[d] that, to the extent [*Hines I*] relied on the professional speech doctrine, its reasoning ha[d] been abrogated by *NIFLA*." *Vizaline*, 949 F.3d at 934.

After issuing *Vizaline*, the Fifth Circuit resolved Hines's appeal: "Bound by *Vizaline*, we are no longer bound by *Hines I*."  *Hines v. Quillivan (Hines II)*, 982 F.3d 266, 272 (5th Cir.

2020).  The court affirmed the dismissal of Hines's equal protection claim, but noted that because of *Vizaline*, "Hines' First Amendment claims may be entitled to greater judicial scrutiny than *Hines I* allowed."  *Id.*  The court remanded for this Court "to make the initial evaluation of whether conduct or speech is being regulated."  *Id.*  Specifically, the Fifth Circuit instructed this Court to determine whether the Examination Requirement "regulate[s] only speech, restrict[s] speech only incidentally to [] regulation of non-expressive professional conduct, or regulate[s] only non-expressive conduct."  *Id.* (quoting *Vizaline*, 949 F.3d at 931).

### E.  *Hines II* on Remand

#### 1.  Motion to Dismiss

On remand, a Magistrate Judge obtained additional briefing from the parties and ultimately recommended the denial of the Board's motion to dismiss Hines's First Amendment claim.  (R&R, Doc. 65)  Adopting the Report and Recommendation, this Court explained that "as applied to Hines, [the Examination Requirement] regulates his alleged speech."  (Order, Doc. 68, 4)  In addition, this Court found that the Board's "application of the statute is content-based" and subject to strict scrutiny.  (*Id.* at 6 (relying on *Holder v. Humanitarian L. Project (HLP)*, 561 U.S. 1 (2010)))  Based on these conclusions, the Court denied the Board's motion to dismiss.

#### 2.  Motions for Summary Judgment

The parties engaged in discovery and now move for summary judgment.  (Hines's MSJ, Doc. 83; Board's MSJ, Doc. 82)  In addition to filing responses and replies, the parties submitted additional briefing regarding specific issues that the Magistrate Judge identified, such as whether Hines has "a First Amendment right to offer personalized veterinary advice in a jurisdiction where he is not a licensed veterinarian".  (Order, Doc. 86, 1; *see* Board's Response to Hines's MSJ, Doc. 84; Hines's Response to Board's MSJ, Doc. 85; Hines's MSJ Reply, Doc. 87; Board's MSJ Reply, Doc. 88; Board's Supp., Doc. 90; Hines's Supp., Doc. 91)

In December 2022, the Magistrate Judge issued a Report and Recommendation (Doc. 92), recommending that the competing summary judgment motions be granted in part and denied in part.  The Magistrate Judge distinguished between Hines's communications with pet owners in Texas, in other states, and in other countries.  He concluded that to the extent that Hines provided veterinary advice to pet owners in other states, he engaged in the unlicensed practice of veterinary medicine, making his speech incidental to criminal conduct and thus unprotected by the First Amendment.  (*Id.* at 34)  On the other hand, when Hines provided veterinary advice to pet owners in Texas, he could not be engaged in the unlicensed practice of medicine because he is licensed in this state.  And as to his communications with individuals in other countries, the Board lacks the authority to discipline him for the unlicensed practice of veterinary medicine in foreign jurisdictions.  (*Id.* at 33, 47)  Based on these findings, the Magistrate Judge applied a First Amendment analysis to Hines's communications with pet owners in Texas and foreign countries.

The Magistrate Judge concluded that as applied to Hines, the Examination Requirement regulated pure speech and did so based on the content of the communications.  As a result, the Magistrate Judge applied strict scrutiny and concluded that the challenged regulation was not narrowly tailored to the compelling interests that the Board asserted.  (R&R, Doc. 92, 43–46)  The Magistrate Judge recommended that a permanent injunction issue to prevent enforcement of the Examination Requirement as to Hines and to the extent that he practices veterinary medicine without a physical examination in Texas and in foreign countries.

The parties timely filed objections and responses to the Report and Recommendation.  (Hines's Objs., Doc. 95; Board's Objs., Doc. 96[2]; Hines's Response to Board's Objs., Doc. 97; Board's Response to Hines's Objs., Doc. 98)  Based on the objections, the Court reviews the Report and Recommendation *de novo*.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3).  The

---

[2] Due to a technical error, the Board filed its objections one day after the deadline.  The Board promptly reached out to opposing counsel and to this Court regarding the error.  The Court finds that good cause justifies the late filing and considers the objections timely filed.

Court sustains the objections to the extent that the Report and Recommendation is inconsistent with the findings of fact and conclusions of law within this Order and Opinion.

### 3.   Hines's Communications with Animal Owners

With their respective summary judgment motions, the parties have submitted substantial evidence, including deposition testimony from various witnesses, declarations, expert opinions, and some of Hines's communications with pet owners.  In particular, with respect to the Court's analysis of whether Hines engaged in speech or conduct, the summary judgment record includes representative examples of his emails with pet owners.  In addition, the Board presents the expert opinions of Dr. Carly Patterson and Dr. Lori Teller, who opine regarding whether Hines's communications represented the practice of veterinary medicine and whether Hines provided appropriate veterinary advice to pet owners.  Hines also deposed Kandace Van Vlerah, a senior investigator with the Board and the Board's representative pursuant to Federal Rule of Civil Procedure 30(b)(6).  *See* FED. R. CIV. P. 30(b)(6) (A "named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf".)  Van Vlerah offered insight into how the Board determines which communications represent the practice of veterinary medicine, and testified as to whether Hines engaged in the practice of veterinary medicine in specific instances.[3]  Based on this summary judgment evidence, and in addition to the factual findings previously noted in this Order and Opinion, the Court makes the following findings.

---

[3] The Board objects to various exhibits that Hines offered with his Motion for Summary Judgment.  (Board's Response to Hines's MSJ, Doc. 84, 10)  First, the Board objects to portions of Van Vlerah's deposition testimony in which she testified regarding whether Hines practiced veterinary medicine in specific instances.  The Board argues that such testimony exceeded the scope of the deposition notice under Rule 30(b)(6).  While the Board correctly notes that the deposition notice does not expressly request testimony on this subject, several of the topics, such as Topics 1–2 and 6, when construed broadly, encompass such testimony—if only to provide context for discussing the enumerated subject matters.  The Court overrules the objections to the specified Van Vlerah deposition excerpts.  Second, the Court sustains the foundation and hearsay objections to Exhibit 16, and sustains the relevance and hearsay objections to Exhibits 18 through 22.

### a. Hines Practicing Veterinary Medicine

With respect to the following six examples, at least one of the Board's experts opined that Hines practiced veterinary telemedicine through his communications with animal owners.[4]

### i. Iranian Pigeon (July 2021)[5]

Mohammad Reza Koohpaee, a man living in Iran, emailed Hines about a pigeon that he found in a parking lot. (Iranian Pigeon Emails, Doc. 83-11, 18) Koohpaee wrote that on the advice of "a vet friend", he had wrapped the pigeon's injured wing with a "figure eight style wrap." (*Id.* at 19) Koohpaee asked if the wing could heal and how long to use the bandage. (*Id.*)

In response, Hines attached a diagram and wrote that a hard spot that Koohpaee identified on the pigeon's left wing was "probably a healing fracture." (*Id.*) Hines told him that the local veterinarian "gave [] good advice", and commented that the pigeon "will never fly normally again" but could live a happy life as Koohpaee's pet or in a park where people routinely feed pigeons. (*Id.*) He added that pigeons often have mites, lice, and pigeon flies, and that the best treatment was using a saltshaker to sprinkle carbaryl powder mixed with powdered corn starch on the pigeon's feathers. (*Id.*)

Dr. Patterson opined that Hines was practicing veterinary medicine by "recommending specific bandages and dietary management" for the bird. (Patterson Supp. Report, Doc. 83-12, 6) She opined that Hines was "only making an estimated guess based on very limited information from a layperson." (*Id.* at 5) Van Vlerah also testified that Hines was practicing

---

[4] In all of these specific instances, the parties agree that Hines communicated solely via email, making his provision of medical advice the practice of veterinary *tele*medicine. The parties also agree that Hines did not physically examine or visit the premises of any of these animals, either before or after his communications.

[5] With respect to the specific instances described in this Order and Opinion, Hines's communications all occurred between 2020 and 2022. Hines did not produce earlier communications, testifying that the email account he uses to exchange emails with pet owners "has a rather low data cap," so when it becomes full, he deletes older emails, including emails from pet owners. (Hines 1st Dep., Doc. 82-1, 17, 49:1–4) The Board requests "an adverse inference due to spoliation," as Hines acknowledges deleting emails after the filing of this lawsuit. (Board MSJ, Doc. 84, 16 n.10) Courts draw an adverse inference against "a party who intentionally destroys important evidence in bad faith". *Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008). For electronically stored information, courts require a finding "that the party acted with the intent to deprive another party of the information's use in the litigation." *Eagan v. Walgreen Co.*, No. 21-20352, 2022 WL 683636, at *3 (5th Cir. Mar. 8, 2022) (quoting FED. R. CIV. P. 37(e)(2)). In the present matter, the Court finds that no evidence indicates that Hines intentionally deleted emails to prevent the Board or the Court from viewing evidence. In addition, neither party argues that Hines's communications with animal owners before 2020 differed materially from his communications between 2020 and 2022. As a result, the Court declines to apply an adverse inference due to spoliation against Hines.

veterinary medicine because he was "providing treatment recommendations regarding the injury of an animal -- or bird." (Van Vlerah Dep., Doc. 83-15, 18, 51:13–18)  And Dr. Teller agreed because Hines "recommended a specific course of treatment for Reza's pigeon and even provided him with a diagram showing the location of the likely injury." (Teller Report, Doc. 82-1, 250)

### ii.  Iranian Bird (August 2021)

Mali Zia, who lives in Iran, sent Hines a picture of a bird's broken leg.  (Iranian Bird Emails, Doc. 83-11, 13–15)  Zia reported that she found the bird when it was three weeks old, had been feeding it, and had "broke[n] her leg accidentally" when giving the animal a chance to fly.  (*Id.* at 15)  Zia reported that a local doctor had tied up the bird's leg, a picture of which she attached.  She asked Hines, "Is there any chance for her?"  (*Id.*)

Hines responded that "[i]t appears from your photograph that the broken bone has now healed in the wrong position."  (*Id.* at 42)  He explained that fixing the bone would "require cutting the bone if possible and putting it in a proper splint."  (*Id.*)  He advised Zia that a hand surgeon or jewelry maker in Iran would be in the best position to help, as they would have the tools necessary to make the splint.  (*Id.*)

Zia replied with an x-ray of the bird's leg, noting that she could not move the bird into a good position. (*Id.* at 2–3)  She also reported that she could not sleep at night because she blamed herself for breaking the bird's leg.  (*Id.* at 2)

Hines responded that the x-ray showed the bird's bones were too soft and that it was calcium deficient.  (*Id.* at 20)  He recommended that Zia add crushed calcium carbonate, like Tums, to the bird's diet.  (*Id.*)  Hines told Zia the calcium deficiency probably caused the leg to break and reassured her that "it was not [her] fault!"  (*Id.*)  Hines finished the email by saying, "This is what needs to be done:", but the email cuts off at that point.  (*Id.*)

After reviewing these communications, Dr. Patterson opined that Hines was practicing veterinary medicine by "detailing a fracture management plan" for Zia's bird.  (Patterson Supp.

Report, Doc. 83-12, 6)  Van Vlerah agreed, reasoning that Hines was "diagnosing a calcium deficiency and he is also recommending treatment with the use of calcium supplements." (Van Vlerah Dep., Doc. 83-15, 19, 52:13–15)  And Dr. Teller reached the same conclusion, explaining that Hines "reviewed photos and an x-ray and diagnosed the bird with calcium deficiency.  He recommended a specific course of treatment for the bird's calcium deficiency." (Teller Report, Doc. 82-1, 252)

Dr. Teller also concluded that Hines "potentially left [the] bird in a worse position by failing to refer Mali to a local veterinarian, disparaging the quality and competency of Iranian veterinarians, diagnosing calcium deficiency and prescribing calcium based on an image taken before Mali gave the bird 2-3 weeks of Osteocare Calcium (and without reviewing the newest imaging), and seemingly giving her a treatment plan that was cut off in the documents produced during discovery." (*Id.* at 253)

### iii. Cat From Unknown Location (April 2022)

Yael Rosen, from an unknown location, emailed Hines about her five-year-old seal point Ragdoll cat named Sofia.  (Unknown Cat Emails, Doc. 83-11, 45)  A local veterinarian conducted blood tests on Sofia, removed fluid from the cat's chest, and diagnosed it with heart failure.  (*Id.*)  Rosen listed the medications that the cat was receiving and asked if Sofia should be seen by a veterinary cardiologist.  (*Id.*)

Hines identified several possibilities for Sofia's symptoms, including cardiomyopathy, feline infections peritonitis, and lymphoma.  (*Id.*)  He provided links to various articles on his website about each disease.  (*Id.*)  And he added that if Sofia was suffering from cardiomyopathy, he would recommend giving the cat "a human taurine supplement". (*Id.*)

Dr. Patterson opined that Hines was practicing veterinary medicine by recommending the taurine supplement for the cat.  (Patterson Supp. Report, Doc. 83-12, 10–11)  Dr. Teller agreed, as Hines "provided differential diagnoses for Yael's cat and provided several treatment plans", and because Hines "recommended taurine without indicating the strength, dosage,

frequency, and length of time to administer, nor the route of administration and potential side-effects." (Teller Report, Doc. 82-1, 255)

Dr. Teller also concluded that when advising the cat's owner, "Hines had no basis for eliminating other possible differential diagnoses" and "insufficient information to determine that the cat was taurine-deficient." (*Id*.) Instead, a "physical examination was necessary first" to "eliminat[e] differential diagnoses." (*Id*.) Dr. Teller opined that Hines "most likely left [the] cat in a worse position by failing to instruct Yael to go to the veterinary cardiologist and providing differential diagnoses and treatment plans that could only be eliminated with laboratory results and imaging." (*Id*.)

### iv. Indian Puppy (May 2022)

Uday Bhaskar, who lives in India, emailed Hines about a two-month-old puppy that was run over by a car tire. (Indian Puppy Emails, Doc. 83-11, 43)  Bhaskar wrote that the puppy could not move one of its legs and appeared to be in pain. (*Id*.)  He asked Hines if he could "advise any first aid or course of treatment as" he did not "have any vet within a range of 25 km." (*Id*.)

Hines informed Bhaskar that there was little he could do to help. (*Id*.)  Hines stated that if the problem was "just one leg, then the leg is probably broken." (*Id*.)  He wrote that the treatment for such an injury was stainless steel rods or external supports, but that any external supports would need to be frequently changed for a growing dog. (*Id*.)  He also wrote that if both rear legs were problematic, then the puppy's spine was likely broken, and no treatment option existed "for that in dogs or humans." (*Id*.)

Dr. Patterson opined that Hines was practicing veterinary medicine by "advising a specific prognosis" for the dog's injuries. (Patterson Supp. Report, Doc. 83-12, 5)  She expressed concern as to whether the dog had suffered internal or neurological injuries that could also be causing the symptoms. (*Id*.)  Van Vlerah similarly testified that Hines was practicing veterinary medicine because he was "providing treatment recommendations and a potential diagnosis."

(Van Vlerah Dep, Doc. 83-15, 14, 44:23–25)   And Dr. Teller agreed, explaining that Hines was practicing veterinary medicine because he "provided a differential diagnosis that Uday's puppy either had a broken leg or back, and made a prognosis (which is incorrect) that there is no treatment for a broken back." (Teller Report, Doc. 82-1, 247)

Dr. Teller also opined that Hines "potentially left the puppy in a worse position than when he found it by failing to refer Uday to a local veterinarian, failing to provide Uday with emergency first aid advice, providing Uday with possibly a false prognosis, providing Uday with an incomplete differential diagnosis, suggesting a treatment plan for Uday that was not indicated, and finally by ignoring Uday's follow up email seeking clarification and offer to send photos of the puppy." (*Id.* at 248)

### v.  New Hampshire Dog (November 2021)

Anne Broussard, a woman living in New Hampshire, emailed Hines about her 19-month-old Japanese Chin dog, which had received a Cytopoint injection to prevent scratching. (N.H. Dog Emails, Doc. 83-11, 26)   After receiving the shot, the dog slept 60 to 90 minutes each night before waking up, shaking and barking frantically, and scratching the floor repeatedly before falling back asleep. (*Id.*)   Broussard advised that these behaviors were new, and she wondered if they were side effects from the shot. (*Id.*)

Hines wrote back that the dog's behavior "might be related to an antibiotic resistant staphylococcus skin infection, exposure to fleas, a dietary allergy or even mange mites", and that it was "extremely unusual for Apoquel and Cytopoint not to stop itching due to environmental allergies". (*Id.*)   He provided a link to an article on his website as to the best products to prevent fleas and mites, and explained that a "skin culture would tell you if staph is involved and which antibiotics work best to cure it." (*Id.*)   He added that "all those decisions need to be made in consultation with your local veterinarians." (*Id.*)

Van Vlerah testified that Hines engaged in the practice of veterinary medicine in this communication, as he was "providing a diagnosis and treatment recommendations." (Van Vlerah Dep, Doc. 83-15, 17, 47:11–12)

In contrast, Dr. Patterson opined that Hines was not practicing veterinary medicine in this email exchange. (Patterson Supp. Report, Doc. 83-12, 7–8) She did not explain how she came to this conclusion or what separated this email from the others where she thought he did practice veterinary medicine.

### vi. British Bird (June 2022)

Helen Scott, a woman living in the United Kingdom, emailed Hines about a young great tit bird in her care. (British Bird Emails, Doc. 83-11, 49) Scott noted that a local veterinarian had splinted the bird's injured leg, but the bird had managed to remove the splint. (*Id.*) She attached a video of the bird and expressed concern that the uninjured leg would cross the injured leg and inhibit the bird's motion. (*Id.*)

In response, Hines explained that the bird would need both legs in tape shackles "for a while". He provided a link to an article he had written about curing spraddle leg in birds. (*Id.*) He added, "But we still need to talk about how that is safely done and for that I need your telephone number." (*Id.*)

The next day, Hines sent a follow up email, noting that the bird appeared to be fully grown, which "makes matters worse." (*Id.* at 11) He explained that Scott did "not need a veterinarian" but instead "an arborist because bones assume the same position a shrub or tree assumes if it is held at a certain angle." (*Id.*) He suggested that Scott undertake "the construction of some very light weight wire device that can slowly be adjusted to guide the bones to a more proper angle", and included a diagram that he had drawn for the device. (*Id.* at 11–12)

Dr. Patterson opined that Hines was practicing veterinary medicine because he was recommending a treatment plan for the bird. (Patterson Supp. Report, Doc. 83-12, 4) She expressed concern that Hines may have estimated the bird's age incorrectly and that Scott would

be unable to construct the device correctly. (*Id.*) Dr. Teller agreed, as Hines "recommended a specific course of treatment for Helen's great tit and even provided her with a diagram of how to construct the device." (Teller Report, Doc. 82-1, 245–46)

Dr. Teller also opined that Hines "most likely left the bird in a worse position" through his veterinary advice. (*Id.* at 246) She explained that Hines and Scott disagreed on the bird's likely age, with Scott estimating that the bird was five to six weeks old, while Hines believed the bird to be fully grown. (*Id.* at 245–46) According to Dr. Teller, "Hines's tape shackles treatment plan appears to be premised on the belief that Helen's bird is fully grown". (*Id.* at 246) Given the uncertainty about the bird's age, a "physical examination was necessary before embarking on a specific course of treatment". (*Id.* at 245) Ultimately, Dr. Teller concluded Hines "*should* have referred Helen back to her treating veterinarian or to a veterinary specialist in the U.K." where she lived, instead of telling her to "contact a male watch maker for tiny tools, an arborist to ascertain the shape of local shrubs, and . . . construct tape shackles based on a diagram he drew". (*Id.* at 246 (emphasis in original))

### b.  Hines Not Practicing Veterinary Medicine

As to the following two examples, the Board's experts opined that Hines did not engage in the practice of veterinary medicine through his communications with the animal owners.

### i.  West Virginia Dog (November 2020)

Linda Riley, a woman living in West Virginia, emailed Hines about her seven-year-old golden retriever. (W.V. Dog Emails, Doc. 83-11, 28–29) Her dog received a Cytopoint injection for excessive itching and scratching, but the problem only worsened. (*Id.* at 28) Riley added that the dog began throwing up a few days after receiving the shot, and the local veterinarian gave the dog hydration and a corticosteroids shot. (*Id.*) Riley noted that the dog continued to suffer from diarrhea, despite being placed on a bland diet. (*Id.*)

Hines responded with a series of questions:

> Did your vet run any laboratory tests and if so might you know the results?  You mentioned that "nothing has returned to baseline".  Are the corticosteroids helping?  Was it a long-term steroid shot like Depo?  It's not that I want to interfere, it's just that I would like to make some sense out of all the data that folks like you are willing to share with me.

(*Id.*)  He wrote that Riley should consider contacting the manufacturer of Cytopoint and asking for their advice, noting that some manufacturers cover the veterinary costs associated with their medications' side effects.  (*Id.*)

Riley replied, explaining that her local veterinarian did not think her dog's symptoms were related to the injection because the adverse reaction was not close enough in time.  (*Id.* at 27)  She added that her dog experienced cycles of throwing up and having diarrhea, followed by periods of being able to keep food down and maintaining normal bowel movements.  (*Id.*)  She also wrote that no blood work had been performed.  (*Id.*)  And she informed Hines that she had adopted a new puppy before the golden retriever's symptoms began, and the local veterinarian thought that the new puppy might be a cause of her dog's health issues.  (*Id.* at 28)

Hines continued the exchange, asking if her dog had a history of intermittent diarrhea and if Riley had ever noticed extraneous things in her dog's stools, like leaves or food wrappers.  (*Id.* at 27)  He asked a series of questions, such as whether her dog was small for a golden retriever and whether the dog was a pure breed.  (*Id.*)  He also noted that the new puppy could be a source of intestinal parasites.  (*Id.*)  Hines explained that Riley would need to make sure that her dog had no other health issues that would predispose it to suffering from diarrhea, such as inflammatory bowel disease.  (*Id.*)  And he added that blood tests could reveal more information, but explained that if the dog was "already on the road to recovery," the tests "might already be normal or close to it."  (*Id.*)

Dr. Patterson opined that Hines was not practicing veterinary medicine in this email exchange.  (Patterson Supp. Report, Doc. 83-12, 8)  She did not explain how she came to this conclusion or what separated this email from others where she thought Hines practiced veterinary medicine.

### ii. Dog From Unknown Location I (March 2022)

Cathy Armstrong, from an unknown location, emailed Hines about her Australian cattle dog.  (Unknown Dog I Emails, Doc. 83-11, 30)  She wrote that her dog's energy level waned after it received Cytopoint injections for itching.  (*Id.*)  The dog eventually died of a brain cancer, and Armstrong believed that the Cytopoint injections "either caused or made the tumor worse."  (*Id.*)

Hines responded, expressing condolences and inquiring where Armstrong lived and whether the dog had also received oral Apoquel.  (*Id.*)  He wrote that he believed that the manufacturer of Cytopoint should place "an age warning" on the medication, notifying pet owners of the risks associated with the treatment.  (*Id.*)

Dr. Patterson opined that Hines was not practicing veterinary medicine in this email exchange.  (Patterson Supp. Report, Doc. 83-12, 10)  She did not explain how she came to this conclusion or what separated this email from the others where she thought he did practice veterinary medicine.  In her deposition, Dr. Patterson admitted that it was sometimes difficult for her to determine if Hines was practicing veterinary medicine.  (Patterson Dep., Doc. 83-13, 13, 72:3–15)

Van Vlerah also testified that Hines's communication did not represent the practice of veterinary medicine, categorizing the email as "just a simple conversation between [Hines] and Cathy Armstrong in regards to Cytopoint injections."  (Van Vlerah Dep., Doc. 83-15, 21, 54:20–22)

### c. Hines's Other Communications with Animal Owners

With respect to the following three examples, the Board's experts did not provide any opinions as to whether Hines engaged in the practice of veterinary medicine through his communications with the animal owners.  The Court includes these examples to demonstrate additional exchanges between Hines and animal owners that the Board does not appear to contend represent the practice of veterinary medicine.  The Examination Requirement would not apply to Hines in connection with these types of communications.

### i.  Florida Dog (March 2021)

Amy Pentkowski, from Florida, emailed Hines about her sister's dog, Zippy.  (Fla. Dog Emails, Doc. 83-11, 47)  Pentkowski asked Hines if he would "go forward with radiation and/or chemo" if Zippy was his dog.  (*Id.*)  She attached a veterinarian's report, which indicated that Zippy had an anal sac carcinoma and that the local veterinarian was not recommending surgery or radiation.  (*Id.* at 50–51)

Hines replied that based on the tumor's "difficult location", he "would just keep Zippy comfortable." (*Id.* at 47)  He explained that he could not think "of any place more difficult to get to surgically or as unlikely to remove all the cancer" and that he was worried about the chances that Zippy would be unable "to defecate or urinate after such a surgery".  (*Id.*)  Hines added that the choice was ultimately about what Pentkowski's "sister and her family members are capable and willing to agree to." (*Id.*)

### ii.  Glasgow Cat (April 2021)

Marie Shannon, from Glasgow, Scotland, emailed Hines about her cat, named Butterfly, who had accumulated fluid in her chest.  (Glasgow Cat Email, Doc. 83-11, 4)  The record contains Hines's response, but not Shannon's initial email.

Hines began by writing that a "big problem" for him in helping Shannon was that he did not have access to "Butterfly's radiologist's report or her laboratory blood analysis report." (*Id.*)  He identified several possible causes of fluid in the chest, including heart issues, cancers, and mutant coronaviruses.  (*Id.*)  He expressed that was he was "disappointed in the University of Glasgow that they are not treating this as a crisis situation and are making you wait until Monday" to be seen.  (*Id.*)  He recommended that Shannon ask her local veterinarian to measure Butterfly's systolic blood pressure and oxygen saturation levels because "an extremely low blood protein level and/or anemia might also exhibit the symptoms" she described.  (*Id.*)  He added that Butterfly should be tested for feline leukemia.  (*Id.*)

### iii. Dog From Unknown Location II (March 2022)

Keitheley Wilkinson, from an unknown location, emailed Hines about a 10-year-old female terrier mix that she owned and that had died a month earlier after being diagnosed with lymphoma.  (Unknown Dog II Emails, Doc. 83-11, 37–41)  Wilkinson informed Hines that "a canine organophosphate test [] showed a lowered cholinesterase level."  (*Id.* at 40)  She indicated that the dog was allergic to the Kikuyu grass in the area where they lived, and that the dog likely ate some of the grass, which contained an herbicide, glufosinate-ammonium.  (*Id.* at 38)  Wilkinson inquired about the relationship between the herbicide and the lowered cholinesterase levels, as well as any possible links between the herbicide and canine cancers. (*Id.* at 38–39)

In response, Hines asked if the dog had been diagnosed with a T lymphocyte lymphoma or a B lymphocyte lymphoma and whether the lymphoma was "specific enzyme positive." (*Id.* at 36)  Wilkinson answered that a local veterinarian would charge $500 to run the necessary tests to find out.  (*Id.* at 35)  She asked Hines if the test was "absolutely necessary to assess the findings of the dog's organophosphate findings".  (*Id.*)  Hines responded: "No. Do not order that test."  (*Id.*)  He added, "No information exists as to any connection between exposure to herbicides and insecticides in dogs and the particular lymphocyte involved."  (*Id.*)

Wilkinson wrote back, thanking Hines and noting that she would "wait for [his] assessment on the findings already given to" him.  (*Id.*)  Hines followed up by writing that the active ingredient had not been linked to cancers "of any kind," but that it was "conceivable" that it contributed to the dog's chronic gastroenteritis.  (*Id.* at 34)  He also noted that Wilkinson had reported that the dog had received Cytopoint injections, which "reduce interleukin 31 levels," and that such reduction "contributes to the growth of follicular lymphoma" in humans.  (*Id.* at 35)  He clarified that this effect was related solely to T-cell origin lymphomas, which explained his initial interest in whether the lymphomas were T-cell or B-cell.  (*Id.*)

## II.    Standard of Review

"Summary Judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The burden is on the moving party to identify "those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf*, 485 F.3d at 261. If the moving party makes this showing, the burden shifts to the nonmoving party, which "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

"In cases involving cross-motions for summary judgment, 'the motions are reviewed independently, with evidence and inferences taken in the light most favorable to the nonmoving party.'" *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 (5th Cir. 2019) (quoting *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005)).  In a nonjury case, "[i]f a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge properly should 'draw [] inferences without resort to the expense of trial.'"[6]  *Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991) (quoting *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978)).

---

[6]  Neither Hines nor the Board has demanded a jury trial.

### III.    Analysis

The parties' cross-motions for summary judgment center around two disputes.  First, the parties dispute whether Hines has standing to challenge the Examination Requirement without proof that his speech was chilled.  Second, as to the First Amendment claim, the parties present competing analyses.  Hines contends that as applied to him, the Examination Requirement regulates pure speech based on its content, is subject to strict scrutiny, and does not survive such demanding review.  In the alternative, he argues that the Examination Requirement regulates his speech incidentally to conduct, triggers intermediate scrutiny, and fails to satisfy that standard as well.[7]  The Board, on the other hand, contends that the Examination Requirement regulates only Hines's non-expressive conduct and does not implicate any form of heightened review.  In the alternative, the Board argues that the Examination Requirement regulates his speech incidentally to conduct, requiring the application of intermediate scrutiny, which the law survives.  Finally, the Board argues that even if the Examination Requirement does regulate pure speech, the regulation is content neutral and survives both intermediate and strict scrutiny.

The Court will address each issue in turn.

### A.    Standing

The Board contends that Hines lacks standing to challenge the Examination Requirement because his speech was never chilled.

"To have standing, a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), *as revised*

---

[7] In his Motion for Summary Judgment, Hines also appears to challenge the Examination Requirement as "overbroad, vague, and underenforced in the real world." (Hines MSJ, Doc. 83, 22)  After the Board contended that Hines's Complaint did not include such allegations, Hines replied that he did not present these issues as "separate claims", but merely as part of the tailoring analysis. (Hines's MSJ Reply, Doc. 87, 20)  Based on this reply, the Court does not reach whether the Examination Requirement would survive a constitutional challenge for vagueness, overbreadth, or selective enforcement.

(Oct. 30, 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Based on the record in the case, the Court concludes that Hines meets all three elements to establish standing.

### 1.  Injury in Fact

Hines alleges a pre-enforcement challenge to the Examination Requirement, claiming that the Texas law violates his First Amendment rights.  "A plaintiff bringing such a challenge need not have experienced 'an actual arrest, prosecution, or other enforcement action' to establish standing." *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  In a First Amendment challenge, a "plaintiff has suffered an injury in fact if he (1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) his intended future conduct is 'arguably . . . proscribed by [the policy in question],' and (3) 'the threat of future enforcement of the [challenged policies] is substantial.'" *Speech First*, 979 F.3d at 330 (quoting *Susan B. Anthony List*, 573 U.S. at 161–64 (alterations in original)).  To establish these three elements, a plaintiff's "theory of standing" can rely on his "future speech [being] chilled" by an unconstitutional law. *Seals v. McBee*, 898 F.3d 587, 593 n.13 (5th Cir. 2018), *as revised* (Aug. 9, 2018).  Alternatively, a plaintiff may base his "theory of standing" solely on a "credible threat of future prosecution". *Id.*

Hines readily satisfies the first two elements.  He has continued emailing pet owners and does not intend to stop.  (*See, e.g.*, Hines Decl., Doc. 83-1, ¶ 12)  And in 2013, this behavior—namely, emailing pet owners veterinary advice without conducting a physical examination—led to disciplinary action against him.  His intended conduct arguably implicates his First Amendment rights, demonstrating that he intends to engage in conduct affected by a constitutional interest, and that the Examination Requirement proscribes such conduct.

As to the third element, a sufficiently substantial threat of enforcement exists to support standing.  "[W]here 'the State has not disavowed any intention of invoking' the challenged law, plaintiffs are 'not without some reason in fearing prosecution'". *Barilla*, 13 F.4th at 432

(quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)).  For this reason, "[p]ast enforcement of speech-related policies can assure standing", while "a lack of past enforcement does not alone doom a claim of standing".  *Speech First*, 979 F.3d at 336; *see also Susan B. Anthony List*, 573 U.S. at 164 (finding the threat of future enforcement "substantial" given the "history of past enforcement"); *Seals*, 898 F.3d at 592 (finding standing where the state "ha[d] disavowed [the plaintiff's] prosecution" for violating the contested law but "concede[d] that [the plaintiff] actually violated the statute and [wa]s legally subject to prosecution").

In this case, the Board has confirmed that it still enforces the statute.  (Van Vlerah Dep., Doc. 83-15, 13, 39:6–8)  And the Board disciplined Hines in 2013 for violating it.  (*See* Agreed Order, Doc. 83-8)  While it is true that the Board has not attempted to discipline Hines during the pendency of litigation or during the three years between his two lawsuits, this inaction alone does not defeat standing.  *See Meltzer v. Bd. of Pub. Instruction of Orange Cnty.*, 548 F.2d 559, 571 n.25, 573 (5th Cir. 1977), *on reh'g*, 577 F.2d 311 (5th Cir. 1978) (concluding that a case or controversy existed despite the non-enforcement of the statute at issue during the seven-year litigation).  The law's continuing force and Hines's continuing violation of the statute suffice to establish a credible threat of prosecution.  Hines has thus established that he suffered an injury in fact.

The Board argues that because Hines alleges in his Complaint that his speech was chilled, and the summary judgment record indicates that he has continued to email pet owners, he cannot establish standing.  The law, however, allows Hines to establish standing with or without a chilling effect.  "Chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Hous. Chron. Publ'g Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007).  But even if a regulation does not chill speech, a credible threat of enforcement alone can support standing. *See Seals*, 898 F.3d at 593 n.13 (noting that the court "need not opine on" the plaintiff's chilling "theory of standing . . . because Seals faces a credible

threat of future prosecution based on his past violation"). In the present case, as Hines brings a pre-enforcement challenge, he must prove a credible threat of enforcement regardless of whether he alleges his speech was chilled. *Compare Speech First*, 979 F.3d at 330 (requiring a credible fear of prosecution to substantiate a chilling injury in fact), *with Seals*, 898 F.3d at 593 n.13 (requiring a credible fear of enforcement only to support standing). He has done so.

The Board also contends that to the extent that the summary judgment record establishes that Hines's activity was not chilled—i.e., that he has continued to engage in the practice of veterinary medicine without physically examining the animal patient—he engaged in a fraud on the court by alleging a fact that he knew could not be supported. The Court is not persuaded. "To establish fraud on the court, 'it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision.'" *First Nat'l Bank of Louisville v. Lustig*, 96 F.3d 1554, 1573 (5th Cir. 1996) (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978)). Fraud on the court "only" includes "the most egregious conduct, such as bribery of a judge or members of a jury" and "fabrication of evidence". *Rozier*, 573 F.2d at 1338. "Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court". *Id.* In the present case, while it is true that Hines alleges that his speech was chilled, but discovery has demonstrated that he has continued to communicate with pet owners, this discrepancy does not amount to the fabrication of evidence or similarly "egregious" conduct necessary to show a fraud on the court.

The Court concludes that Hines has alleged an injury in fact.

### 2. Traceability

Standing also requires "a causal connection between the injury and the conduct complained of" to ensure the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). "[A]n injury resulting from the application or threatened

application of an unlawful enactment remains fairly traceable to such application". *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647 (2022).

Here, the Board acknowledges that it enforces the Examination Requirement and has enforced this statute in the past against Hines.  Hines can sue the members of the Board in their official capacity because they have "'some connection with the enforcement of the act' in question", are "'specially charged with the duty to enforce the statute' and" are "threatening to exercise that duty." *Tex. Dem. Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (quoting *Okpalobi v. Foster*, 244 F.3d 405, 414–15 (5th Cir. 2001)).  As a result, Hines has demonstrated an alleged injury that is fairly traceable to the Board's conduct.[8]

### 3. Redressability

Finally, redressability ensures it will "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Bennett*, 520 U.S. at 167.

Hines seeks a declaratory judgment that "Tex. Occ. Code § 801.351; Tex. Occ. Code §§ 801.401-02; Tex. Admin. Code Title 22, Part 24, § 573.27 (Rule of Professional Conduct involving 'Honesty, Integrity and Fair Dealing'); and related regulations and practices promulgated or carried out under the Texas Veterinary Licensing Act are unconstitutional as applied and on their face to the extent that they prohibit Dr. Hines from providing veterinary advice solely through electronic means without first physically examining the animal that is the subject of that advice". (Complaint, Doc. 1, 34)   In addition, he requests an injunction preventing the Board from enforcing those "unconstitutional statutes, regulations, and practices against Dr. Hines".  (*Id.*)  Granting Hines his requested relief and enjoining the Board from enforcing the statutes will redress any suppression of Hines's speech stemming from the laws' enforcement.  The injunction will relieve the threat of criminal prosecution and administrative penalties.  *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006)

---

[8] On July 27, 2023, the Board informed the Court that effective September 1, 2023, the Board's rulemaking and enforcement powers will transfer to the Texas Department of Licensing and Regulation.  (Advisory, Doc. 100)  The Board suggests that this change in Texas law will render Hines's lawsuit moot.  (*Id.*)  The Court, however, need not reach that issue, as jurisdiction currently exists in this lawsuit.

("Potential enforcement of the statute caused the [] self-censorship, and the injury could be redressed by enjoining enforcement".).

The Board challenges redressability on the grounds that other provisions of Texas law prohibit Hines's intended conduct.  For example, the Board cites to Section 573.24(a) of Title 22 of the Texas Administrative Code, construing that regulation as impliedly requiring veterinarians to conduct a physical examination of the animal to be treated.  This provision, contends the Board, would authorize the requirement of a physical examination even if the Court enjoined enforcement of the specific laws that Hines challenges.[9]  This argument fails, however, because Hines has sought a declaratory judgment that any statute, regulation, or rule that prohibits him from offering personalized veterinary advice to pet owners without a prior physical examination is unconstitutional and cannot be enforced against him.  As a result, the requested relief would redress Hines's injuries as to any Texas law that prohibits his activity with respect to pet owners.

For these reasons, Hines has satisfied the elements of injury in fact, traceability, and redressability.  He possesses standing to pursue his claims against the Board.

### B.  First Amendment Analysis

Satisfied that Hines has standing to pursue his lawsuit, the Court turns to its central mandate:  determining whether the Examination Requirement "regulate[s] only speech, restrict[s] speech only incidentally to [the] regulation of non-expressive professional conduct, or regulate[s] only non-expressive conduct."  *Hines II*, 982 F.3d at 272 (quoting *Vizaline*, 949 F.3d at 931) (cleaned up).

Previously, in its Order denying the Board's motion to dismiss, the Court concluded that the Examination Requirement represented a content-based regulation of Hines's speech.  (Order, Doc. 68)  Now, upon further consideration of the issue, and with the benefit of

---

[9] The Court notes that this line of reasoning cuts against the Board's argument that Hines does not face a credible threat of prosecution.  The Board is arguing that even if the Court enjoined enforcement of the Examination Requirement, the Board could, and presumably would, enforce an analogous requirement through other regulations.

additional briefing and discovery in this case, the Court reaffirms that the challenged statute regulates Hines's speech, but finds that the regulation is content neutral and subject to intermediate scrutiny.

### 1. Speech Versus Conduct

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *NIFLA*, 138 S. Ct. at 2371.  In cases brought under the Free Speech Clause, a court at times must initially determine whether the challenged law abridges the freedom of speech or merely impacts an individual's non-expressive conduct.  A court's conclusion on this threshold question impacts the standard, if any, that the state must satisfy to justify the law's continued enforcement.  For example, some laws affect only an individual's non-expressive conduct and do not present First Amendment concerns.  *See, e.g.*, *United States v. Hansen*, 143 S. Ct. 1932, 1946 (2023) (noting that laws prohibiting "smuggling noncitizens into the country", "providing counterfeit immigration documents", and "issuing fraudulent Social Security numbers to noncitizens" restrict "nonexpressive conduct—which does not implicate the First Amendment at all").  In those cases, the court does not analyze the state's motivation in passing the law or the statute's breadth.  At the other end of the spectrum, some laws directly prohibit certain communications or compel individuals or organizations to disseminate a particular message.  *See, e.g.*, *HLP*, 561 U.S. at 27–28 (concerning a law that banned speech amounting to "material support" of terrorist organizations); *NIFLA*, 138 S. Ct. at 2369 (involving a law requiring pregnancy crisis centers to inform patients about public programs offering abortion services).  In those instances, if the regulation is content based—i.e., if it "target[s] speech based on its communicative content"—the law is "presumptively unconstitutional and may be justified only if the government proves that" the challenged regulation is "narrowly tailored to serve compelling state interests." *NIFLA*, 138 S. Ct. at 2371 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).  On the other hand, if the law regulates speech in a neutral fashion, the state must satisfy intermediate scrutiny, which

generally requires the state to show that the regulation is "sufficiently drawn to achieve" a "substantial" interest. *NIFLA*, 138 S. Ct. at 2375.[10]

Some cases rest in between regulating pure speech and solely regulating non-expressive conduct. For example, a law may focus only on an individual's non-expressive conduct, but still have an impact on the individual's speech. *See, e.g.*, *id.* at 2373 (noting that a law requiring physicians to obtain informed consent prior to abortion procedures regulated speech incidentally to professional conduct—namely, performing the procedure). In such circumstances, courts also apply intermediate scrutiny. *See Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 209 (4th Cir. 2019) (finding "intermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech" (citing *Ohralik v. Ohio Bar Ass'n*, 436 U.S. 447, 460 (1978))).

As a general matter, regulations of conduct prescribe what a person "must *do*". *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 60 (2006) (emphasis in original). In *Rumsfeld*, the Court concluded that a law requiring law schools to give military recruiters equal access to on-campus recruiting events regulated conduct and not speech, reasoning that the law affected "what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* (emphasis in original); *see also id.* at 62 (noting that laws prohibiting racial discrimination in hiring "will require an employer to take down a sign reading 'White Applicants Only'" but that "hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct"); *Hansen*, 143 S. Ct. at 1946.

At times, laws focus on conduct, but impose an incidental impact on speech. For example, the Supreme Court has explained that a price regulation such as "a law requiring all New York delis to charge $10 for their sandwiches" would regulate conduct by dictating how much money a deli owner could charge. *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017). Such a law, however, would also affect the deli operators' speech by changing the

---

[10] Courts have applied varying iterations of intermediate scrutiny to different types of speech, as discussed *infra* Part III.B.3.

price listed on the menu or changing how employees communicated about those prices.  This impact would only "indirectly dictate the content of that speech" because "the law's effect on speech would be only incidental to its primary effect on conduct".  *Id.*

In other cases, courts have concluded that regulations that directly dictate the content of speech can nevertheless represent only the regulation of conduct with an incidental impact on speech.  Informed consent requirements represent such an example.  Those regulations require doctors to communicate specific information to patients before a procedure.  Even though such regulations mandate specific messages, courts consider them as laws regulating "speech only 'as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State.'"  *NIFLA*, 138 S. Ct. at 2373 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)) (emphasis in original).

Turning to the present matter, the Court must consider whether the Examination Requirement regulates only Hines's speech, only his non-expressive conduct, or his non-expressive conduct with an incidental restriction on his speech.  As a general matter, the Examination Requirement expressly concerns only conduct.  A veterinarian must establish a veterinarian-client-patient relationship before providing veterinary advice to animal owners.  And to establish a veterinarian-client-patient relationship, the veterinarian must conduct a physical examination of the animal or visit the premises where the animal is kept.  The physical examination or site visit represents pure non-expressive conduct.

But Hines presents an as-applied challenge.  As a result, the Court examines the statute in relation to the facts of this particular case, and not whether the law would be constitutional as applied to every action taken by every veterinarian in Texas.  *See HLP*, 561 U.S. at 28 (considering the law at issue as applied to the plaintiffs, even though the law was generally directed at conduct); *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) ("An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular

speech activity, even though the law may be capable of valid application to others."). Courts first consider the statute's "primary effect". *Expressions Hair Design*, 581 U.S. at 47. But even when a law generally regulates conduct, if the state directs the law at an individual because "of what his speech communicate[s]", the law is considered to regulate speech. *See HLP*, 561 U.S. at 28 (citing *Cohen v. California*, 403 U.S. 15 (1971)). As a result, "a statute or a rule may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971).

Hines argues that as applied to him, the Examination Requirement regulates his speech. He points out that his sole interaction with animal owners consists of email exchanges. He neither physically examines the animal nor visits the premises on which the animal is kept. At most, he reviews the animal's medical records, pictures, or videos that the owner provides to him.

Given the nature of Hines's interaction with pet owners, the Court agrees that the Examination Requirement primarily regulates his speech. In an as-applied challenge, the key to determining when the government is regulating speech and when it is regulating conduct is to look at what "trigger[s] coverage under the statute". *HLP*, 561 U.S. at 28. If it is "communicating a message", then the statute as applied to the plaintiff regulates speech. *Id.* While Hines may engage in some conduct, such as reviewing an animal's medical records or reaching a diagnosis based on those medical records and his professional experience, his activity that triggers the Board's enforcement of the Examination Requirement is his communication with pet owners. The Board claims that "words, alone, <u>can</u> constitute[] conduct". (Board's Objs., Doc. 96, 4 (emphasis in original)) But while that statement may be valid in some circumstances, the position does not hold true here. It is Hines's communication with pet owners that subjects him to potential discipline. His emails trigger the government's application of the law. And those communications represent speech.

The Board also argues that the Examination Requirement concerns solely conduct because Hines "would be subject to disciplinary action for failing to perform a physical examination prior to diagnosing an animal—even if he never communicated that diagnosis to the pet owner." (Board's Objs., Doc. 96, 7)  This statement sweeps too broadly.  For example, Hines could access and review information about a specific animal via the internet.  He could mentally apply his experience and knowledge to reach a specific diagnosis, technically engaging in veterinary medicine as defined by Section 801.002(5) of the Texas Occupation Code.  But considering such conduct the unlawful practice of veterinary medicine or as conduct subject to professional discipline would be inconsistent with basic First Amendment principles against criminalizing thought.  *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) ("First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end."); *see also Ex parte Harrington*, 499 S.W.3d 142, 148 (Tex. App. Houston—[14th Dist.] 2016, pet. ref'd) ("An offense must have an *actus reus*." (citing *Ramirez-Memije v. State*, 444 S.W.3d 624, 627 (Tex. Crim. App. 2014))).  The Board's statement reflects only that in a normal context, a veterinarian's conduct—e.g., physically examining an animal and reaching a diagnosis—and the veterinarian's speech—i.e., communicating the diagnosis to an animal owner—go hand in hand.  This scenario may lead to the conclusion that as generally applied, the Examination Requirement could be viewed as regulating conduct with an incidental burden on speech.  But when applying the Examination Requirement to Hines, the Board focuses on his speech with animal owners.  Ultimately, were Hines to merely review an animal's medical records and reach a diagnosis, but not subsequently communicate with the pet owner, the Board almost certainly would have no cause to enforce the Examination Requirement against him.

On this issue of conduct versus speech, Hines correctly analogizes to the Supreme Court's analysis in *HLP*.  That case concerned an as-applied challenge to a prohibition on providing terrorist groups "material support", defined as any "service, including . . . training,

expert advice or assistance".  18 U.S.C. § 2339A(b)(1).  The statute further defined "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge", and defined "expert advice or assistance" as "advice derived from scientific, technical or other specialized knowledge." *Id.* at § 2339A(b)(2)–(3).  In defense of the statute's constitutionality, the government argued that the material support provision only regulated speech incidentally to conduct.  The Supreme Court, however, disagreed, explaining that while the material support ban could "be described as directed at conduct, . . . as applied to plaintiffs the conduct triggering coverage under the statute consist[ed] of communicating a message." *HLP*, 561 U.S. at 28.  As applied to the plaintiffs, the Supreme Court concluded, the material support ban restricted their speech.  In the same manner, Hines wishes to provide veterinary advice to pet owners by communicating with them via email, and it is this activity that leads the Board to threaten disciplinary action against him.  Although the Examination Requirement is generally directed at conduct, as applied to Hines's activities, the Board is directing the Examination Requirement to prohibit his speech.

### 2.  Content Neutral Versus Content Based

Having concluded that the Examination Requirement, as applied to Hines, regulates his speech, the Court must consider whether the law is content neutral or content based.  This analysis determines whether the state must satisfy intermediate or strict scrutiny to defend the regulation.  *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC (Reagan Nat'l II)*, 142 S. Ct. 1464, 1475 (2022) (concluding that intermediate scrutiny applies to a content-neutral regulation); *Reed*, 576 U.S. at 165 (applying strict scrutiny to a content-based regulation).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163.  The court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011)).  Even when a law is facially neutral, a court may find it content based if the law "cannot be

'justified without reference to the content of the regulated speech'" or if the law was "adopted by the government 'because of disagreement with the message [the speech] conveys'". *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (alteration in original). On the other hand, the state may examine the speech at issue if necessary to apply neutral regulations, without triggering strict scrutiny. *Reagan Nat'l*, 142 S. Ct. at 1472–73. The *Reed* decision does not stand for the proposition that strict scrutiny automatically applies if, in order to determine how to apply a regulation, a "reader must ask: who is the speaker and what is the speaker saying". *Id.* at 1471 (quoting *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin (Reagan Nat'l I)*, 972 F.3d 696, 706 (5th Cir. 2020)).

Based on these principles, the Court concludes that to the extent that the Examination Requirement affects Hines's speech, it does so neutrally.[11] The Board's enforcement of the Examination Requirement does not depend on what veterinary advice Hines provides to the pet owner. In that respect, the Examination Requirement remains agnostic. For example, the State has not deemed certain veterinary advice acceptable, and other forms of advice harmful, disfavored, or disagreeable. The Examination Requirement applies neutrally to all forms of veterinary care and veterinary speech.

Hines correctly notes that the Board must analyze his communications with pet owners to determine whether he has violated the Examination Requirement. But this fact does not render the regulation content based. The Supreme Court has explained that its "precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *Reagan Nat'l II*, 142 S. Ct. at 1473. For example, in examining regulations differentiating between signs advertising on-premises and

---

[11] In *Hines I*, the Fifth Circuit also concluded that the Examination Requirement represented a content-neutral regulation. *See Hines I*, 783 F.3d at 201–02. The parties contest whether this finding survived *NIFLA*. (*See* Board's Response to Hines's MSJ, Doc. 84, 12 (arguing that "the Fifth Circuit already ruled that the physical examination requirement is content neutral" (emphasis in original)); Hines's MSJ Reply, Doc. 87, 11 (contending that the Fifth Circuit's reasoning on the issue "was squarely rejected within *NIFLA*'s rejection of the professional speech doctrine")) Given the Court's independent finding that the Examination Requirement is content neutral, the Court need not reach whether the Fifth Circuit's resolution of the content-based versus content-neutral analysis in *Hines I* rested on the professional speech doctrine and has been, as a result, undermined by *NIFLA*.

off-premises businesses, the Supreme Court explained that "enforcing the [] challenged sign code provisions requires reading a billboard to determine whether it directs readers to the property on which it stands or to some other, offsite location." *Id.* at 1472. Despite the need to analyze the substance of the billboard, such a regulation was not "content-based" because "[a] sign's substantive message itself is irrelevant to the application of the provisions". *Id.* The Supreme Court analogized to regulations of solicitations, explaining that "[t]o identify whether speech entails solicitation, one must read or hear it first." *Id.* at 1473. Nevertheless, solicitation restrictions represent content-neutral regulations, "so long as they do not discriminate based on topic, subject matter, or viewpoint." *Id.*

The same can be said of the Examination Requirement. The Board must review Hines's emails to determine whether they represent the practice of veterinary medicine, akin to reviewing billboards to view the content of the advertisements or reading a communication to determine whether it represents a solicitation. If the Board finds that one of Hines's emails does not constitute the practice of veterinary medicine, the Board has no basis to discipline him for sending that email. On the other hand, if the Board concludes that a message contains veterinary advice, the Board applies the Examination Requirement to determine whether Hines established the required veterinarian-client-patient relationship before engaging in the practice of veterinary medicine. In conducting this analysis, however, the Board does not determine whether it agrees with the content of Hines's messages or approves of the topics or subject matter discussed. The substance of Hines's veterinary advice proves irrelevant to the application of the Examination Requirement. The Board merely reviews the emails to gauge whether Hines, before engaging in those communications, must satisfy that requirement.

Hines's specific communications with animal owners, and the Board's position as to those communications, demonstrates this principle. As previously described in this Order and Opinion, Hines's emails with animal owners vary in terms of substance and length. (*See supra* Part I.E.3) The Board has not taken the position that Hines engaged in the practice of veterinary

medicine in each of those communications, or that he had to satisfy the Examination Requirement before engaging in any of those email exchanges.  On the contrary, the Board expressly acknowledges that some of those communications do not represent the practice of veterinary medicine.  To reach that conclusion, however, the Board had to examine the emails—not to determine whether it agreed with or approved the veterinary advice, but solely to gauge whether the communication amounted to veterinary advice.  The need for this review does not transform the Examination Requirement into a content-based regulation.

Hines essentially proposes a test that automatically applies strict scrutiny whenever the state must review an individual's communications to determine whether to apply a regulation.  But accepting this approach not only runs contrary to the applicable law, it leads to unreasonable results.  For example, his position would require the application of strict scrutiny to the threshold requirement that veterinarians be licensed.  Texas requires that veterinarians obtain and maintain a veterinary license.  *See* TEX. OCC. CODE ANN. § 801.251.  An unlicensed individual cannot establish a valid veterinarian-client-patient relationship, even if the individual has physically examined the animal at issue.  To determine whether an individual has provided veterinary advice without a license, the Board at times would have to analyze the individual's communications with the pet owner.  Based on the need for this review, Hines's position would automatically subject the license requirement to strict scrutiny.  But the Court is unaware of any judicial decision requiring a state to satisfy strict scrutiny to justify a licensing requirement for veterinarians.  *Cf. Brokamp v. James*, 66 F.4th 374, 393 (2d Cir. 2023) (finding that a state licensing requirement for mental health professionals was content neutral and thus subject to intermediate scrutiny because the "license requirement applies—regardless of what is said").

A similar result occurs with the legal practice.  As with veterinary medicine, states restrict who may practice law.  A person cannot engage in the practice of law without a law license, and in most states, such as in Texas, a person cannot obtain a license without passing the bar exam.  Tex. Rules Govern. Bar Adm'n R. II(6) (2021).  For the state to determine

whether an unlicensed individual has engaged in the unauthorized practice of law by providing legal advice to other persons, the state must analyze the individual's communications. Under Hines's analysis, the need to review those communications would render the statute a content-based restriction of the individual's speech. Of course, courts have rejected this position. *See Osborne v. Travis Cnty.*, 638 Fed. App'x 290, 293 (5th Cir. 2016) (finding that requiring individuals to pass the bar exam to practice law did not present "a plausible constitutional violation", despite the plaintiff's attempt to frame the regulation as violating the First Amendment right to free speech); *see also Doyle v. Palmer*, 365 F. Supp. 3d 295, 304 (E.D.N.Y.), *aff'd*, 787 F. App'x 794 (2d Cir. 2019) (finding New York's sponsor affidavit requirement for bar admission did not violate the plaintiff's free speech rights).

In light of Hines's unworkable test, and because the Board does not restrict Hines's speech based on viewpoint or on the topics or subject matter discussed when providing veterinary advice, the Court concludes that the Examination Requirement represents a content-neutral regulation of speech.[12] As a result, the Court will apply intermediate scrutiny.

### 3.  Intermediate Scrutiny

In constitutional law, "intermediate scrutiny" ordinarily requires a challenged law to be "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (describing the intermediate scrutiny standard in a claim under the Equal Protection Clause); *see also NIFLA*, 138 S. Ct. at 2375 (requiring the government to show a regulation is "sufficiently drawn to achieve" a "substantial" interest to survive intermediate scrutiny).

In the context of the Free Speech Clause, courts have applied varying iterations of intermediate scrutiny to different types of speech. These standards are similar, with some distinctions. For example, regulations of expressive conduct are "sufficiently justified if" the regulation: (1) "is within the constitutional power of the Government"; (2) "furthers an

---

[12] In light of this conclusion, the Court need not consider the Board's position that if the Examination Requirement represented a content-based regulation, the Court should "recognize a new category of content-based speech that is not subject to strict scrutiny." (Board's Response to Hines's MSJ, Doc. 84, 14)

important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).  When analyzing restrictions on commercial speech, courts require that the government: (1) "assert a substantial interest to be achieved by restrictions on commercial speech"; (2) show that "the restriction [] directly advance[s] the state interest involved"; and (3) that the "speech restrictions [are] 'narrowly drawn'".  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564–65 (1980) (quoting *In re Primus,* 436 U.S. 412, 438 (1978)); *see also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995).  With respect to the second prong of the *Central Hudson* standard, the government cannot rely on "mere speculation or conjecture", but must show evidence of "real" harm that the restriction materially alleviates.  *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).

Courts also apply intermediate scrutiny to time, place, or manner restrictions effectuated through content-neutral regulations.  *See Reagan Nat'l II*, 142 S. Ct. at 1475 (describing the inquiry for time, place, or manner restrictions as "intermediate scrutiny").  "A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 482 (5th Cir. 2022) (quoting *Turner Broad. Sys., Inc. v. F.C.C. (Turner II)*, 520 U.S. 180, 189 (1997)); *see also Reagan Nat'l Advert. of Austin, Inc. v. City of Austin (Reagan Nat'l III)*, 64 F.4th 287, 293 (5th Cir. 2023) (explaining that under "intermediate scrutiny" any "restriction on speech or expression must be narrowly tailored to serve a significant governmental interest" (cleaned up)).

In the present matter, at the motion to dismiss stage, the Board presented its alternative argument that if intermediate scrutiny applied, the *O'Brien* test would control because the Examination Requirement regulated only conduct.  (Board R&R Objs., Doc. 66, 8–9)  But this

position suffers from two deficiencies.  First, the Court has determined that as applied to Hines, the Examination Requirement regulates pure speech, rendering the *O'Brien* test for expressive conduct inapplicable.  In addition, courts appear to apply the *O'Brien* test only where the action at issue was not written or spoken word.  *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 403 (1989) (flag burning); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 286 (5th Cir. 2001) (school uniforms).  This Court has located no Supreme Court or circuit precedent applying *O'Brien* to a regulation that applied to a profession and that affected both conduct and speech.  And the parties did not cite any.

In their summary judgment briefing, the parties predominantly rely on the *Central Hudson* standard, as applied in *Sorrell v. IMS Health Inc.*  (*See, e.g.*, Board's MSJ, Doc. 82, 27; Hines's Response to Board's MSJ, Doc. 85, 19)  But *Sorrell* concerned commercial speech, as did *Central Hudson.*  *See Sorrell*, 564 U.S. at 557 (involving a challenge to a state law "restrict[ing] the sale, disclosure, and use of pharmacy records that reveal the prescribing practices of individual doctors"); *Central Hudson*, 447 U.S. at 559–61 (concerning a ban on commercial advertising by electric utilities).  In the present case, neither party contends that Hines proposes a commercial transaction in connection with his communication of veterinary advice.  As a result, the *Central Hudson* standard proves a poor fit.

Ultimately, the Court concludes that the Examination Requirement, which represents a content-neutral regulation, should be analyzed as a time, place, or manner restriction.  While the Examination Requirement may not resemble a typical time, place, or manner restriction on speech, the nature in which the Board applies the Examination Requirement to Hines best represents a restriction on the manner in which he may engage in veterinary medicine—i.e., by first physically examining the animal.  As a result, to pass constitutional muster, the Examination Requirement must "advance[] important governmental interests unrelated to the suppression of free speech and [] not burden substantially more speech than necessary to further those interests."  *NetChoice*, 49 F.4th at 482.  The Board also must demonstrate that the

Examination Requirement is "narrowly tailored to serve a significant governmental interest". *Reagan Nat'l III*, 64 F.4th at 293 (cleaned up). "[T]he government's burden . . . 'is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction . . . must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Sarre v. City of New Orleans*, 420 F. App'x 371, 375 (5th Cir. 2011) (quoting *Fane*, 507 U.S. at 770–71).

Hines concedes that the Board's asserted interests—public and animal health and safety, public confidence in licensure, maintaining minimum standards of care, and preventing the spread of zoonotic diseases—are "substantial". (Hines's Response to Board's MSJ, Doc. 85, 19) He also does not present evidence that the Examination Requirement was created or applied to him specifically to suppress speech. As a result, no genuine dispute of material fact exists as to the importance of the government's interests or as to the requirement that the asserted interests be unrelated to the suppression of speech.

Instead, Hines contends that the Examination Requirement does not "directly advance" a "real harm" because the Board cannot prove his advice harmed any animals.[13] Effectively, he argues that the Examination Requirement is insufficiently tailored to survive intermediate scrutiny. *See, e.g.*, *Turner Broad. Sys., Inc. v. F.C.C. (Turner I)*, 512 U.S. 622, 664 (1994) (analyzing whether the legislature's "recited harms [were] real" and were materially alleviated by the challenged law as part of the tailoring analysis).

### a. Real Harm

The Board must first demonstrate that the Examination Requirement addresses a real harm. The government cannot rely on "mere speculation or conjecture". *Fane*, 507 U.S. at 770. Evidence of real harm can include "studies", "anecdotal evidence", or instances of the plaintiff's "own conduct". *Id.* at 771. Courts view such evidence in light of "common sense". *Went For It*,

---

[13] Hines bases this argument on commercial speech caselaw, specifically the second prong of the *Central Hudson* test. (*See, e.g.*, Hines's MSJ Resp., Doc. 85, 19 (relying on *Sorrell*)) While the Court finds the specific iteration of intermediate scrutiny from *Central Hudson* inapplicable, courts have applied the "real harm" inquiry to time, place, or manner restrictions that regulated speech neutrally. *See, e.g.*, *Sarre*, 420 F. App'x at 375–76.

515 U.S. at 628 (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992)).   While a legislature cannot conjure harms out of whole cloth to justify legislation, lawmakers can enact statutes to proactively prevent identified harms.   *See Turner I*, 512 U.S. at 665 ("Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable."); *see also Free Speech Coal.*, 535 U.S. at 264 (O'Connor, J., concurring) ("[T]his Court's cases do not require Congress to wait for harm to occur before it can legislate against it.").

In the present case, the Board relies on three primary types of evidence.   First, the Board presents studies emphasizing the importance of the Examination Requirement.   The literature indicates that veterinary telemedicine creates "risks of missed diagnoses" and, as a result, experts question whether states should allow the virtual creation of a veterinary-client-patient relationship.   (Literature Rev., Doc. 82-1, 364)   In one survey of veterinarians, "most participants acknowledged that the service provided by teleconsultations is complementary to that of physical consultations but stressed the need for having a face-to-face interaction before resorting to telematic means."   (*Id.*; *see also id.* at 366 ("Veterinarians with exotic animal practices . . . recogni[z]e the advantages of teleconsulting and the potential benefit for situations with a recent hands-on examination of the patient, but they have concerns about establishing a direct relationship with a client and providing care to the patient without a physical exam".))

Second, the Board presents an expert, Dr. Carly Patterson, who opines on the importance of the physical examination, describing it as the "cornerstone of all veterinary care." (Patterson Report, Doc. 82-1, 114)   "Without it," she continues, "veterinarians are left to aimlessly pursue diagnostics that might be needless and in the worst case scenario, completely circumvent the actual problem at hand, resulting in the death of the patient."   (*Id.*)   In her report, she presents five cases from her professional experience in which the physical examination yielded critical information that telemedicine alone would fail to capture.   (*Id.* at

119–22)  For example, she details her treatment of a two-year-old Schnauzer brought in for "waxing and waning shifting leg lameness." (*Id.* at 122)  Dr. Patterson notes, "The history and description of clinical signs from the owner sounded very much like an immune-mediated polyarthritis case, but the physical exam informed us otherwise." (*Id.*)  Upon further examination, "[t]he dog had palpable cervical pain on neurologic examination and the Neurology Section recommended advanced imaging (MRI) of her neck for potential neurologic causes of spinal pain." (*Id.*)  She concludes that "had [she] not performed a comprehensive physical examination with neurologic assessment, [she] would have missed an important component of establishing the dog's diagnosis." (*Id.*)  The other four examples provide similar instances in which the physical examination revealed important information that the veterinarian could not obtain solely from verbal or written communications with the pet owner.[14]

Finally, the Board submits the opinions of another expert, Dr. Lori Teller, who reviewed Hines's emails with pet owners and opines that Hines "likely" harmed animals through his veterinary advice.  She provides specific examples of deficiencies in Hines's communications with various animal owners, concluding that with respect to Rosen's cat and Scott's bird, Hines's advice likely left each animal in a "worse position".  And Dr. Patterson likewise testified that Hines's advice could have harmed the Unknown Cat, the Indian Pigeon, and the British Bird. (Patterson Dep., Doc. 82-1, 216, 213:19–25; *id.* at 217, 214: 1–2)

Taken together, the evidence on which the Board relies demonstrates the materiality and substantive reality of the harms that the Board fears.  The scholarly literature evidences a concern that telemedicine without a prior physical exam can result in misdiagnoses.  While experts in the field may disagree about the need for a physical examination, the debate alone does not negate the potential harm.  Legislatures may assess competing evidence and make reasonable decisions to prevent harm. *See Turner I*, 512 U.S. at 665.  In addition, the submitted

---

[14] Consistent with Dr. Patterson's views, Hines's own website includes a term of use that reads: "Dear Viewer, There is no substitute for direct, hands-on examination of your pet." (Terms of Use, Doc. 82-1, 379)

expert opinions reveal multiple concrete examples when a veterinarian would have reached the wrong diagnosis and incorrect treatment plan absent a physical examination of the animal. Common sense instructs that treating an animal incorrectly causes harm—both by failing to treat the animal's true ailment and by subjecting it to the additional risks from unnecessary treatment. And another expert opines that in specific cases involving Hines, his diagnoses without a physical examination likely resulted in improper treatment plans.

Critically, Hines presents no controverting evidence. He challenges the sufficiency of the Board's evidence, but submits no competing expert testimony or any empirical data of his own. Instead, he relies primarily on the argument that the Board presents only possible harms that could have occurred, without identifying any actual harm. But, while it is true that no evidence conclusively reveals that an animal has suffered harm by receiving veterinary care without the benefit of a physical examination, the Board need not "wait for harm to occur before it can legislate against it." *Free Speech Coal.*, 535 U.S. at 264 (O'Connor, J., concurring). The scientific literature and expert testimony demonstrate a credible risk of real harm. And the absence of any controverting evidence means that no genuine issue exists on the matter. The Court finds that the summary judgment evidence proves an actual harm that is not "merely conjectural".

### b.  Material Alleviation

For a regulation to be sufficiently drawn under intermediate scrutiny, the government must demonstrate that the "restriction will in fact alleviate" the real harm "to a material degree." *Fane*, 507 U.S. at 771. Importantly, the regulation need not be the least speech-restrictive means of achieving the government's interest. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989). "Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Reagan Nat'l III*, 64 F.4th at 293 (quoting *Rock Against Racism*, 491 U.S. at 799). For example, the Supreme Court has concluded that time-limited bans on

soliciting accident victims and their relatives materially alleviate the harm of privacy intrusion and harm to the legal profession's reputation. *Went For It*, 515 U.S. at 626–28; *see also Moore v. Morales*, 63 F.3d 358, 363 (5th Cir. 1995) (reaching a similar conclusion as to a Texas Penal Code provision prohibiting such solicitation, as applied to attorneys); *Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 225–26 (5th Cir. 2011) (finding that a rule of professional conduct restricting attorneys' use of "a nickname, moniker, motto or trade name that states or implies an ability to obtain results in a matter" materially addresses the harm resulting from "misleading lawyer advertising" (cleaned up)). In *Moore*, the accident victims' ability to opt out of such solicitation communications did not preclude the government's ability to show material alleviation because when seeking to alleviate a harm, the government "is not required to employ the least restrictive means in promoting its interest." *Moore*, 63 F.3d at 363.

Applying these principles to the challenged regulation in this lawsuit, the Court finds that the Examination Requirement is narrowly tailored to the government's asserted interests. By imposing the Examination Requirement to establish a veterinary-client-patient relationship, Texas law ensures that veterinarians possess information that proves important in many cases involving veterinary care. The data that veterinarians obtain through the physical examination of an animal typically cannot be secured by any other means.

Moreover, Texas law carves out "emergency situation[s]" in which veterinarians cannot perform a physical examination in a timely fashion. In such circumstances, "a veterinarian may, after determining the nature of the emergency and the condition of the animal, issue treatment directions to a non-veterinarian by means of telephone, electronic mail or messaging, radio, or facsimile communication", without having to physically examine the animal beforehand. 22 TEX. ADMIN. CODE § 573.10(j). Through this provision, Texas recognizes the potential benefits of telemedicine, but tailors it to cases where the preferred approach—i.e., veterinary care after a physical examination—is impractical. Accordingly, the Court finds that the Examination Requirement materially alleviates a real harm.

Because the Examination Requirement is narrowly tailored to the Board's substantial interests, which are unrelated to the suppression of speech, the Court finds that based on the applicable law and the record in this case, the Examination Requirement withstands intermediate scrutiny.[15]

## IV.   Conclusion

For the reasons stated above, the Board may continue to enforce the Examination Requirement without violating Hines's free speech rights.  Based on this conclusion, Hines is not entitled to injunctive relief.[16]

It is:

**ORDERED** that Plaintiff Ronald S. Hines's Motion for Summary Judgment (Doc. 83) is **DENIED**;

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. 82) is **GRANTED** on the grounds explained in this Order and Opinion; and

**ORDERED** that Plaintiff Ronald S. Hines's claims based on the First Amendment to the United States Constitution are **DISMISSED WITH PREJUDICE**.

The Court will separately issue a Final Judgment in accordance with this Order and Opinion.

Signed on August 15, 2023.

Fernando Rodriguez, Jr.
United States District Judge

---

[15] The Court notes that application of the *O'Brien* or *Central Hudson* standard would lead to the same conclusion— i.e., the Board has demonstrated that the Examination Requirement satisfies the iteration of the intermediate scrutiny standard that these cases establish.

[16] In addition, the Court's conclusion renders it unnecessary to reach the Board's argument that Hines's conduct is speech integral to a crime and, as a result, unprotected.  The Court thus need not consider the sections of the Report and Recommendation distinguishing between Hines's communications with individuals in Texas, other states, and foreign countries.